**SEEGER WEISS, LLP**
Christopher A. Seeger
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
Facsimile:  (973) 639-9393

**KESSLER TOPAZ**
**MELTZER & CHECK LLP**
Darren J. Check
David Kessler
Matthew L. Mustokoff
Michelle M. Newcomer
Margaret E. Mazzeo
Joshua A. Materese
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiff First Manhattan Co.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| FIRST MANHATTAN CO.,<br><br>        Plaintiff,<br><br>  v.<br><br>PERRIGO COMPANY PLC, JOSEPH C. PAPA, JUDY L. BROWN, AND MARC COUCKE,<br><br>        Defendants. | Civ. No. 2:18-cv-02291-MCA-LDW<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u><br><br>**ECF CASE** |

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................................2

  A.  Defendants Misled Investors by Representing that "Tremendous Revenue Synergies" and Operating Efficiencies from the Omega Acquisition Were Driving Perrigo's Standalone Value ..................................................................3

  B.  Defendants Falsely Claimed that Perrigo's Revenues Were "Insulated" from Pricing Pressures in the Generic Drug Industry ...........................................11

  C.  Defendants Concealed Perrigo's Price-Fixing of Generic Drugs ..........................13

  D.  Defendants Misrepresented the True Value of the Tysabri Royalty Stream .........15

  E.  The Truth Is Revealed after Mylan's Failed Takeover Attempt............................15

II.  JURISDICTION AND VENUE .........................................................................18

III.  PARTIES AND RELEVANT NON-PARTIES ................................................19

  A.  Plaintiff ...............................................................................................................19

  B.  Defendants ..........................................................................................................19

  C.  Relevant Non-Parties ..........................................................................................21

IV.  SUBSTANTIVE ALLEGATIONS OF DEFENDANTS' FRAUD ..................24

  A.  Perrigo's Operations ...........................................................................................24

  B.  Perrigo Acquired Omega to Expand Its International Market Presence and then Touted Its Value to the Company's Growth Strategy and Financial Prospects Through Synergies and Operational Efficiencies...................................25

  C.  Mylan Begins Its Takeover Attempt....................................................................28

  D.  Defendants Misled Investors Concerning the Omega Acquisition and the Company's Growth Prospects while Rejecting Mylan's Multiple Offers .............29

    1.  Unbeknownst to Investors, Omega Was Nowhere Near the Point of Contributing to Perrigo's Bottom Line or Growth ....................................32

    2.  Defendants Were Fully Informed of, and Recklessly Disregarded, the Myriad, Debilitating Issues that Were Plaguing Omega.....................37

    3.  Defendants Imposed Unrealistic Financial Targets on Omega, which They Knew or Should Have Known Could Not Be Achieved........42

  E.  Defendants Misled Investors about Perrigo's Supposed Insulation from Pricing Pressures ................................................................................................44

    1.  The FDA's Accelerated Approvals for New Generic Drugs Reaches Record Levels in 2015 .................................................................45

    2.  Defendants Knew or Recklessly Disregarded that the Pricing Levels for Perrigo's U.S. Generic Drugs Were Unsustainable.................50

F.     Perrigo Colluded with Its Competitors to Fix Prices in the Generic Drug Markets ...................................................................................................53

      1.    By Law, the Generic Drug Market in the U.S. Is Designed for Drugs to Reach Equilibrium Price Points ......................................53

      2.    Perrigo Colluded to Fix Prices for Several of Its Generic Drugs ..............54

      3.    Desonide ..........................................................................................55

      4.    Other Generic Drugs .......................................................................65

      5.    Perrigo's Reporting Chain for Generic Drug Pricing ...............................66

      6.    Government Investigations into Perrigo's Anti-Competitive Conduct ...........................................................................................67

G.    Defendants Falsely Represented the Fair Value of the Tysabri Royalty Stream, Perrigo's Largest Financial Asset .............................................70

      1.    Perrigo Is Required to Adhere to GAAP ...................................71

      2.    Perrigo Admitted that It Violated GAAP by Misclassifying the Tysabri Royalty Stream .................................................................73

      3.    Through Perrigo's GAAP Violations, Defendants Concealed Billions of Dollars of Deterioration in Fair Value ......................75

H.    Perrigo Issued Aggressive, Unsupported Financial Guidance.............................76

I.     Perrigo Campaigned Against Mylan's Hostile Takeover Attempt and Continued to Mislead Investors .......................................................78

J.     Perrigo Convinced First Manhattan and the Assignors to Reject Mylan's Tender Offer.......................................................................80

V.    THE TRUTH EMERGES...............................................................................84

VI.   DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT .................................................95

A.    Statements Concerning the Omega Acquisition and the Valuation of Mylan's Offers ..............................................................................95

      1.    April 21, 2015 Press Release, Rejection Call, Presentation, and Earnings Release ............................................................................95

      2.    May 4, 2015 Meeting with Papa at First Manhattan................................99

      3.    May 6, 2015 Deutsche Bank 40th Annual Health Care Conference .......100

      4.    May 12, 2015 Bank of America Merrill Lynch Health Care Conference ...................................................................................101

      5.    June 2, 2015 GSK Call and Presentation ................................103

      6.    June 2, 2015 Jefferies Global Healthcare Conference ............................104

      7.    June 23, 2015 Oppenheimer Consumer Conference................................105

      8.    July 22, 2015 Meeting with Papa at First Manhattan ...........................106

9. August 5, 2015 Earnings Call ................................................................107

10. August 6, 2015 Investor Presentation ...................................................107

11. August 13, 2015 Form 10-K .................................................................108

12. September 17, 2015 Press Release.........................................................109

13. September 17, 2015 Conference Call ....................................................109

14. September 17, 2015 Letter to Shareholders..........................................110

15. September 17, 2015 Morgan Stanley Healthcare Conference ................111

16. September 30, 2015 Meeting with Brown at First Manhattan...............111

17. October 22, 2015 Earnings Call and Presentation ..................................112

18. November 2, 2015 Form 10-Q..............................................................112

19. January 5, 2016 Goldman Sachs Healthcare Conference .......................113

20. January 11, 2016 JPMorgan Healthcare Conference ..............................114

B. Statements Concerning Generic Drug Pricing.....................................................114

1. April 21, 2015 Rejection Call and Presentation.....................................115

2. April 22, 2015 First Manhattan Call with Papa .....................................116

3. May 12, 2015 Bank of America Merrill Lynch Conference....................117

4. June 2, 2015 Jefferies Global Healthcare Conference ............................117

5. August 5, 2015 Earnings Call ................................................................118

6. August 13, 2015 Form 10-K .................................................................118

7. September 30, 2015 Meeting with Brown at First Manhattan...............119

8. October 22, 2015 Earnings Call and Presentation ..................................119

9. January 5, 2016 Goldman Sachs Healthcare CEOs Conference.............121

10. February 18, 2016 Earnings Call ...........................................................121

11. February 25, 2016 Form 10-KT............................................................122

12. May 12, 2016 Earnings Call .................................................................123

13. May 16, 2016 Press Release .................................................................123

14. May 16, 2016, August 10, 2016 and November 10, 2016 Forms
10-Q .....................................................................................................124

15. May 24, 2016 UBS Global Healthcare Conference................................124

C. Statements Containing Perrigo's Financial Guidance .........................................125

1. April 21, 2015 Earnings Release ...........................................................126

2. August 5, 2015 Earnings Release ..........................................................127

3. October 22, 2015 Press Release and Presentation ..................................128

4. January 11, 2016 Earnings Release .......................................................129

D. Statements Concerning the Tysabri Royalty Stream ...........................................129

1.      April 29, 2015 Form 10-Q ...................................................................129

2.      August 13, 2015 Form 10-K ...............................................................130

3.      October 22, 2015 Press Release...........................................................130

4.      November 2, 2015 Form 10-Q.............................................................131

5.      January 5, 2016 Goldman Sachs Healthcare CEO's Conference ...........131

6.      February 25, 2016 Form 10-KT...........................................................132

7.      May 12, 2016 Earnings Call ...............................................................132

8.      May 16, 2016 Form 10-Q ...................................................................133

9.      August 10, 2016 Form 10-Q ...............................................................133

10.     November 10, 2016 Form 10-Q...........................................................133

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER.....................................................134

VIII.   RELIANCE....................................................................................................146

A.      Plaintiff Is Entitled to a Presumption of Reliance ...............................146

B.      Plaintiff's Allegations of Direct Reliance............................................147

IX.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
        ARE INAPPLICABLE .....................................................................................149

X.      CAUSES OF ACTION .....................................................................................150

XI.     PRAYER FOR RELIEF .....................................................................................157

XII.    JURY TRIAL DEMANDED ...............................................................................158

Plaintiff First Manhattan Co. ("Plaintiff" or "First Manhattan"),[1] by and through its undersigned counsel, brings this action for violations of Sections 10(b), 14(e), 18, and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b), 78n(e), 78r(a), and 78t(a), respectively, and the rules and regulations promulgated thereunder, including United States Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Defendants Perrigo Company plc ("Perrigo" or the "Company"); Joseph C. Papa ("Papa"), Perrigo's former Chief Executive Officer ("CEO"); Judy L. Brown ("Brown"), Perrigo's former Chief Financial Officer ("CFO"); and Marc Coucke ("Coucke"), Perrigo's former Executive Vice President and General Manager for the Company's Branded Consumer Healthcare ("BCH") segment (collectively, "Defendants").  Papa, Brown, and Coucke are collectively referred to as the "Individual Defendants."

Except as to allegations specifically pertaining to Plaintiff, all allegations herein are based upon the investigation undertaken by Plaintiff's counsel, which included, but was not limited to, the review and analysis of:  (i) public filings made by Perrigo with the SEC; (ii) press releases and other public statements issued by Defendants; (iii) research reports by securities and financial analysts; (iv) media and news reports related to Perrigo; (v) transcripts of Perrigo's earnings and other investor conference calls; (vi) publicly available presentations, press releases, and interviews by Perrigo; (vii) economic analyses of the movement and pricing of Perrigo

---

[1] As set forth *infra*, First Manhattan served as an SEC-registered investment advisor and/or broker dealer to several clients (the "First Manhattan Clients") in connection with those clients' purchases of Perrigo common stock and decisions to hold Perrigo common stock during the Relevant Period (defined below).  First Manhattan also served as the investment advisor to FMC Select Fund, First Health, L.P., First BioMed, L.P., First Health Limited, First BioMed Portfolio, L.P., and First Health Associates, L.P. (collectively, the "Funds") in connection with the Funds' purchases of Perrigo common stock and decisions to hold Perrigo common stock during the Relevant Period.  First Manhattan is the assignee of all claims arising from the First Manhattan Clients' and the Funds' (together, the "Assignors") purchases and/or retention of Perrigo common stock during the Relevant Period.

publicly traded common stock and options; (viii) consultations with relevant consultants and experts; (ix) media reports and other publicly available information concerning the Company and the Individual Defendants; and (x) interviews of former employees of Perrigo.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.      This case arises from a series of materially false or misleading statements made by Perrigo and its senior-most officers beginning in April 2015, including statements made as part of an effort to fend off a hostile takeover attempt by one of the Company's chief competitors, Mylan N.V. ("Mylan"), a rival generic and specialty pharmaceutical company. Defendants' fraud then continued long after Mylan's tender offer ("Tender Offer") failed in November 2015.

2.      Given what was at stake for Defendants—the possibility that the Company's shareholders would flee from their investment in Perrigo and exchange their shares for the valuable consideration offered by Mylan, thus ending the Company—Defendants had strong incentives to mislead the market about multiple aspects of Perrigo's then-existing business to stave off Mylan's bid.

3.      To convince Perrigo's shareholders to reject Mylan's tender offer, Defendants made numerous misrepresentations touting Perrigo's standalone value and growth prospects. They falsely claimed that:  (i) Perrigo's acquisition of Omega Pharma NV ("Omega") would accelerate the Company's international expansion into the European market and afford Perrigo increased revenue and operational and supply chain synergies marketed through Omega's extensive distribution network and product portfolio; (ii) Perrigo had the ability to withstand pricing pressures in the generic drug industry; and (iii) Perrigo's future profitability—as

expressed in positive financial guidance—was robust.  Defendants also misstated the value of the Company's largest financial asset, a royalty stream for Tysabri, a drug used for the treatment of multiple sclerosis.  In addition, Defendants concealed collusive pricing in Perrigo's generic drug division—conduct which is now being investigated by the U.S. Department of Justice ("DOJ").  These false or misleading statements, which were in part designed to defend against the Mylan bid, and continued to mislead the market for months thereafter, had the effect of causing Perrigo's shares to trade at prices in excess of their true value throughout the period of April 21, 2015 through May 3, 2017 (the "Relevant Period").  In addition to their public statements in filings with the SEC and during conference calls with the public at large, many of Defendants' false or misleading statements were made during face-to-face meetings with First Manhattan investment management professionals at First Manhattan's offices in New York—meetings that were specifically convened to afford First Manhattan the opportunity to learn about Perrigo directly from members of senior management, including Papa and Brown, and to inform First Manhattan's investment decisions concerning Perrigo common stock.

A.     **Defendants Misled Investors by Representing that "Tremendous Revenue Synergies" and Operating Efficiencies from the Omega Acquisition Were Driving Perrigo's Standalone Value**

4.     Perrigo is a manufacturer of specialty, generic, and over-the-counter ("OTC") pharmaceutical and healthcare products.  From its creation in 1887 through 2013, Perrigo operated primarily out of Allegan, Michigan and focused its business almost exclusively on the U.S. market.  In or around 1997, Perrigo began expanding into the international market.  This effort was accelerated when Perrigo purchased an Irish drug company, the Elan Corporation plc, and reincorporated in Dublin, Ireland in 2013.

5.     Though its presence in Ireland established an initial foothold for the Company in the European market, Perrigo nonetheless struggled to gain access to the international OTC

market.  As explained by Company executives, as of November 2014, Perrigo had "hundreds of products that [it] eventually could sell if [it] had the infrastructure," but it "did not have an infrastructure in Europe."   Thus, as of November 2014, Perrigo's business remained approximately 80% driven by the U.S. market and only 20% driven internationally.  In fact, at that time, Perrigo's international presence was limited to just six countries, including the U.S.

6.     On November 6, 2014, in support of its push into the European market, Perrigo announced that it had entered into an agreement to acquire Omega, then the fifth largest European OTC healthcare company.   Headquartered in Belgium, Omega maintained a commercial presence in approximately thirty-five countries as of November 2014, boasting a commercial network of over 200,000 pharmacists and 105,000 retail stores, and a portfolio of roughly 2,000 products, including numerous leading cough, cold, skincare, pain relief, and gastrointestinal treatment brands.

7.     The Omega acquisition was intended to dramatically alter the balance of Perrigo's total business operations.  As a result of the deal, Perrigo's international business was expected to comprise approximately 40-45% of total Perrigo operations, up from 20% prior to the acquisition.    According to Perrigo, Omega "instantly enhance[d] [Perrigo's] scale and, broaden[ed] [its] footprint," providing Perrigo with an "established commercial infrastructure" to use in the highly profitable $30 billion European market.  Specifically, the Omega acquisition left Perrigo with a commercial presence in thirty-nine countries (as opposed to six) and, according to the Company, would "accelerate Perrigo's international growth strategy."

8.     From the time of the announcement of the transaction in November 2014, Defendants were quick to focus investors on the purported immediate and long-term impact that the Omega acquisition would have on Perrigo's business and growth.  According to Papa,

Perrigo could now bring "many" of its 3,000 products "to our European platform and launch them in Europe. [That] gives us a chance to continue to have very significant revenue synergies for the future." These "tremendous revenue synergies," Perrigo said, would drive the Company's overall growth. Perrigo also hailed the Company's now-expanded product portfolio and enhanced scale and distribution network in Europe, highlighting the combination of "Perrigo's supply chain and operational excellence with Omega's OTC branding and regulatory expertise."

9.     Market commentators immediately embraced management's statements regarding the synergies, reporting positively that the Omega deal "ma[d]e[] abundant strategic sense" and provided "infrastructure that would have taken years to build organically." Based on Defendants' representations, Goldman Sachs, for example, expected large revenue and cost "synergies to come from the ability to sell [Perrigo's] products in new channels, overseas, where [Perrigo] previously had little exposure."

10.     To accommodate Perrigo's more than doubled international business operations, shortly after the deal closed on March 30, 2015, the Company re-structured its reporting segments to create a new segment, BCH, which was comprised almost entirely of Omega and would focus primarily on the sale of branded cough, cold, allergy, vitamin, and supplement products in Europe. Perrigo named Omega's founder, Defendant Coucke, as General Manager of Omega's operations and later handed him a seat on Perrigo's Board of Directors ("Board").

11.     Just a week after Perrigo closed the Omega transaction, Mylan approached Perrigo's Board with an offer to purchase Perrigo for approximately $205 per share ("Offer"). At the time, the Offer represented approximately a 25% premium to Perrigo's stock price.

5

12.     Despite the substantial premium offered to Perrigo shareholders, almost immediately, the Board "unanimously rejected" Mylan's Offer, claiming it "substantially undervalue[d] the Company and its future growth prospects" and "d[id] not take into account the full benefits of the Omega Pharma acquisition," namely, the "tremendous revenue synergies" between Omega and Perrigo once the former was fully integrated.  According to Defendants, buoyed by the Omega acquisition and the Company's purported emergence as an international market player, Perrigo's standalone value far exceeded Mylan's Offer, which Papa would claim "*was not even in the right ZIP code*."[2]

13.     Perrigo's rejection, however, did not end Mylan's pursuit.  Mylan's Offer would be the first of four distinct offers to Perrigo, which Mylan claimed would be worth more than $242 per share, culminating in the hostile Tender Offer in the fall of 2015.  Over the months that followed Perrigo's initial rejection, Perrigo and Mylan publicly sparred over the merits of Mylan's hostile takeover bid and whether the proposed merger would benefit Perrigo shareholders.  Defendants Papa, Brown, and Coucke constituted the front line of Perrigo's counter-attack, as they tried to convince shareholders that, despite the undeniable monetary premium offered by Mylan, Mylan's various offers "substantially undervalued [the] Company and [its] future growth prospects."

14.     At each turn, Defendants focused First Manhattan's and other investors' attention on Omega as the primary driver of the Company's immediate and long-term growth prospects. In both public filings and private meetings with First Manhattan investment management professionals, Defendants highlighted Omega's established European infrastructure and product line and raved about Perrigo's unique ability to capitalize on the combination of entities.

---

[2] Unless otherwise stated, all emphasis is added.

In response to questions concerning Omega's integration and performance, Perrigo assured investors that the Omega acquisition was "immediately accretive" and that the process of migrating Omega into Perrigo was "working smoothly" and had not in any way been interrupted by Mylan's takeover attempt.  In May 2015, for example, Papa told investors that Mylan's offers had substantially undervalued Perrigo, "especially given what we have now done with Omega." Papa repeated this during a private meeting with First Manhattan investment management professionals on July 22, 2015, when he stated that "the real value of Perrigo is 'substantially' higher" than the Mylan offer based on the "value creation" potential from Omega, "future M&A," and a big "new product pipeline." Papa added that he "sees potential for Omega to deliver upside quickly."[3]  In August 2015, Papa flatly told investors that Perrigo "delivered on our Omega integration plan" and "achieved great operational efficiencies and productivity improvement."  Indeed, just hours after Mylan launched its Tender Offer in September, Perrigo unequivocally assured investors that Omega "***has done outstanding***."  Two weeks later, on September 30, 2015, Brown visited with First Manhattan investment management professionals, including Sawyer, at their New York office, during which time Brown stated that the "Omega acquisition [is] off to a good start" and that the Omega "business is ahead of plan through the first six months with healthy sales growth and upsides in operating synergies."

15.     These statements were false.  According to numerous former Perrigo and Omega employees who had key roles in the actual integration process, the Omega acquisition was problematic from the start because Perrigo had rushed into the Omega acquisition with no

---

[3] Quotations are to reports prepared contemporaneously with the referenced meetings by First Manhattan Director of Research Andrew Sawyer ("Sawyer"), who covered Perrigo during the Relevant Period.  Sawyer was the primary research analyst at First Manhattan responsible for making recommendations to First Manhattan's portfolio managers regarding investments in Perrigo stock.

understanding of the regulatory, commercial, and data challenges to achieving the synergies it claimed it would accomplish with Omega.  In truth, at all times between the acquisition and the ultimate impairments on Omega taken by the Company, Perrigo was nowhere close to achieving synergies and operating efficiencies through Omega.  And Defendants knew it.

16.     As soon as the Omega transaction closed on March 30, 2015, Defendants— because they had access to information regarding Omega's operations during a due diligence period prior to closing the transaction—were aware (and had been for some time) that virtually none of Omega's thirty-five different systems were compatible with Perrigo's data management and central operating system.  This critical issue forced Omega personnel to manually track and input Omega's financial data and performance information into non-automated files, including data concerning Omega's:  (i) sales, including orders, returns, and discounts; (ii) purchases, including orders, returns, and damaged goods reports; (iii) inventory, including sub-ledgers, damaged goods, and obsolete goods; and (iv) accounting, including sub-ledgers for accounts receivable and payable.  Because Perrigo had virtually no transparency into Omega's operations and finances, the Company did not have a grasp on what it had acquired or how to monetize the benefits of the Omega platform.

17.     These operational deficiencies were well known inside Perrigo.  For example, two former Chief Information Security Officers ("CISO") at Perrigo confirmed that much of Omega's data was only available to Perrigo through requests for manual reviews and reports.  These former officers added that it could (and often did) take weeks for Omega to process even the most basic requests and report back to Perrigo on Omega's financial data, performance, or performance history.  In fact, numerous former Perrigo employees confirmed that the Company *never* migrated complete financial data and performance information from Omega's franchises

8

to Perrigo's system in 2015 and 2016. Nonetheless, Defendants continued to publicly misrepresent that Perrigo had "delivered on our Omega integration plan" and that Omega was contributing positively to Perrigo's bottom line throughout this same period of time.

18.     Because Perrigo executives had no real-time visibility into Omega or its respective (and incompatible) systems, they utilized unsubstantiated oral representations from Omega personnel as the foundation for Perrigo's financial projections, guidance, and other public statements to the market. Unbeknownst to the market, these oral representations from Omega were frequently determined by Perrigo to be inaccurate and unreliable. As one former employee responsible for the Omega data migration noted, "if you don't have all the data, it's hard to say what your financial numbers are." Even after Omega processed requests and internally provided reports to Perrigo, the accuracy of the information provided was constantly disputed—and in many cases discovered to be incorrect—by Perrigo. Yet Perrigo and the Individual Defendants continued to provide these undocumented and faulty numbers to investors in support of their public representations about the success of the Omega integration and the performance of the Omega business.

19.     Perrigo also failed to appreciate a number of applicable European Union ("EU") regulations, including that, unlike in the U.S., OTC drug prices are set and governed by the European country of sale or the EU. As multiple former Perrigo employees explained, this dynamic drastically limits price flexibility and an "outside" supplier like Perrigo's ability to compete in the European market. Because Perrigo lacked a European manufacturing facility, it was forced to cut margins to account for shipping, tariffs, and other costs necessary to bring products to market. None of these pricing problems that are germane to the European market—

all of which impacted Perrigo's ability to achieve synergies by selling its products through Omega's European network—were disclosed to investors prior to April 2016.

20.     Despite these roadblocks to growing the Omega business with Perrigo products, Perrigo pushed Omega to achieve unattainable financial goals in order to maintain the façade that Perrigo's then-existing business prospects were strong and improving and to manufacture artificial support for the Company's publicly disclosed financial guidance so as to defeat Mylan's Tender Offer.  In doing so, Perrigo recklessly disregarded informed pushback from Omega personnel.  This led to regular feuds between Perrigo and Omega executives over Omega's performance and what several former employees described as the "unrealistic" nature of the financial goals Perrigo sought to impose on Omega.

21.     Perrigo senior management, including the Individual Defendants, knew or recklessly disregarded each of these critical impediments to the "tremendous revenue synergies" and "operational efficiencies" that Defendants boasted about to investors.  For example, during at least one quarterly update meeting in the second half of 2015, as the Company was fighting off Mylan and telling investors that Omega "has done outstanding," Defendant Brown herself presented slides to Perrigo's executive team that definitively showed that Omega was missing its goals and failing to perform.  Numerous former employees confirmed that Perrigo's Chief Information Officer ("CIO"), Thomas M. Farrington, who was hand-selected by Papa to lead the Omega integration, was in frequent (if not daily) contact with the Individual Defendants, keeping each of them apprised of the numerous debilitating issues concerning Omega.  The Individual Defendants, however, recklessly ignored these realities and rejected pleas for additional manpower and resources to remedy the problems.  As one former Perrigo employee explained, senior management took their "eyes off the ball" in addressing the problems with integrating

10

Omega to focus entirely on defending against Mylan's takeover bid.  Yet Defendants continued to falsely trumpet the "outstanding" Omega deal and its benefits to the investing public all the while knowing of these grave integration problems.

22.     These concealed problems with Omega were so impactful that Perrigo ultimately had to take approximately ***$2.3 billion in impairment charges*** in 2016, amounting to over 50% of the approximately $4.5 billion purchase price for Omega.

23.     In short, Defendants had no reasonable basis to claim to investors, as they did throughout 2015, that Omega would boost Perrigo's growth or bottom line anytime soon or that Mylan's tender offer was undervaluing the Omega portion of its business.  Instead, they knew, or recklessly disregarded, that the acquisition was a debacle from the start and that the touted synergies were a pipedream.

### B.     Defendants Falsely Claimed that Perrigo's Revenues Were "Insulated" from Pricing Pressures in the Generic Drug Industry

24.     During the Relevant Period, Perrigo also operated a Prescription Pharmaceuticals ("Rx") segment, which focused primarily on the sale of generic and specialty pharmaceutical prescription products in the U.S. and the United Kingdom.

25.     As Perrigo was failing to get Omega off the ground, increased competition and regulatory scrutiny in the U.S. generic drug industry were major causes of concern for investors and the subject of numerous questions posed to Defendants during the Relevant Period.  In each instance, Defendants denied that Perrigo was feeling the impact of any "pricing pressures," repeatedly assuring the market that the Company could withstand any such pressures by keeping pricing "flat to up slightly."  Brown even told the market on October 22, 2015—just three weeks before the Tender Offer deadline—that "nearly all of [Perrigo's] revenues are ***insulated from the***

*current pricing drama* you see playing out in the pharmaceutical industry today." These statements too were false or misleading when made.

26.     In point of fact, beginning prior to the Relevant Period, the U.S. Food and Drug Administration ("FDA")—faced with a colossal backlog of generic drug applications and political pressure to lower the price of generic drugs—accelerated its approvals of new generics to historic levels. This acceleration of drug approvals led to a tsunami of new competitors and approved products in the generic drug markets, including products in direct competition with those owned by Perrigo, resulting in significant downward pricing and never-before-seen levels of newly approved generic drugs competing with existing brands (and previously approved generics).

27.     The influx was no surprise to Perrigo. According to several former Perrigo employees who worked in the Company's Rx segment, Perrigo specifically kept track of what their rivals were doing in the new product development area. To this end, the Company maintained a running list of companies in competition with Perrigo to be first to the market with new generic products, as well as new generics to compete with previously approved generic products. As a result, Perrigo knew which drugs the other generic pharmaceutical companies were bringing to the market to compete with existing Perrigo products, and closely tracked the FDA's submission, review, and approval process.

28.     Thus, the Company knew it was not "immune" to pricing pressures, despite having assured investors otherwise. Given this wave of new competition, Defendants either knew, or were recklessly blind to the fact, that the elevated pricing levels for its generic drugs were unsustainable as new drug approvals accelerated at an unabated pace throughout 2015.

Yet, in an attempt to fend off the Mylan takeover at all costs, Defendants insisted that Perrigo was immune to these sliding prices.

      **C.**      **Defendants Concealed Perrigo's Price-Fixing of Generic Drugs**

      29.      Before Defendants were fending off Mylan's Tender Offer through misrepresentations about Omega and the Company's immunity to pricing pressure, Perrigo and some of its competitors tried to maximize their profits from generic drug sales through illicit price collusion.  As described below, there is a clear pattern of an industry conference attended by Perrigo and its competitors, followed by an abrupt and unprecedented spike in the Company's drug price, closely timed with spikes in Perrigo's competitors' prices.  These patterns are undeniable and provide clear evidence of price collusion, particularly because there is no evidence of contemporaneous supply shortages, increased costs, or increases in demand to otherwise explain the drastic price increases for these drugs.  What is more, the price increases operated as a "one-way ratchet": the drug prices never decreased following the initial price increases to the extent one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations.

      30.      Perrigo's extraordinary and historic price increases for these generic drugs would have been against Perrigo's economic self-interest absent the existence of a price-fixing scheme. Generic drugs are commodity products.  Absent price collusion, if one manufacturer raises the price of a given drug, its competitors will seek to increase their own market share by selling the drug to the first manufacturer's customers at lower prices.  Indeed, under the Maximum Allowable Cost ("MAC") pricing regime that governs much of the U.S. generic pharmaceutical market, drug cost reimbursements from insurance companies are capped at a certain price, and if a drug manufacturer raises its prices above this cap while its competitors do not, the reimbursements for the higher-priced drug will cease.  Thus, it would not be in any drugmaker's

unilateral self-interest to increase the prices of its generic drugs unless it had an agreement with the other drugmakers that they would do the same.

31. The suspicious price increases by Perrigo and others have spawned investigations by the DOJ and several state Attorneys General. These investigations have begun to reveal a broad, well-coordinated, and long-running series of schemes to fix prices for a number of generic drugs. They have also revealed that collusion on generic drugs was centered around meetings of trade associations, such as the Generic Pharmaceutical Association ("GPhA"), and other industry gatherings attended by senior Perrigo officials.

32. On May 2, 2017, Perrigo confirmed that the DOJ had executed search warrants at the Company's corporate offices in connection with its investigation into price collusion in the generic drug industry. As reported by Bloomberg, analysts from RBC Capital Markets stated that the raid of Perrigo "is going to bring the DOJ generic pricing risk back into focus." Drew Armstrong and Caroline Chen, *Perrigo Offices Searched by U.S. Agents in Drug Price Probe*, Bloomberg, May 2, 2017. The fact that the DOJ raided Perrigo's offices *after* sending subpoenas to certain of its competitors strongly suggests that evidence learned in those other investigations led the DOJ to believe that Perrigo was also participating in a price-fixing conspiracy.

33. Throughout the Relevant Period, Defendants failed to disclose that: (i) Perrigo's generics unit and several of its pharmaceutical industry peers, including Allergan, Akorn, Fougera, G&W, Glenmark, Hi-Tech, IGI, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, Taro, and Valeant (the "Co-Conspirators") colluded to fix generic drug prices; and (ii) consequently, Perrigo's statements regarding the Company's pricing strategy for its generic drugs and the purportedly competitive nature of the generic drug markets in which it operated

were materially false or misleading at all relevant times.  These false or misleading statements also disguised the true source of Perrigo's income from generic drug sales, i.e., price collusion.

**D.     Defendants Misrepresented the True Value of the Tysabri Royalty Stream**

34.     Defendants also fraudulently presented the fair value for Perrigo's largest financial asset, the Tysabri royalty stream, during the Relevant Period.  Defendants claimed it was worth an inflated $5.8 billion and represented that the Company's accounting followed Generally Accepted Accounting Principles ("GAAP").   Perrigo now admits that both representations were false.  In truth, Perrigo's accounting for the Tysabri royalty stream violated GAAP, and the fair value of the royalty stream was significantly less than $5.8 billion throughout the Relevant Period.  Through its GAAP violations, overseen by Defendant Brown, Perrigo hid billions of dollars in deterioration from investors. In a post-Relevant Period restatement on May 22, 2017, Perrigo conceded that its balance sheets should have recorded the following deteriorating fair values for the Tysabri royalty stream:

| Measurement Date | Last reported value for Tysabri royalty stream | Actual fair value according to Perrigo[4] | Decline hidden from investors by false accounting |
| --- | --- | --- | --- |
| 6/27/2015 | $5.8 billion | $5.42 billion | *$380 million* |
| 12/31/2015 | $5.8 billion | $5.31 billion | *$490 million* |
| 4/2/2016 | $5.8 billion | $5.02 billion | *$780 million* |
| 7/2/2016 | $5.8 billion | $4.02 billion | *$1.78 billion* |
| 10/1/2016 | $5.8 billion | $3.55 billion | *$2.25 billion* |
| 12/31/2016 | $5.8 billion | $2.35 billion | *$3.45 billion* |

**E.     The Truth Is Revealed after Mylan's Failed Takeover Attempt**

35.     Ultimately, on the strength of Defendants' misrepresentations concerning Omega, Perrigo's purportedly strong growth prospects and financial guidance, and the Company's ability

---

[4] Sources: Form 10-K/A filed on May 22, 2017 for year ended December 31, 2016; Form 10-Q/A filed on May 22, 2017 for quarterly periods ended April 2, 2016 and July 2, 2016; and Form 10-Q/A filed on May 23, 2017 for quarterly period ended October 1, 2016.

to withstand pricing pressures in the generic drug industry, Defendants' efforts to fend off Mylan's takeover bid succeeded.  On November 13, 2015, the majority of Perrigo shareholders, including the Assignors, voted against the Tender Offer, electing not to tender their shares to Mylan and to instead buy into the Company's supposed "standalone" growth prospects.

36.     In the months following Mylan's thwarted takeover attempt, the market and Perrigo shareholders gradually learned that Defendants' representations concerning Omega were pure fabrication, as Perrigo was forced to take billions of dollars in impairment charges against Omega.  According to one analyst, Omega was an "***unequivocally disastrous [] acquisition***."  The market also learned through these revelations that Perrigo's financial guidance in 2015 and the beginning of 2016—which, according to Defendants, was largely driven by Omega—had been baseless the entire time.  On May 12, 2016, Perrigo's then-CEO, John Hendrickson, who replaced Papa, admitted such guidance was "unrealistic."

37.     To compound the newly unveiled Omega problems, Defendants also acknowledged that, contrary to their unequivocal representations throughout 2015 and the beginning of 2016, the increased competition in the U.S. generic drug market, spurred by the FDA's ramped-up approvals of generic drug applications, had taken a gigantic toll on Perrigo's Rx segment.  By April 2016, Perrigo could no longer conceal that this increased competition— which Perrigo had stated it was immune to just months earlier when resisting the hostile Tender Offer—had already and would continue to negatively impact Perrigo's financial performance, forcing the Company to slash its earnings guidance.  Defendants knew or were recklessly ignorant of the fact that, since at least the spring of 2015, the FDA was fast-tracking the review and approval process for Accelerated New Drug Applications ("ANDAs") and that the increased competition was unavoidable.

38.     Perrigo's gradual revelations of the truth regarding Omega and its vulnerability to generic pricing pressures in the spring and summer of 2016 caused the Company's stock to decline over $42 per share over the course of just a few trading days.

39.     In response to these revelations, a chorus of market commentators reported that "***Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid***," to the detriment of Perrigo's shareholders, including Plaintiff. Indeed, "Mad Money" host Jim Cramer outright stated that "Papa had come on 'Mad Money' and talked about how the Mylan bid dramatically undervalued Perrigo . . . . ***That was clearly untrue***."

40.     Notably, the Omega disaster continued long after the Relevant Period, forcing the Company to sell off brands and business under the Omega umbrella in late 2016/early 2017 and acknowledge that Omega had failed to perform from the moment it was acquired, costing Perrigo billions of dollars.

41.     On February 27, 2017, Perrigo shocked the market again when it announced that the Company was selling the Tysabri royalty stream ***for only $2.2 billion cash*** (plus additional contingent payments of up to $0.65 billion)—***over $3.5 billion less*** than the fair value of the asset Perrigo had publicly reported throughout the Relevant Period.  That same day, Perrigo also disclosed that the Company could not timely file its Annual Report on Form 10-K for 2016, telling investors it needed to review its historical revenue recognition practices for the royalty stream and other potential issues.  Perrigo also disclosed that CFO Brown—the person most responsible for the GAAP violations—had unexpectedly resigned.  In direct response to these disclosures, Perrigo shares dropped another $9.91 per share, from $84.68 to close at $74.77.

42.     Defendants' misrepresentations caused Perrigo's common stock to trade at prices in excess of its true value throughout the Relevant Period.  They also fraudulently induced the Assignors to hold Perrigo shares rather than tender them to Mylan in exchange for millions of dollars more in value.  Through gradual revelations of the fraud, the artificial inflation attributable to Defendants' misrepresentations was removed from Perrigo's stock, damaging the Assignors.  This Action seeks to recoup those losses and the value that the Assignors unwittingly gave up when the Tender Offer was voted down by a duped majority of Perrigo shareholders.

## II.    JURISDICTION AND VENUE

43.     The claims asserted herein arise under Sections 10(b), 14(e), 18, and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e), 78r(a), and 78t(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

44.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b) because the Company conducts a substantial amount of business throughout the District, including maintaining offices and operations in Piscataway, New Jersey and Parsippany, New Jersey.  Further, Papa resides in this District and maintains a residence in this District.

45.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and facilities of the national securities markets.

### III.   PARTIES AND RELEVANT NON-PARTIES

#### A.   Plaintiff

46.   Plaintiff First Manhattan is an SEC-registered investment advisor and/or broker dealer managing more than $16 billion in assets as of December 31, 2017 for numerous individuals and entities, including the Assignors.

47.   First Manhattan served as an SEC-registered investment advisor and/or broker dealer to the First Manhattan Clients in connection with their purchases of Perrigo common stock and decisions to hold Perrigo common stock during the Relevant Period, which are reflected in the attached Appendix A.  The First Manhattan Clients held Perrigo stock and/or purchased or otherwise acquired Perrigo stock on domestic exchanges in the United States during the Relevant Period.  First Manhattan is the assignee of all claims arising from the First Manhattan Clients' purchases and/or retention of Perrigo stock during the Relevant Period.

48.   First Manhattan also served as the investment advisor to the Funds—FMC Select Fund, First Health, L.P., First BioMed, L.P., First Health Limited, First BioMed Portfolio, L.P., and First Health Associates, L.P.—in connection with the Funds' purchases of Perrigo common stock and decisions to hold Perrigo common stock during the Relevant Period, which are reflected in the attached Appendix A.  The Funds held Perrigo stock and/or purchased or otherwise acquired Perrigo stock on domestic exchanges in the United States during the Relevant Period.  First Manhattan is the assignee of all claims arising from the Funds' purchases and/or retention of Perrigo stock during the Relevant Period.

#### B.   Defendants

49.   Defendant Perrigo is a manufacturer of specialty, generic, and OTC pharmaceutical and healthcare products.  The Company was founded in 1887 as a packager of home remedies and has since grown to become the world's largest manufacturer of OTC

healthcare products and supplier of infant formulas for the store brand markets.  The Company's market capitalization reached a high of $29 billion on May 22, 2015.  Perrigo is incorporated under the laws of Ireland and maintains its corporate headquarters in Ireland.  However, Perrigo conducts significant operations in the U.S., including in New Jersey, where the Company: (i) maintains a 14,000 square foot Consumer Health Care R&D Center in the township of Piscataway, New Jersey, which Perrigo describes as a "strategic location in the hub of New Jersey's pharmaceutical industry" that "gives Perrigo a footprint in the northeast"; and (ii) operates a research and development facility in the township of Parsippany, New Jersey. Perrigo's common stock trades on the NYSE under the ticker "PRGO" and did so throughout the period between Defendants' initial false or misleading statements and the full revelation of the fraud (i.e., April 21, 2015 through May 3, 2017).

50.     Defendant Papa was, from 2006 until his resignation on April 24, 2016, the CEO of Perrigo and served as the Chairman of Perrigo's Board.  During the Relevant Period up through April 2016, Papa was responsible for the day-to-day management and controlled and directed the business and activities of Perrigo, including certifying Perrigo's periodic financial reports filed with the SEC, and speaking on a regular basis with investors and securities analysts regarding the Company.  Papa currently resides in New Jersey and maintained a residence in New Jersey throughout the Relevant Period.

51.     Defendant Brown was, from 2006 through February 2017, the CFO of Perrigo, and, prior to 2006, served as the Company's corporate controller dating back to 2004.  During the Relevant Period, Brown was responsible for the day-to-day management and controlled and directed the business and activities of Perrigo, including certifying Perrigo's periodic financial

reports filed with the SEC, and speaking on a regular basis with investors and securities analysts regarding the Company.

52.     Defendant Coucke was, from March 2015 through his termination in April 2016, the Executive Vice President and General Manager for Perrigo's BCH segment, in which Omega was housed.  Coucke is the co-founder of Omega and served as its Chairman and CEO from 1987 until March 2015, when Omega was acquired by Perrigo.  From March 2015 through his termination, Coucke was responsible for the day-to-day management of and controlled and directed the business and activities of Omega, including speaking on a regular basis with investors and securities analysts regarding Omega and the Company.  Coucke was also a member of Perrigo's Board between November 2015 and April 2016.

**C.     Relevant Non-Parties**

53.     Christine Ray (formerly known as Christine Kincaid) ("Ray") worked for Perrigo from July 2015 through late-2015 as the acting CISO based out of Perrigo's U.S. headquarters in Allegan, Michigan.  In her role as CISO, Ray reported to Perrigo's CIO, Farrington, and was responsible for monitoring governance, risk, and information security compliance.  Ray worked closely with information security and application development teams on, among other things, Omega information migration, security, and compliance.  Ray was responsible for IT integration projects in Europe, including Omega.

54.     CW-1[5] worked for Perrigo from late 2014 through mid-2015.  During his tenure, CW-1 was CISO based primarily out of Perrigo's U.S. headquarters in Allegan, Michigan and Perrigo's offices in Belgium.  In CW-1's role as CISO, CW-1 reported to Perrigo's CIO, Farrington.  CW-1 was responsible for analyzing databases and data handling, performing

---

[5] Confidential witnesses ("CWs") will be identified herein by number (CW-1, CW-2, etc.).  All CWs will be described in the masculine to protect their identities.

21

vulnerability scans, coordinating and discussing data handling with business line leaders, and executing risk and threat assessments, and was involved in the Omega integration.

55.     CW-2 worked for Perrigo in various positions from late 2008 through the end of 2016.   From mid- to late 2016, CW-2 was an Associate Director of Business Process Architecture based out of Perrigo's U.S. headquarters in Allegan, Michigan.   In this role, CW-2 worked with Perrigo's IT personnel throughout the Company and received information from Perrigo's IT and other personnel involved in supporting Omega's integration to Perrigo's system.

56.     CW-3 worked for Omega from mid-2014 until it was acquired by Perrigo in March 2015, after which CW-3 worked for Perrigo until the fall of 2016.   During his tenure with the Company, CW-3 was a senior executive with sales and forecasting responsibilities for Perrigo based primarily out of the Company's offices in Belgium.   In this role, CW-3 reported to Omega's Belgium General Manager, Davy De Vlieger, and was responsible for all commercial activities at Omega's Belgium location.

57.     CW-4 worked for Perrigo in various positions for more than two years before the Relevant Period through the fall of 2016.   From 2015 through early 2016, CW-4 was an Enterprise Reporting Manager based out of Perrigo's U.S. headquarters in Allegan, Michigan. CW-4 was a member of the Enterprise Reporting Team that helped corporate reporting specific to manufacturing productivity.   CW-4's group was responsible for Systems, Applications, Products ("SAP") Reporting, and part of CW-4's work involved retrieving data from the BCH segment.

58.     CW-5 worked for Perrigo from mid-2011 through the end of 2016.   From 2015 through 2016, CW-5 was the SAP Platform Services Manager, working on the Enterprise Reporting Team based primarily out of Perrigo's U.S. headquarters in Allegan, Michigan.   In this

role, CW-5 reported to the Director of SAP Applications and was responsible for working on the SAP platform, business intelligence solutions, and data conversion with Advanced Business Application Programming.

59.     CW-6 worked for Perrigo from August 2010 to mid-2016.  From late 2014 through mid-2016, CW-6 was a Senior Business Analyst and reported to the Israel-based Director of SAP Applications.  CW-6 was responsible for growing the E-Commerce Group and working to get the E-Commerce platform integrated into the SAP system.  The E-Commerce Group reported up to senior management through CIO Farrington.

60.     CW-7 worked for Omega from early-2014 until it was acquired by Perrigo in March 2015, after which CW-7 worked for Perrigo through early 2017.  During the Relevant Period, CW-7 was an Account Manager, and later a Brand Manager, and was based primarily out of Omega's U.K. headquarters in London, England.  In this role, CW-7 reported up to Stuart Mills, who was Head of Sales.

61.     CW-8 worked for Perrigo from approximately mid-2012 through early 2017. During the Relevant Period, CW-8 was a Scientific Advisor for Medical Affairs based primarily out of the Company's Martin, Michigan location, which was considered part of Perrigo's headquarters.  In this role, CW-8 reported to Tony Fargasso, who in turn reported to Chief Medical Officer, Grainne Quinn.  CW-8 was familiar with the generic pricing team headed up by John Wesolowski, Senior Vice President of Generic Rx, because he answered drug-related questions for the team.  CW-8 also participated on conference calls during which questions related to pricing were discussed.

62.     CW-9 worked for Perrigo from early 2011 through August 2015.  During the Relevant Period, CW-9 was a Vice President in Perrigo's Sales and Marketing unit based

primarily out of the Company's offices in Atlanta, Georgia and Allegan, Michigan. In this role, CW-9 reported to Stephanie Gamble, the Director of Marketing, who in turn reported to Tom Cotter, the Vice President of OTC Marketing.

63.     CW-10 worked for Perrigo from 2006 to 2016 in various roles. From 2006 to 2014, CW-10 worked out of the Company's in Allegan, Michigan as a Generics contract manager in the Company's Rx segment. In this role, he interacted with wholesalers and retail chains and had reporting responsibility to Dawn Couchman, Vice President of Contract Administration for Generic Rx. In late 2014, CW-10 began working in the Company's Branded Division.

64.     CW-11 worked for Perrigo in various capacities from 2013 to early 2017, including two years—2015 to 2017—in the Rx segment. While working in the Rx segment, CW-11 reported to Jim Booydegraaff, a marketing director, who in turn reported to Wesolowski.

## IV.    SUBSTANTIVE ALLEGATIONS OF DEFENDANTS' FRAUD

### A.    Perrigo's Operations

65.     Perrigo manufactures specialty, generic, and OTC pharmaceutical and healthcare products. From its creation in 1887 to 2013, Perrigo was primarily based in Allegan, Michigan. In or around 1997, Perrigo began expanding from the U.S. market to the international market. In 2013, Perrigo purchased Elan for approximately $4.5 billion and reincorporated in Dublin, Ireland. Through that transaction, Perrigo also acquired Elan's major asset, a financial interest in the royalty stream for Tysabri, a blockbuster treatment for multiple sclerosis. While the Elan transaction made Perrigo an Irish corporation, it did not provide Perrigo with any meaningful operations outside the United States.

66.     At the start of the Relevant Period, April 21, 2015, Perrigo was the world's largest manufacturer of OTC healthcare products for the store brand market. Perrigo identifies itself as

the provider of "Quality Affordable Healthcare Products" across a wide variety of products and categories.

67.     During the Relevant Period, the Company operated four primary reporting segments:  (i) Consumer Healthcare, which focused primarily on the sale of OTC store brand products, including cough, cold, allergy, vitamin, and supplement products; (ii) BCH (i.e., Branded Consumer Healthcare), which focused primarily on the sale of branded cough, cold, allergy, vitamin, and supplement products in Europe; (iii) Rx (i.e., Prescription Pharmaceuticals), which focused primarily on the sale of generic and specialty pharmaceutical prescription products in the U.S. and the United Kingdom; and (iv) Specialty Sciences, which focused primarily on the receipt of royalty payments from the sale of Tysabri.  As discussed above, Perrigo created the BCH segment after completing the Omega acquisition in March 2015.  The segment was comprised almost entirely of Omega's pre-existing European business from March 2015 through the end of the Relevant Period.

**B.     Perrigo Acquired Omega to Expand Its International Market Presence and then Touted Its Value to the Company's Growth Strategy and Financial Prospects Through Synergies and Operational Efficiencies**

68.     In November 2014, after having been provided extensive open access to Omega's operations during a due diligence period, Perrigo announced that it had entered into an agreement to acquire Omega for approximately $4.5 billion.  The acquisition of Omega, then the fifth largest European OTC healthcare company, purportedly accelerated the Company's expansion into the European market.  Headquartered in Belgium, Omega maintained a commercial presence in thirty-five countries as of November 2014.  With annual revenues of approximately $1.6 billion as of September 30, 2014, and approximately 2,500 employees (including Omega's salesforce and a lineup of nearly 2,000 products), Omega was larger and more complex than any other company that Perrigo had previously acquired and attempted to

integrate.  At the time, Omega owned numerous leading cough, cold, skincare, pain relief, weight management, and gastrointestinal treatment brands, focusing on name brand products (rather than store brand or unbranded products, like Perrigo).

69.    Upon announcing the agreement, Papa proclaimed that the "combination of these two great companies accelerates Perrigo's international growth strategy, substantially diversifies our business streams and establishes a durable leadership position in the European O.T.C. marketplace."  According to Papa:

> We believe this strategic transaction will enhance shareholder value by further strengthening our industry-leading revenue and cash flow growth profile and by expanding market opportunities.  Omega brings a leading OTC product portfolio, European capabilities, and a highly experienced management team to support Perrigo's continued growth. . . . Our strong financial performance and operational structure have enabled the continued growth and globalization of our business model with Ireland as our gateway for this expansion.  Together, our combined company will have an even larger product portfolio, broader geographic reach, and enhanced scale.

70.    Analysts and market commentators were quick to accept the Company's representations and lauded the unprecedented access to the European market that Omega would afford Perrigo, with many noting that the acquisition helped to offset an otherwise disappointing quarter for Perrigo.  For example, William Blair & Company, L.L.C., reported:

> The transaction will enhance Perrigo's position in OTC healthcare by bringing a broad portfolio of new products, as well as go-to-market capabilities and resources, in Europe.  This in turn, provides a platform for co-distribution of each other's products in various markets around the world and a foundation for additional bolt-on acquisitions. Omega provides access to the European OTC market, a large ($30 billion) but high-barrier-to-entry market; and, in total, 35 countries globally.
>
> Once combined, Perrigo's non-U.S. businesses will represent more than 40% of consolidate[d] sales, compared with a current run-rate of approximately 20%. And management anticipates revenue synergies by marketing product offerings from both company's portfolios through shared U.S. and European commercial channels; and efficiencies are also expected, as scale and volume drive productivity across the combined company's manufacturing base and supply chain.

71.     Prior to the Omega acquisition, Papa had told the market that Perrigo had "many hundreds of products that [it] eventually could sell if [it] had the infrastructure," but it "did not have that infrastructure in Europe."  At that time, Perrigo's business was approximately 80% driven by the U.S. market and 20% driven internationally.

72.     Analysts from Morningstar—noting Perrigo's "difficulty expanding its store-brand business outside of the U.S. where few large pharmacy and retail chains exist"—viewed the deal as "an incremental positive for the company's narrow economic moat."  Morningstar further reported that the acquisition "gives Perrigo access to the branded international OTC market" and "boosts Perrigo's diversification and economies of scale."  Jefferies LLC similarly reported that the Omega deal "makes abundant strategic sense" and provides "infrastructure that would have taken years to build organically."  Through the acquisition, Perrigo had increased its international business to approximately 45%, which was comprised primarily of Omega and its European network.

73.     Prior to announcing the deal in November 2014, Perrigo had been given access to a confidential "Data Room" and open access to Omega's "business, operations, assets, liabilities, legal, tax, commercial and accounting and financial condition," including meetings with Omega management and the ability to submit and have answered written inquiries concerning Omega's operations. *See* Purchase Agreement, Ex. 10.1 to Form 8-K filed on November 12, 2014.  In or around February 2015, Papa, Brown, and other members of Perrigo's leadership met in Norway with Omega's executive team.  CW-1 attended that meeting.

74.     The Omega transaction closed on March 30, 2015.  Shortly thereafter, Defendants proclaimed that the acquisition left the Company "better positioned than ever to continue a strong growth trajectory," placing it in the top five global OTC companies by revenue.

Defendants touted the "key benefits" Perrigo would derive from Omega, representing that Omega advanced the Company's international growth strategy through its "established commercial infrastructure in the high-barrier to entry European OTC marketplace," which would purportedly afford Perrigo "critical mass in all key European countries."  Perrigo also directed investors' attention to its now expanded product portfolio and enhanced scale and distribution network in Europe, highlighting the combination of "Perrigo's supply chain and operational excellence with Omega's OTC branding and regulatory expertise."

75.     To better align Perrigo's organizational structure following the addition of Omega, the Company changed its reporting segments (discussed above), creating the BCH segment, which consisted largely of Omega.

### C.     Mylan Begins Its Takeover Attempt

76.     On April 8, 2015, on the heels of the completion of the Omega acquisition, Mylan approached Perrigo's Board, including Papa, then the Chairman of that Board, with an offer to purchase Perrigo for approximately $205 per share.  At the time, that proposed price represented approximately a 25% premium to Perrigo's stock price at the close of trading on April 7, 2015 ($163.73).

77.     Mylan was no stranger to Perrigo.  Less than a year earlier, in or around May of 2014, Perrigo executives, including Papa, engaged in preliminary discussions with Mylan about potentially merging the two companies.  Those preliminary discussions were not publicly and fully disclosed by Perrigo until Mylan made its Offer.  The previous discussions did not advance far, and the two companies went their separate ways shortly thereafter.

78.     In the public offer letter addressed to Papa, Mylan's CEO touted the Offer as "the culmination of a number of prior discussions between Mylan and Perrigo about the compelling strategic and financial logic of this combination," with Mylan representing that the combination

would "generate enhanced growth and deliver significant immediate and long-term value and benefits for shareholders and the other stakeholders of both companies." That same day, Perrigo confirmed receipt of the "unsolicited, indicative proposal" and stated that Perrigo's Board would meet to consider Mylan's Offer.

79.     On April 8, 2015, in response to the news of Mylan's Offer, numerous analysts and market commentators extolled the potential of a Perrigo-Mylan combination:

a)  During CNBC's "Mad Money," host Jim Cramer told investors "[t]hese two would be a match made in heaven."

b)  Bank of America Merrill Lynch reported "[f]rom a business combination perspective, this make sense to us as it brings together two companies with arguably best-in-class operations in generic (MYL) [Mylan] and OTC (PRGO) spaces. Therefore, a combined entity, which could result in a best-of-breed, highly diversified generic Rx/OTC company, and have meaningful potential for operational synergies, is conceptually appealing in our view." *MYL not waiting for an Rx to buy OTC*, April 8, 2015.

c)  Barclays reported "[w]e believe a combination between MYL and PRGO would offer a unique value proposition to their customers based on PRGO's unique 'front of the store' OTC business combined with MYL's 'behind the pharmacists counter' generics franchise." *U.S. Specialty Pharmaceuticals Center of the Storm*, April 8, 2015.

d)  Deutsche Bank reported "[w]e believe MYL's Chairman's letter to PRGO makes a compelling case for the business combination." *Deal Could Make a Ton of Sense*, April 8, 2015.

e)  Stifel reported "[f]ollowing 1-2 years of underperformance (at PRGO), we think shareholders might appreciate this opportunity." *MYL Bid puts PRGO in Play*, April 8, 2015.

**D.     Defendants Misled Investors Concerning the Omega Acquisition and the Company's Growth Prospects while Rejecting Mylan's Multiple Offers**

80.     Because Perrigo is an Irish company, Mylan's April 8, 2015 proposal set the clock running on an offer period under the Irish Takeover Rules, which govern both the bid and the target's defense against the bid in a takeover. Among other things, the Irish Takeover Rules

prohibit unsubstantiated claims to defeat an offer, requiring the directors of the offeree, including Defendant Papa, to make a representation that they:

> [A]ccept responsibility for the information contained in the document or advertisement and [to represent] that, to the best of their knowledge and belief (having taken all responsible care to ensure that such is the case), the information contained in the document or advertisement is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information.

Irish Takeover Rule 19.2.   Similarly, recognizing that the target can attempt to influence takeovers through the issuance of financial projections or guidance, Irish Takeover Rules require that *"every such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy and objectivity by the directors of the . . . offeree . . . ."* Irish Takeover Rule 28.1

81.     Against this backdrop, on April 21, 2015, Perrigo announced to investors that its Board of Directors had "unanimously rejected" Mylan's Offer, representing that the Offer "*substantially undervalues the Company and its future growth prospects*[,] [] is not in the best interests of Perrigo's shareholders," and "*does not take into account the full benefits of the Omega Pharma acquisition*."

82.     Defendants focused investors on the unprecedented access Omega purportedly provided Perrigo in the European market, representing that Omega "provide[d] a significantly enhanced international platform for additional growth," including "access to over 300 million consumers in Europe along with a springboard for international expansion through its established European commercial regulatory and distribution platforms."   "Simply put," Defendants told investors, in combination with Perrigo's existing business and product lines, "Omega allows [Perrigo] to pursue paths that were never available to us in the past."

83.     Given these representations, analysts pressed Papa for information concerning Omega and the status of Perrigo's integration efforts.  In response, Papa assured investors that: (i) the Company was "very pleased with our initial integration projects with Omega"; (ii) "a lot of good activities [were] happening with the integration team"; and (iii) the Omega acquisition left the Company "better positioned than ever to continue a strong growth trajectory."

84.     That same day, Papa was also asked to comment on pricing in the generic drug industry and whether changes to the industry would impact Perrigo's business.  In response, Papa stated that Perrigo intended to "keep pricing flat to up slightly" despite industry trends.  Papa would repeat this assurance concerning Perrigo's supposed immunity to pricing pressures throughout 2015 and the beginning of 2016, despite lacking a reasonable basis to do so, as alleged in Sections IV.E & VI.B, *infra*.

85.     On April 24, 2015, Mylan revised its offer, announcing a formal offer (the "Second Offer") to Perrigo's Board to purchase Perrigo in exchange for $60.00 per share in cash and 2.2 Mylan ordinary shares per share—reflecting an economic value of approximately $181.67 per Perrigo share.  The Second Offer, however, was swiftly rejected by Perrigo, who "strongly advised [shareholders] to take no action in relation to the [Second] Offer," and stated that the Offer "significantly undervalue[s] the Company and its future growth prospects and was not in the best interests of Perrigo's shareholders."

86.     Undeterred, on April 29, 2015, Mylan announced a further revised offer (the "Third Offer") to purchase Perrigo.  This time, Mylan offered to purchase the company in exchange for $75.00 per share in cash and 2.3 Mylan ordinary shares per share—reflecting a value of approximately $202.20 per Perrigo share.  Hours later, Perrigo rejected the Third Offer,

claiming again that it still "significantly undervalue[s] the Company and its future growth prospects and was not in the best interests of Perrigo's shareholders."

### 1.    Unbeknownst to Investors, Omega Was Nowhere Near the Point of Contributing to Perrigo's Bottom Line or Growth

87.    Despite touting Omega's value to Perrigo's bottom line through synergies and operational efficiencies as the primary basis for rejecting Mylan's multiple offers, behind the scenes, Defendants knew or recklessly disregarded that the acquisition was a calamity plagued by one issue after another, making the realization of Omega's potential value impossible.

88.    While Defendants boasted that the Company had "delivered on our Omega integration plan" and "achieved great operational efficiencies," according to Ray, CW-1, CW-4, and CW-5—each of whom had direct involvement with Omega's integration—Perrigo was unable to migrate Omega's financial data and performance information to Perrigo's SAP system, which is used to enable companies to run their business processes, including accounting, sales, production, and accounts payable.  This critical issue stemmed from the incompatibility between Perrigo's and Omega's data management systems, which was or should have been obvious to Defendants during their due diligence period prior to acquiring Omega.  During the Relevant Period, Omega operated on as many as thirty-five discrete data systems, the overwhelming majority (if not all) of which were incompatible with SAP.

89.    CW-1, who served as the Company's CISO until July 2015, further explained that connectivity between Omega's own systems was a significant issue.  While a handful of the Omega franchises were connected by a virtual private network ("VPN"), which extends a private network across a public network and enabled the sharing of data with Omega's German data center, most franchises were not connected at all.  CW-2, the former Associate Director from mid- to late-2016, confirmed that following the acquisition Omega franchises were not working

in unison with one another, much less working with Perrigo, thus impeding the Company's integration of Omega.

90.     Ray, who served as the Company's CISO from July 2015 through November 2015, stated that when she joined Perrigo, integration between Perrigo and Omega was at a complete standstill.  Immediately upon taking over as CISO in July 2015, Ray was instructed by CIO Farrington to reach out to Omega's heads of IT to find out why integration was not moving forward.  Ray recalled that during this period of time, Perrigo knew the Company needed to establish a centralized SAP system in Germany, where Omega's central data center was to be maintained.  According to Ray, this centralized SAP system would, in theory finally allow Perrigo to consolidate all Omega data in one location, but that this critical step had not been implemented as of late 2015 when Ray left the Company.

91.     Ray further explained that, in or around August 2015, Mary Donovan, who had been hired to assist in the Omega integration efforts, came to the U.S. to meet with Perrigo's IT development team and discuss existing integration roadblocks and challenges.  These roadblocks and challenges included the results of an external scan of the Omega network and PEN Test (Penetration Test) that had been performed by CW-1 prior to July 2015, and the SAP development team needs.

92.     Ray and numerous CWs, including CW-1, CW-5, and CW-6, each corroborated and confirmed that only a "bare minimum" amount—or, in many cases, none—of Omega's data was migrated to Perrigo's systems during 2015 and 2016, much less at this early stage when Defendants were making false representations regarding integration efforts.  CW-5, for example, recalled that Omega data was not fully migrated into the Perrigo data warehouse through the time of his departure from the Company in late 2016.  According to CW-7, the Brand Manager

of Omega UK between March 2014 and February 2017, it was not until the autumn of 2016, *after* the ultimate revelations about Omega were made by the Company, that Perrigo even began the process of integrating Omega UK into the Company.

93.     Because Perrigo was not able to migrate Omega's financial information or operate Omega franchises through its automated SAP system, Ray and CW-1 explained that Perrigo had no real-time access to critical Omega financial data, including data relating to: (i) sales, including orders, returns, and discounts; (ii) purchases, including orders, returns, and damaged goods reports; (iii) inventory, including sub-ledgers, damaged goods, and obsolete goods; and (iv) accounting, including sub-ledgers for accounts receivable and payable.  Perrigo's dearth of vital information could (and did) impact supply chains, distribution channels, inventory management, and other decision making, according to Ray and CW-1.

94.     Absent a central, functioning, automated data entry and management system, Ray and CW-1 explained that the Omega franchises were thereby forced to manually input this critical information concerning Omega's financial performance into Excel spreadsheets or other non-automated files or convey this information to Perrigo orally.  This process was riddled with errors and led to a number of internal disputes at Perrigo over the accuracy of the data. According to these witnesses, substantive Omega financial data and performance information was available only by manual request made by Perrigo's accountants to Omega's franchises, which could take weeks to complete depending on the complexity of the data sought.

95.     Ray explained that any questions posed by Perrigo to Omega concerning its financial data or performance required the respective Omega location to manually check all data relevant to the inquiry and report back to Perrigo, which "definitely had an impact" on Perrigo's operations.  As one example, Ray explained that any time Perrigo needed to create a report

consolidating any financial information from Perrigo's and Omega's respective operations, particularly for senior leadership, the Company had to manually collect reports from each of the thirty-five franchises and merge them together.  This process could take at least three weeks for each such report, and Defendants knew or recklessly disregarded that it was highly susceptible to error and prevented Perrigo's management from having a true picture of Omega's performance.

96.     According to both Ray and CW-1, the fact that Omega's financial data was non-automated caused a lack of confidence in the data because Perrigo was forced to rely on representations made by Omega without having access to the underlying data in order to verify its accuracy.  As one example, CW-1 explained that in or around July 2015, CIO Farrington discussed in a weekly IT leadership meeting how actual hard data ultimately obtained from Omega differed from the verbal data previously provided by Omega.  Farrington specifically discussed the problem of Omega's invalid and inaccurate data. CW-1 recalled that Farrington had told him that Coucke had contentious calls with the rest of Perrigo leadership regarding the accuracy of the Omega data.

97.     As another example, Ray recalled that until at least the end of November 2015, Perrigo had no visibility into trends in the Omega sales or supply chain and lacked an understanding of the causes of variances in projected sales or expenses because the Company had no access to the underlying detail.  CW-1 similarly concluded that Perrigo's failure to migrate Omega's data from across its numerous business units was highly problematic in that it adversely impacted Perrigo's visibility into Omega's financial data and performance and crippled Perrigo's ability to understand Omega's financial performance, projections, and overall results.

98.     Further compounding Perrigo's undisclosed issues with Omega, according to Ray, Perrigo lacked an understanding of applicable laws and regulations governing its operations in Europe.  For one, international and local-country data and personal privacy laws preclude taking certain data outside the host-country borders, including within the EU, Germany, and Belgium, among others.  These laws include the Data Privacy Act, the German Privacy Act and the Belgium Privacy Act.  This, in turn, prevented the Company from removing certain financial data from Omega's various franchises and migrating it to Perrigo's central system.  Similarly, CW-3—who was responsible for all commercial activities at Omega's Belgium franchise following the acquisition—explained that Omega operated under International Financial Reporting Standards ("IFRS"), while Perrigo operated under GAAP, which made migration of financial reporting information extremely challenging.  This was particularly true because Perrigo's financial reporting systems operated on a weekly system (i.e., results were tabulated by week), whereas Omega tabulated results by the month.

99.     Far from the "very simple" synergy of existing networks that Papa pitched to investors at a conference on May 6, 2015, Defendants ignored, and were substantially disadvantaged by, the dynamics of the European market in which Omega operated.  Prior to its acquisition in March 2015, Omega operated primarily as a supply channel for OTC drugs, supplying approximately 2,000 such products.  Following its acquisition, however, Omega was transitioned to serve as a sales channel, with Perrigo taking over the role of the supplier.  Replacing Omega's EU suppliers with Perrigo's U.S.-based suppliers, however, proved to be problematic and cut into Perrigo's margins.

100.    More specifically, Ray explained that because OTC drug prices are set and governed by the European country of sale or the EU, price flexibility and the ability to compete

in Europe is limited.  Much of the EU pharmaceutical business is contracted through local governments who wish to do business with in-country companies first and European suppliers second.  Ray estimated that outside suppliers, disadvantaged in the pecking order, must price their products 5% to 10% below in-country suppliers to be competitive.  Given that Perrigo lacked a European manufacturing facility, such pricing squeezed margins, particularly when factoring in shipping, tariffs, and other costs necessary to bring products to market.  This issue was exacerbated by the fact that host-country government contracts usually last for several years.  Moreover, jettisoning Omega's EU-based suppliers in favor of Perrigo's U.S.-based suppliers changed the terms of service for numerous existing Omega service contracts, which, according to Ray, could cause serious interference with Omega's existing customer relationships.

101.    Given Perrigo's outsider status, as Ray explained, Perrigo was forced to cut into its margins (i.e., reduce prices below those offered by in-country supplier) just to compete, as it was not as attractive to European government customers as an in-country supplier, or even an outside-country supplier with a larger EU presence.  None of these pricing problems in the European market, all of which negatively impacted Perrigo's ability to sell its products in Europe, were disclosed by the Company before the ultimate impairments on Omega were taken.

## 2.    Defendants Were Fully Informed of, and Recklessly Disregarded, the Myriad, Debilitating Issues that Were Plaguing Omega

102.    According to multiple witnesses, from the outset of the Omega acquisition, the systems and financial integration, data migration, and pricing issues concerning Omega were known to Perrigo's senior management, including the Individual Defendants, but were recklessly disregarded because senior management was preoccupied with defending against Mylan's takeover attempt.

103.    During a June 2, 2015 call with investors, Papa identified Farrington as the "specific person that I [Papa] had designated in my Company who heads up all my integrations." Papa added, "I said, Tom, you need to help us successfully integrate Omega.  That's your role. Make sure it happens.  And that's your focus."  As a result, CW-1 stated that Farrington held weekly or bi-weekly meetings with senior members of Perrigo's IT leadership team, which included:  (i) Farrington; (ii) Brian Marr, Perrigo's Director of Infrastructure, who reported primarily to Farrington; (iii) Paula Makowski, Farrington's Chief of Staff; (iv) Mary Sheahan, who assisted in Perrigo's integration efforts and was responsible for communicating with Omega and ensuring their concerns in the integration process were heard and addressed; (v) Sven Deneubourg, the Corporate IT professional for Omega (housed in Omega's Belgium headquarters); (vi) Scott McKeever, Perrigo's Vice President of Global Applications Service Delivery; and (vii) Brona Brillan, Perrigo's Vice President of Business Process Architecture.

104.    At these IT leadership meetings, the group discussed, among other things: (i) issues Perrigo was having in obtaining accurate oral data and timely hard copy data from Omega given the non-automated nature of Omega's financial reporting and how to validate and determine the accuracy of data received from Omega; (ii) Omega integration efforts; (iii) roadblocks concerning the migration of Omega's data, including security risks or data compliance issues arising from the migration; (iv) the dynamics of the European market in which Omega operated as they pertained to Perrigo's inability to competitively price products and achieve favorable margins; and (v) the aggressive growth targets Perrigo was setting for Omega, including pushback from Omega executives and personnel (discussed in § IV.D.3, *infra*).

105.    According to CW-1, Farrington made it clear that he met and conversed regularly with Papa, Brown, and Coucke, as well as other Board members and senior members of Papa's

team.  As one example, CW1 recalled that Farrington represented to IT leadership that he was in daily contact with Papa.  In CW-1's words, "if not on speed dial with each other, [they were] pretty darn close."

106.    Ray also stated that Perrigo leadership was told by Omega personnel that full migration of Omega data from each country location could not be completed based on the incompatible operating systems and applicable EU regulations, but that Perrigo continued to ignore the negative impact of the issue.  Ray met, spoke on conference calls, or emailed with senior level personnel at both Perrigo and Omega at least monthly, and sometimes weekly, to discuss compliance and regulation problems related to migrating Omega's data from Germany to the U.S.  These personnel included:  (i) Farrington; (ii) Marr; (iii) Makowski; (iv) Donovan; (v) Deneubourg; and (vi) Jill Gilbert, SAP System Architect, who also reported to Farrington.

107.    Ray stated that the Omega integration team had weekly reporting responsibilities to CIO Farrington.  To this end, Makowski, Farrington's Chief of Staff, would send a weekly email requesting a status report.  Ray would respond to both Farrington and Makowski providing updates on her conversations with Deneubourg and Donovan and the aforementioned integration calls and meetings.  Often times, Ray would have no information to report because Deneubourg was out of the office from July 2015 through August 2015 (returning part time in September 2015 with a broken leg), such that integration efforts "came to a standstill."

108.    Ray explained that even prior to his injury, Deneubourg was overwhelmed by trying to plug the numerous holes from the high priority PEN Testing relating to Omega's systems, in addition to handling the day-to-day troubleshooting of Omega (i.e., providing regular and routine tech support to and troubleshooting for Omega employees).  Ray added that because of the sheer number of Omega franchises Deneubourg supported, he could not possibly get all

the work done.   As a result, local IT issues were taking precedence over the Omega/Perrigo integration.  Queried if Deneubourg was "ridiculously understaffed," Ray responded, "yes."

109.    Ray explained that during meetings and calls that took place during her tenure, Farrington confirmed that he had reported the Omega data migration issues to Papa and sought assistance at the highest levels—from Papa and Perrigo's Board—to remedy those issues.  As one example, Ray recalled that Farrington told Papa during the summer of 2015 that the migration had not occurred, that the project was stalled, and that Deneubourg was injured.  As another example, Farrington mentioned to Ray and other members of Perrigo's integration team during at least two or three meetings leading up to the August 2015 Perrigo Board meeting, that he spoke with Papa about dedicating funds to hire an assistant for Deneubourg.  Ray and the integration team even put together a "CapEx forecast" and "Request for Hire," detailing the need for the hire as it pertained to the stalled integration project.

110.    The Board, led by Papa, not only denied the request in August 2015, but again in October 2015, when it deferred consideration until January 2016.  Farrington told the integration team that he attempted (without success) to make the case for the position several times with Papa during the August 2015 through November 2015 timeframe.  Ray recalled Farrington instructing the integration team to "do what you can to move it forward."  CW-7 similarly recalled that Perrigo had taken its "eyes off the ball" during Mylan's takeover bid. CW-7 spoke specifically about the restructuring and integration of Omega UK into Perrigo, which CW-7 stated was put on hold during the Mylan bid as Omega was waiting on decisions from Perrigo as to how to proceed.

111.    Ray explained that several Omega senior members of sales leadership felt their concerns regarding the Omega data migration issues were being ignored during meetings with

Perrigo executives, including Papa and Perrigo Board members.  According to Ray, during July and August 2015, Omega's senior-most executives made several attempts to report their concerns to Papa and Brown, both of whom refused to engage in additional discussions.  Ray recalled that Omega leadership felt that Perrigo, preoccupied with the Mylan takeover bid, disregarded or minimized the negative impact of the debilitating migration issues.  Indeed, Omega's head of IT, Deneubourg, specifically told Ray that Coucke had instructed him in mid-2015 to put integration to the side.

112.   Based on conversations that Ray had with Farrington and those that took place during integration meetings and conference calls, Ray understood that Brown met with Farrington at least weekly and was aware of the integration issues and failures.  Ray also recalled that in August 2015, Donovan came to the U.S. and briefed everyone on the overall integration challenges with respect to Omega, including technology and security issues.  Ray, CW-1, CW-5, and CW-6 all corroborated and confirmed that, in stark contrast to Defendants' public statements, by the summer of 2016—a year and a half following the acquisition—only a "bare minimum" of Omega's financial data and performance information had been migrated to Perrigo's systems.

113.   CW-4 recalled that shortly after one of the Company's public filings in late 2015 or early 2016, Perrigo was criticized by an analyst for not knowing more about Omega's poor profitability.  According to CW-4, "corporate didn't have access to the Omega numbers they wanted" at that time given the faulty integration process.  CW-4 stated that very late in the quarter-end or year-end financial consolidation process, Perrigo's finance department identified shortfalls in Omega's financial results, which were largely unknown by finance leadership until that late date.  CW-4 attributed the late identification to the deficient data migration process.

114.    Perrigo also was late to acknowledge the pricing concerns voiced by Omega and knew or recklessly disregarded the extent to which Perrigo would have to discount products to make them competitive in the EU.   Ray stated that Omega executives and sales personnel explained the effect of the pricing challenges caused by EU regulations to Perrigo's U.S. executive management, including Papa, senior management in Ireland, and Board members in the U.S.  According to Ray, the Omega sales team felt that executive management and the Board ignored or minimized their warnings because they were more concerned at the time with fending off the Mylan takeover.  Frustration boiled over to the point where some Omega salespeople stopped attending meetings with Perrigo's executive management.  Ray's impression, based on the calls and meetings she attended, was that the frustration applied to sales challenges at all Omega locations.

115.    Given the magnitude and duration of these problems with Omega during the Relevant Period, Perrigo was nowhere close to being in a position to benefit from the Omega acquisition.  Despite having knowledge of these material problems with the Omega integration, Defendants continued to point to Omega's value as the primary basis for rejecting Mylan's multiple offers in communications with Plaintiff and other investors.

### 3.    Defendants Imposed Unrealistic Financial Targets on Omega, which They Knew or Should Have Known Could Not Be Achieved

116.    Given the myriad, debilitating issues hampering Omega which prevented Defendants from getting Omega off the ground, let alone capitalizing on synergies, Defendants knew or recklessly disregarded that Omega drastically underperformed throughout the Relevant Period.  According to CW-1, "[Perrigo] overestimated what they had" with respect to Omega.

117.    CW-1 explained that Perrigo was very aggressive as to demanding future sales and margins for Omega in their budgeting process.  To this end, CW-1 recalled hearing of the

aggressive growth targets and the pushback from Omega through anecdotes provided by Farrington, Sheahan, and Deneubourg.  One of these accounts is that during one of the weekly meetings, Farrington told IT leadership that Perrigo wanted to see revenue growth at Omega because Perrigo leadership needed to go back to the Board to justify the purchase of Omega.

118.    To make matters worse, Defendants ignored the top-level information they did receive from Omega concerning Omega's financial performance and pushed Omega for unrealistic deliverables.  Through IT leadership meetings and conversations with Farrington, Sheahan, and Omega staff in Belgium, including Deneubourg, CW-1 learned that Omega personnel were constantly pushing back against the aggressive projections received from Perrigo.  Because Perrigo "didn't like the numbers" (actual and forecasted) that Perrigo received from Omega, the Company, in turn, challenged Omega on the accuracy of the financial data that Omega provided, failing entirely to address the issues raised by Omega.  But as CW-1 stressed, "if you don't have all the data, it's hard to say what your financial numbers are."

119.    As one example, CW-3 explained that in September or October of 2015, he prepared the 2016 Omega Belgium Forecast for Omega Belgium management and projected 2016 Omega Belgium Earnings Before Interest and Taxes ("EBIT") of approximately 9 million euros.  After submission, however, he received from Omega Belgium Financial Director, Anja Imschoot, a budget created by Perrigo management, calling for EBIT of approximately 24 million euros.  According to CW-3, this forecast was "far from realistic," as, among other things, it called for two to three times more EBIT than he had projected.

120.    Thereafter, CW-3 met with Imschoot and the entire Omega Belgium management team regarding the budget.  During the meeting, everyone agreed that the Perrigo forecast of 24 million euros was unrealistic.  CW-3 personally told internal auditors at Perrigo who were

present at Omega Belgium that the forecast was both unrealistic and misguided, and he believes from conversations with Omega senior management that these conclusions were communicated to Perrigo's executive team, including Papa, Brown, and Coucke.

121.    During CW-2's last six months at Perrigo (i.e., the second half of 2016), CW-2 worked with Perrigo Quality, Research & Development, and Regulatory personnel, many of whom similarly informed CW-2 that Perrigo had unrealistic revenue expectations for Omega. Among other things, CW-2 was told that Perrigo overestimated its ability to take existing Perrigo products and sell them in Europe through the existing Omega business structure and was still struggling to do so even after the Company announced the Omega impairments.  Like the issues arising from Perrigo's lack of understanding of European privacy laws, Perrigo failed to acknowledge or appreciate the legal and regulatory challenges which made it extraordinarily difficult to sell Perrigo products in Europe.

122.    These material issues with Omega's performance and ability to meet deliverables were known by senior management, including Brown.  CW-8 worked directly with Omega and explained that he had learned during quarterly update meetings in the second half of 2015 through early 2016 that Omega was struggling, failing to meet its performance goals, and was not at all what Perrigo had expected.  CW-8 recalled that slides shown during these meetings made it clear that Omega was not performing and that these same slides were shown by Brown to the executive team.

### E.    Defendants Misled Investors about Perrigo's Supposed Insulation from Pricing Pressures

123.    While Perrigo's newly-formed BCH segment housed the Company's consumer-facing business (including Omega), Perrigo's Rx segment is (and was throughout the Relevant Period) primarily focused on the sale of generic and specialty pharmaceutical prescription

products in the U.S.  Throughout 2015, Defendants represented that the prices for Perrigo's prescription drugs in the U.S., including generics, were sustainable.  In fact, Defendants—on no less than *five* occasions between April 2015 and January 2016—told investors that the Company intended to keep pricing in its Rx segment "flat to up slightly," while Brown assured the market that Perrigo's revenues were "insulated from the current pricing drama" in the market.  In contrast to these representations, Defendants knew or recklessly disregarded the fact that the pricing levels for Perrigo's generic drug products were unsustainable—a fact that the Company did not begin to reveal until April 2016.

### 1.   The FDA's Accelerated Approvals for New Generic Drugs Reaches Record Levels in 2015

124.   Generic drugs are a key component of the U.S. healthcare system, accounting for approximately 88% of all prescriptions written in the U.S. and over $74 billion in annual sales. Since the implementation of the Drug Price Competition and Patent Term Restoration Act (known as the "Hatch-Waxman Act") in 1984, generic drugs have resulted in tens of billions of dollars in annual savings for consumers and the overall healthcare system.  The Hatch-Waxman Act initially was enacted to simplify the regulatory hurdles for bringing generic drugs to market and eliminated the prior requirement that generic drug companies file costly New Drug Applications ("NDAs") to obtain FDA approval.  The Hatch-Waxman Act is designed to get less expensive generic drugs into the hands of consumers expeditiously.  Under the revised process, generic drug companies can instead file an ANDA.  A generic drug company that submits an ANDA generally is not required to include clinical trial data to establish the safety and efficacy of the drug.  Instead, the generic drug company can "piggyback" on the safety and efficacy data supplied by the original NDA holder for a given drug.

125.    Generic drugs must meet certain bioequivalence and pharmaceutical equivalence standards set by the FDA to ensure that the generic drug is essentially an exact substitute for the given brand-name drug.  To receive FDA approval through an ANDA, a generic drug must contain the same active ingredient, in the same dosage form, and in the same strength to be bioequivalent to the reference listed drug (i.e., the original brand-name version approved by the FDA through an NDA).  The FDA uses a review process to ensure that brand-name and generic drugs that are rated "therapeutically equivalent" have the same clinical effect and safety profile.  According to the FDA: "[P]roducts classified as therapeutically equivalent can be substituted with the full expectation that the substituted product will produce the same clinical effect and safety profile as the prescribed product."  The FDA assigns generics that are deemed to be therapeutically equivalent to their brand-name counterparts an "AB" rating.  Drugs that are bioequivalent, but that do not share the same dosage form, are not AB-rated.

126.    The Hatch-Waxman Act also provides a 180-day exclusivity period for the first generic drug company that files an ANDA and simultaneously challenges the validity of the patent for a brand-name drug.  This exclusivity period, which allows the generic drug company to market its generic version free from competition, is intended to spur generic drug companies to provide alternatives to brand-name drugs.  When generic drugs enter the market, they are often priced well below the brand-name drugs and quickly take a large market share from the brand-name drug company.  The first generic drug will generally be priced 15% to 20% below the brand-name drug.  Once the exclusivity period ends and more generic versions enter the market, the price of the generic drugs continues to fall and the generics' combined share of the market for that drug, relative to the brand-name equivalent, continues to grow.  The price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the

brand-name drug.  Eventually, the price of the generic drugs reaches an equilibrium price point, at or close to the manufacturers' marginal production costs, resulting in significant savings for consumers, insurers, and employers.

127.    This competition allows purchasers to buy the generic equivalent of a brand-name drug at substantially lower prices.  As Stephen W. Schondelmeyer, Pharm.D., Ph.D., Professor of Pharmaceutical Care & Health Systems at the University of Minnesota, College of Pharmacy, explained in his November 20, 2014 testimony before the Senate Committee on Health, Education, Labor, and Pensions:

> The Congressional Budget Office has credited the Hatch-Waxman Act and, importantly, the process for easy and routine A-rated generic substitution by pharmacists with providing meaningful economic competition from generic drugs, and with achieving billions of dollars of savings for drug purchasers such as consumers and employers.

128.    For all of these reasons, the overall cost of prescription drugs for the public is reduced by faster generic drug approval times.  Generally speaking, the average time between generic drug application submission and approval ranges from six months to several years, depending on the complexity of the drug production and the completeness of the application.

129.    Given the influx of market participants as the generics market expanded, the FDA was left with a substantial backlog of ANDAs, which it largely attributed to a lack of resources.  Spurred on by the severe scrutiny placed on the FDA's approval process during the early years of the AIDS epidemic in the late 1980s and early 1990s, in 1992, Congress enacted the Prescription Drug User Fee Act ("PDUFA"), which provided the FDA with a supplemental revenue source to fund the approval process, namely, fees paid by drug companies seeking approval of their drugs.  PDUFA was passed in order to shorten the length of time from a manufacturer's submission of a new drug application to the FDA's decision to approve or deny the application.

130.    After undergoing various authorizations and reauthorizations since its inception, the PDUFA was once more reauthorized in July 2012, at a time when the FDA was saddled with nearly 3,000 backlogged ANDAs and 2,000 prior approval supplements ("PASs").[6]  Around that same time, Congress passed the Generic Drug User Fee Act of 2012 ("GDUFA"), which authorized additional funds for the FDA's review of generic drug applications, among other things.

131.    With the additional funds provided by GDUFA came an FDA commitment to reach a variety of goals, including accelerating the review process and eliminating the mounting backlog of ANDAs.  This backlog had led to unprecedented generic price inflation between 2013 and late 2014—the result of highly concentrated markets in which a handful of competitors could hike prices.  One such commitment the FDA took was to review and act on 90% of all backlogged ANDAs, PASs, and amendments by the end of fiscal year 2017.

132.    By early 2015, ANDAs were still subject to significant backlogs, limiting price competition for generics.  In a keynote address at the Generic Pharmaceutical Association annual meeting in the spring of early 2015, the Director of the FDA's Office of Generic Drugs, Kathleen Uhl, M.D., pledged accelerated action.  The FDA delivered on Director Uhl's promise, hiring nearly 1,200 new employees in 2015—more than the preceding two years combined.

133.    As the graph below depicts, the number of full approvals and tentative approvals of generic drugs began to reach record heights in or around April 2015, at the start of the Relevant Period.

---

[6] A PAS is a filing with the FDA to gain approval of a major change that has a substantial potential to have an adverse effect on the identity, strength, quality, purity, or potency of a drug product, as these factors may relate to the safety or effectiveness of the drug product.

**Chart 7. Approvals and Tentative Approvals**



134.     In addition, as shown below, between April 2015 and December 2015, the FDA approved the ANDAs for at least nine drugs that compete directly with drugs sold by Perrigo, according to the FDA's Orange Book:

| PROPRIETARY NAME | APPLICANT HOLDER | APPROVAL DATE |
|---|---|---|
| 1% CLINDAMYCIN PHOSPHATE TOPICAL SOLUTION | VINTAGE PHARMACEUTICALS | 5/29/2015 |
| 0.25% DESOXIMETASONE TOPICAL CREAM | AKORN INC | 6/12/2015 |
| 0.01% FLUOCINOLONE ACETONIDE TOPICAL OIL | AKORN INC | 6/25/2015 |
| 0.25% DESOXIMETASONE TOPICAL CREAM | ACTAVIS MID ATLANTIC LLC | 9/4/2015 |
| 400MG IBUPROFEN TABLET | GRANULES INDIA LTD | 9/15/2015 |
| 600MG IBUPROFEN TABLET | GRANULES INDIA LTD | 9/15/2015 |
| 800MG IBUPROFEN TABLET | GRANULES INDIA LTD | 9/15/2015 |
| 20MG FAMOTIDINE TABLET | AUROBINDO PHARMA LTD | 12/22/2015 |
| 40MG FAMOTIDINE TABLET | AUROBINDO PHARMA LTD | 12/22/2015 |

135.   On November 9, 2015, InsiderHealthPolicy reported in an article entitled, *FDA, Pressed to Clear Generic Drug Backlog, Says It Is Ahead of Schedule*, that the FDA had taken action on **82% of the backlog** "as a rising chorus of voices, including Democratic presidential candidate Hillary Clinton, press the agency to clear the backlog to help counter rising pharmaceutical prices."

136.   All told, in 2015, more than 700 generic drugs were approved or tentatively approved by the FDA—**the highest figure in the FDA's history**.

### 2. Defendants Knew or Recklessly Disregarded that the Pricing Levels for Perrigo's U.S. Generic Drugs Were Unsustainable

137.   In light of the well-known and undeniable impact that increased competition and generic drug approvals has on market pricing for such drugs, as well as the historic tidal wave of ANDA approvals by the FDA beginning in April 2015, Perrigo knew or recklessly disregarded that the elevated pricing levels for its generic drugs were unsustainable as the rate of new approvals accelerated and continued unabated throughout 2015 and into 2016.   Perrigo's knowledge is demonstrated by the fact that it had entire divisions tasked with monitoring its rivals' development of competing generic drugs and the regulatory status of such potential competitor drugs.   However, the market was in the dark as Defendants falsely represented that Perrigo was immune to such pricing pressures.

138.   *First*, Defendants were aware that increased competition in the industry was pushing—and would continue to push—generic drug pricing down.   As discussed above, beginning in April 2015, the FDA began to clear its substantial backlog of ANDAs and approve new generic drugs at record levels, including nine drugs approved between May and December 2015 that competed directly with Perrigo's products.   The accelerated rate of ANDA approvals persisted throughout 2015 and into the first quarter of 2016.

139.   Internally, Defendants knew the Company was not immune to these pricing pressures, as Hendrickson admitted following Papa's abrupt departure from the Company, and that competition was the cause of such pressures.  According to CW-8 and CW-9, Perrigo, like other drug companies, kept track of what competing drug companies were doing in the new product development area.  More specifically, Wesolowski had a running list that included not only Perrigo products coming to market, but also identified the companies in competition with Perrigo to be first to market in the ANDA process.  CW-8 explained that Wesolowski would give him the list identifying which competing companies were applying for ANDA approval of competing products so that CW-8 would know which companies Perrigo had to beat in the ANDA process.  Wesolowski had management oversight of the entire generic side of Perrigo's business and reported directly to Doug Boothe, who ran the Rx segment, and who in turn, reported to Papa.

140.   According to CW-8, Wesolowski's group also knew which products other drug companies were bringing to market to compete with existing Perrigo products.  CW-8 heard individuals in Wesolowski's group discuss keeping track of such information.  CW-8 explained that Wesolowski's group needed this information so it could plan sales and pricing.

141.   CW-6, who served as a Senior Business Analyst from late 2014 through mid-2016, learned through conversations with Tom Wight, a Business Process Architect for Rx and OTC at Perrigo, that increased competition in the generic market was creating pricing pressure in the Rx segment in 2015.  CW-6, who worked on the same floor as Wight, explained that Business Process Architects are essentially business relationship managers who work with business line leaders to develop sales strategy.  CW-6 recalled being told by Wight that, whereas prior to the increased competition in the marketplace sales were almost automatic for the

business segment, during the Relevant Period, the sales team encountered a market where buyers were looking elsewhere.

142. *Second*, Defendants were aware that the generics market was under pricing pressure following the commencement of industry-wide investigations of suspicious price hikes by Congress, the DOJ, and several State Attorney Generals beginning in late 2014. These investigations have begun to reveal a reportedly broad, well-coordinated, and long-running series of schemes to fix prices for a number of generic drugs.

143. As discussed in more detail below, a March 3, 2017 Bloomberg article reported that Perrigo was one of the companies under scrutiny at the DOJ and disclosed that the DOJ sought a stay of discovery in certain civil antitrust suits brought against Perrigo. Then, on May 2, 2017, Perrigo confirmed that the DOJ had executed search warrants at the Company's corporate offices in connection with its investigation into price collusion in the generic drug industry.

144. Given the intense scrutiny of price inflation across the generic drug industry— coupled with the FDA's well-known and identifiable efforts to accelerate the approval of new generics to bring down that inflation—Defendants knew or recklessly disregarded the fact that the then-current pricing levels for Perrigo's Rx products were unsustainable. In fact, when asked about Papa's statements in March and April 2015 discussing how Perrigo Rx would not be negatively impacted by competitive pricing pressures, CW-6 responded that Papa's statements did not make sense given that he recalled the pricing pressures being felt by the Company at that time as a result of both the increased competition and the government scrutinizing generic pricing, which CW-6 discussed with colleagues on the floor.

145.    In short, even as Defendants were aware of the pricing pressures impacting the Rx business, they publicly and repeatedly denied that such pressures were having any impact on Perrigo.

**F.     Perrigo Colluded with Its Competitors to Fix Prices in the Generic Drug Markets**

146.    At the same time Defendants were making misrepresentations to investors about the purported value of the Omega acquisition and Perrigo's immunity to pricing pressures, Perrigo and certain of its rival drug makers were engaged in an anti-competitive price-fixing conspiracy involving generic drugs.   Perrigo's illicit price-fixing rendered false or misleading Defendants' repeated representations during the Relevant Period that the competitive nature of the markets allowed them to keep their generic drug prices as high as they were.

**1.     By Law, the Generic Drug Market in the U.S. Is Designed for Drugs to Reach Equilibrium Price Points**

147.    As discussed above, the price of the generic versions of a given drug can fall to as little as 10% to 20% of the original price for the brand-name drug after the eighteen-day exclusivity period under the Hatch-Watchman Act expires and additional generic drugs enter the market.  Over time, the prices of the generic drug fall until they reach an equilibrium price point, at or close to the manufacturers' MAC.  The MAC pricing regime also serves to control drug prices.  Under this regime, individual states or pharmacy benefits managers ("PBMs")—third party administrators of prescription drug programs—establish an MAC for drug products using a variety of different inputs and formulas.  If the cost for a pharmacy to dispense a given drug exceeds the MAC, the pharmacy will either opt to substitute a less expensive version, if available, or sell the drug at a loss to service the patient.  This MAC framework incentivizes pharmacies to fill prescriptions with the least expensive, therapeutically equivalent version of a drug to maximize their potential profits.

### 2.      Perrigo Colluded to Fix Prices for Several of Its Generic Drugs

148.    Before and during the Relevant Period, the operating segment with the largest impact on the Company's earnings was Rx. According to the Company's reported operating income numbers for fiscal years 2012, 2013, and 2014, the Rx division was the second largest contributor to Perrigo's adjusted net operating earnings, averaging $275.4 million annually during that time.

149.    While the competitive forces of the generic drug markets and the increased regulatory scrutiny ultimately caught up with Perrigo in 2016 and the Company was forced to lower prices for many of its drugs, in the years leading up to the Relevant Period, Perrigo and certain of its competitors colluded to engage in extraordinary price hikes that could never have occurred in a competitive market. According to a Wall Street Journal analysis of generic drug price fixing, seven of Perrigo's ten top-selling drugs experienced record price increases between 2011 and 2016, including price hikes *as high as 530%*:[7]

---

[7] *See* J. Rockoff and M. Rapoport, *Valeant's New CEO Brings Familiar Prescription*, Wall St. J. (July 5, 2016), https://www.wsj.com/articles/valeants-new-ceo-brings-familiar-prescription-1467745749.



**Potent Hikes**
The cost of many of Perrigo's best-selling drugs increased considerably under CEO Joseph Papa.

| | Comparative name brands* | Percent change |
|---|---|---|
| **Betamethasone dipropionate** – lotion .05% (1 ml)  $0.75 | Diprolene | ▲ 275% |
| **Clindamycin phosphate** – topical solution 1%† (1 ml)  $3.15 | Cleocin T | ▲ 140% |
| **Clobetasol propionate** – gel .05% (1 gm)  $9.87 | Clobevate | ▲ 495% |
| **Desonide** – cream .05% (1 gm)  $5.35 | Tridesilon | ▲ 529% |
| **Econazole nitrate** – cream 1% (1 gm)  $6.54 | | ▲ 495% |
| **Halobetasol propionate** – cream .05% (1 gm)  $4.57 | Ultravate | ▲ 151% |
| **Mupirocin** – ointment 2% (1 gm)  $0.51 | Bactroban | ▼ 75% |
| **Permethrin** – cream 5% (1 gm)  $3.09 | Elimite | ▲ 531% |

Source: Connecture          *Not available for all drugs    †Base price is from September 2013          THE WALL STREET JOURNAL.

The article cited experts from SSR Health LLC who stated that "[g]eneric drug prices rose significantly in 2013 and 2014 . . . and Perrigo upped the list prices of its generics more than many rivals.  The list prices of Perrigo's drugs rose 52% over the past four years,  compared with an average 18% across manufacturers." *Id.*

> **3.    Desonide**
>
> **a.    The Co-Conspirators' Price Hikes**

150.    Perrigo and certain of its competitors, Taro and Allergan (a/k/a Actavis)[8] engaged in anti-competitive conduct by colluding to improperly raise and/or maintain the prices of Desonide, beginning in mid-2013.  Desonide is a mild topical corticosteroid produced in cream,

---

[8] Before June 15, 2015, Allergan plc was known as Actavis plc.  Allergan plc and Actavis plc are collectively referred to herein as "Allergan."

gel, and ointment form.  Desonide is used to treat a variety of skin conditions, including eczema, seborrheic and contact dermatitis, allergies, and psoriasis, and works by reducing the swelling, itching, and redness that accompanies these conditions.  As demonstrated by publicly available data, the markets for various dosages of generic Desonide were highly susceptible to cartelization by Perrigo and its rival drug-makers and, in fact, Perrigo participated in price collusion.

151.    For example, as demonstrated by the chart and graph below, Taro and Perrigo raised the price of a 15gm tube of Desonide 0.05% cream by as much as ***470%*** between March and September of 2013.

152.    The graph below shows the average monthly price per 15gm tube of Desonide 0.05% cream manufactured by Taro, Perrigo, and Allergan between December 2010 and December 2016:



153.    The table below shows the average monthly price of a 15gm tube of Desonide

0.05% cream manufactured by Taro, Perrigo, and Allergan from March 2013 to January 2014:

**Desonide 0.05% Cream 15gm**

|  | March 2013 | April 2013 | May 2013 | June 2013 | July 2013 | Aug. 2013 | Sept. 2013 | Oct. 2013 | Nov. 2013 | Dec. 2013 | Jan. 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ALLERGAN |  |  |  |  |  |  |  |  |  |  |  |
| PERRIGO |  |  |  |  |  |  |  |  |  |  |  |
| TARO PHARM |  |  |  |  |  |  |  |  |  |  |  |

154.    This drastic increase in the price of 15gm tubes of generic Desonide 0.05%

cream occurred shortly after the GPhA 2013 Annual Meeting in February 2013 attended by

representatives from Perrigo and Taro (¶ 170), and the GPhA 2013 CMC Workshop in June

2013, attended by representatives from Perrigo, Taro, and Allergan (*id.*).

155.    There was no reasonable justification for the price hike discussed above.  While a supply shortage can explain an abrupt rise in prices, here—notwithstanding drug manufacturers' obligation to report shortages to the FDA—no such shortage of Desonide was reported during the relevant time period.  In addition, there was no significant increase in the demand for Desonide or in the drug's production costs that would explain the enormous price increase.  Even if there was such a benign market explanation for the price increase, at no point following the initial spike did the price return to the pre-spike equilibrium price point.

156.    An article in eDermatology News noted that there was no economic justification for the Desonide price hikes:

> [R]ecently I've become aware of a new wrinkle that complicates daily practice life for both doctors and patients in a significant way. I can't make any sense if it.
>
> I mean the high price of desonide.
>
> When I was student many years ago, my teachers told me that I should prescribe generic drugs whenever possible.  This would help hold down medical costs.  It was the right thing to do.
>
> ***
>
> But lately I've been getting complaints from patients about the high cost of desonide. My first reaction to these was, "How on earth is that possible?"
>
> ***
>
> I asked my secretary to call the pharmacy to get a price for other generic steroid creams. Triamcinolone would cost $14.70.  Alclometasone would cost $35.20.
>
> And desonide – generic desonide – would cost $111.70.  For a 15-g tube. $111.70 for 15 g of a generic cream that's been on the market forever!  Does that make any sense?[9]

157.    In addition, price increases of this magnitude would have been contrary to each of the Co-Conspirators' economic interest absent the price-fixing scheme.  Without the certainty

---

[9] Alan Rockoff, M.D., *The high price of desonide*, eDermatology News (Feb. 3, 2015), http://www.mdedge.com/edermatologynews/article/96892/high-price-desonide.

that all of the Co-Conspirators would raise and maintain the prices for generic Desonide, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and a loss of revenue.  This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices for generic Desonide.

### b.       The Market Was Susceptible to Anti-Competitive Conduct

158.    Perrigo's participation in this price-fixing scheme for generic Desonide is further supported by certain factors demonstrating the susceptibility of the market for this generic drug to price fixing.

159.    **Market Concentration.**  Industry or market concentration is a function of the number of firms in a given market and their respective market shares.  Market concentration is commonly measured through the Herfindahl-Hirschman Index ("HHI"), which is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers.  Through this calculation, the HHI factors in the relative size distribution of the firms in a given market.  The HHI approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches the 10,000 point maximum when a market is controlled by a single firm.  The HHI increases as: (i) the number of firms in a given market decreases; and (ii) the disparity in size between those firms' increases.

160.    As noted by the DOJ, markets in which the HHI is between 1,500 and 2,500 points are generally considered moderately concentrated, and markets in which the HHI exceeds 2,500 points are considered highly concentrated.  A more highly concentrated market is more susceptible to anti-competitive behavior, such as price-fixing.  This increased susceptibility is due, in part, to the relative ease with which co-conspirators can monitor each other's pricing behavior to ensure adherence to the price-fixing agreement, especially when only two or three competitors have the majority of the market share.  In addition, in a highly concentrated market,

there is a lower probability that each firm has different production costs, which facilitates the formation and maintenance of a price-fixing scheme.

161.    In 2013 and 2014, the market for 15gm tubes of generic Desonide 0.05% cream was highly concentrated, as demonstrated by the HHI calculation below:

| | **2013 HHI** | **2014 HHI** |
|---|---|---|
| **Desonide 0.05% 15gm tube** | 5,317 | 4,731 |

162.    During this period, Perrigo and Co-Conspirators Taro and Allergan combined to account for 100% of the total market for 15gm tubes of generic Desonide 0.05% cream, as shown in the charts below:





163. **Barriers to Entry.** Barriers to entry into a market can delay, diminish, or even prevent the attraction and arrival of new market participants, which is the usual mechanism for checking the market power—i.e., the ability to set prices above market costs—of existing participants. Entry barriers include things like: trade secrets, patents, licenses, capital outlays required to start a new business, pricing elasticity, and difficulties buyers may have in changing suppliers. If there is no significant threat that new firms will enter a market, a single firm with a dominant market share—or a combination of firms with a significant percentage of the market— is able to engage in anti-competitive conduct, such as restricting output and raising prices to the detriment of consumers. Barriers to entry in the markets for generic drugs include, among other things, high manufacturing costs and regulatory and intellectual property requirements. For example, the requirement that companies file an ANDA and receive FDA approval can delay entry into the market by an average of thirty-six months.

164.   The barriers to entry into the market for 15gm tubes of generic Desonide 0.05% cream included high manufacturing costs as well as certain regulatory and intellectual property barriers.

165.   **Lack of Substitutes.**   The presence of alternative products that can easily be substituted for a given product serves to undermine anti-competitive behavior.  Conversely, the absence of available substitutes increases the susceptibility of a market to anti-competitive behavior because consumers have no alternative but to purchase the product, notwithstanding any price increases.   In the context of prescription drugs, a pharmacist presented with a prescription for a given drug can only substitute another drug if that drug has an "AB" rating. Only generic and brand-name versions of a drug are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for a given drug with the brand-name version or one of the AB-rated generic versions and cannot substitute another drug.   Only generic Desonide and brand-name Desonide for a given dosage are AB-rated to one another.  Therefore, a pharmacist can only fill a prescription for Desonide with the brand-name version or one of the AB-rated generic versions.

166.   **High Degree of Interchangeability.**   A standardized, commodity-like product with a high degree of interchangeability between the goods of the participants in an anti-competitive conspiracy also increases the susceptibility of a given market to anti-competitive conduct.  By their very nature, all generic versions of a given drug are interchangeable, as every generic version of a drug must be bioequivalent to the original, brand-name drug.   Generic Desonide is no exception.   The FDA approved versions of generic Desonide 0.05% cream in 15gm tubes manufactured by the Co-Conspirators Perrigo, Allergan, and Taro each has an "AB"

rating.   Thus, pharmacists are able to substitute one manufacturer's generic version of Desonide for another.

167.   **Absence of Competitive Sellers.**   The presence of firms that manufacture the same product but are not part of the anti-competitive conspiracy—also called fringe sellers—can erode the conspirators' market share by offering the product at lower, more competitive prices. This reduces the conspirators' revenue and makes it more difficult to sustain the conspiracy.   By contrast, the absence of fringe sellers can increase the susceptibility of a given market to anti-competitive conduct.   In the case of 15gm tubes of generic Desonide 0.05% cream, there were no other market participants who could take market share from Perrigo and Co-Conspirators Taro and Allergan.   The complete dominance of Perrigo and the Co-Conspirators facilitated their ability to raise prices without losing market share to the non-conspirators.   Moreover, following the dramatic price increases in mid-2013, discussed above, neither Perrigo nor the Co-Conspirators were willing to meaningfully undercut prices to gain market share, thereby further demonstrating the absence of a competitive market.

168.   **Co-Conspirator   Contacts   and   Communications   at   Trade   Events.** Representatives from Perrigo and its competitors with whom it colluded on prices for Desonide and other generic drugs routinely attended conferences, meetings, and trade shows sponsored by various pharmaceutical trade associations.   These events provided frequent opportunities for individuals from Perrigo and the Co-Conspirators to interact with each other and discuss their respective businesses and customers.   Social events and other recreational activities—including golf outings, lunches, cocktail parties, and dinners—were also organized in conjunction with the trade association events and provided further opportunities for representatives from the drug manufacturers to meet outside of the traditional business setting.   These trade associations and

the related formal and informal events provided representatives from Perrigo and the Co-Conspirators with ample opportunities to meet, discuss, devise, and implement the price-fixing described herein.

169.    One of the more prominent trade associations in the generic drug industry is the Association for Accessible Medicines (formerly known as the GPhA).  The GPhA is, according to its website, "the nation's leading trade association for manufacturers and distributors of generic prescription drugs, manufacturers of bulk active pharmaceutical chemicals, and suppliers of other goods and services to the generic industry."  The GPhA was formed in 2001 following the merger of three industry trade organizations:  the Generic Pharmaceutical Industry Association, the National Association of Pharmaceutical Manufacturers, and the National Pharmaceutical Alliance.  In describing its members, the GPhA's website previously stated: "GPhA member companies supply approximately 90 percent of the generic prescription drugs dispensed in the U.S. each year. Our membership includes the world's largest generic finished dose manufacturers and active pharmaceutical ingredient suppliers."  The GPhA's website further stated: "By becoming part of GPhA, you can participate in shaping the policies that govern the generic industry and help secure the future of this vital pharmaceutical market segment.  In addition, GPhA provides valuable membership services, such as business networking opportunities, educational forums, access to lawmakers and regulators, and peer-to-peer connections."

170.    Representatives from Perrigo and the other Co-Conspirators regularly attended GPhA meetings, including the following:

- October 1-3, 2012 GPhA 2012 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Akorn, Fougera, G&W Laboratories, Glenmark, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, and Taro.

- February 20-22, 2013 GPhA 2013 Annual Meeting in Orlando, Florida, attended by representatives from Perrigo, Allergan, Akorn, G&W, Glenmark, IGI, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, and Taro.

- June 4-5, 2013 GPhA 2013 CMC Workshop in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Fougera, G&W, Glenmark, Hi-Tech, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, and Taro.

- October 28-30, 2013 GPhA 2013 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Akorn, Fougera, G&W, IGI, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, and Taro.

- February 19-21, 2014 GPhA 2014 Annual Meeting in Orlando, Florida, attended by representatives from Perrigo, Allergan, G&W, Hi-Tech, IGI, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, and Taro.

- June 3-4, 2014 GPhA 2014 CMC Workshop in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Fougera, G&W, Glenmark, Hi-Tech, IGI, Mylan, Ranbaxy, Sandoz, Taro, and Valeant.

- October 27-29, 2014 GPhA 2014 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Fougera, G&W, Glenmark, IGI, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, Taro, and Valeant.

- February 9-11, 2015 GPhA 2015 Annual Meeting in Miami Beach, Florida, attended by representatives from Perrigo, Allergan, Akorn, G&W, Glenmark, IGI, Mylan, Ranbaxy, Renaissance, Sandoz, Spear, Taro, and Valeant.

- June 9-10, 2015 GPhA 2015 CMC Workshop in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Fougera, G&W, Glenmark, Mylan, Renaissance, Sandoz, Taro, and Valeant.

- November 2-4, 2015 GPhA 2015 Fall Technical Conference in Bethesda, Maryland, attended by representatives from Perrigo, Allergan, Akorn, Fougera, G&W, Glenmark, IGI, Mylan, Renaissance, Sandoz, Spear, Taro, and Valeant.

### 4.    Other Generic Drugs

171.    Perrigo also colluded to fix prices of other generic drugs, including Clobetasol, Econazole, Permethrin, Tretinoin, and Halobetasol Propionate.  As a result of Perrigo's collusion with the Co-Conspirators, the prices of these drugs increased dramatically between 2011 and 2016.  Specifically, the price of Permethrin increased by more than 530%, and the prices of Halobetasol Propionate, Econazole, and Clobetasol increased by approximately 150%, 500%,

and 500%, respectively. The Plaintiffs in *Roofers' Pension Fund v. Perrigo Co., plc*, No. 16-2805 (D.N.J.) (the "Class Action"), retained Symphony Health Solutions, a well-respected market research firm, to analyze the market concentration and price increases for each of these drugs. As pled in detail in the amended complaint filed in the Class Action (ECF No. 89), the markets for Clobetasol, Econazole, Permethrin, Tretinoin, and Halobetasol Propionate were highly concentrated, and dominated by Perrigo. *See* Class Action, ECF No. 89 ¶¶ 77, 81, 85, 87, 89. In addition, many of the drastic price increases occurred in conjunction with GPhA meetings or other industry meetings attended by representatives from Perrigo and the Co-Conspirators. *See id.* ¶¶ 78, 82.

### 5. Perrigo's Reporting Chain for Generic Drug Pricing

172. Several witnesses, including CW-8, CW-10, and CW-11, confirmed that the Perrigo employees responsible for generic drug pricing at the Company during the Relevant Period reported directly to Papa and Brown. CW-10 stated that Wesolowski headed up a pricing team that consisted of Booydegraaff, Dawn Couchman, Vice President of Contract Administration, and Steve Gallagher, Finance Director for the Rx Division. Gallagher reported directly to Defendant Brown. CW-11 stated that Wesolowski had management oversight over the Company's Generic Rx segment. Wesolowski reported to Boothe, who then reported to Defendant Papa. CW-8 stated that Boothe had management oversight over the Perrigo employees who handled generic pricing. Boothe reported directly to Papa. CW-8 further stated that Wesolowski, who reported to Boothe, had management oversight over the whole generic side of the business and Wesolowski's team, which handled generic pricing, included Booydegraaff. CW-8 was familiar with Wesolowski's team because CW-8 answered drug-related questions for the team.

### 6.      Government Investigations into Perrigo's Anti-Competitive Conduct

173.     On October 2, 2014, U.S. Senator Bernie Sanders and U.S. Representative Elijah Cummings launched an investigation into "soaring generic drug prices," according to a press release.  One month later, the DOJ convened a grand jury in the United States District Court for the Eastern District of Pennsylvania.

174.     To date, the DOJ has issued subpoenas to numerous generic drug manufacturers, including Allergan, Mylan, and Taro.

175.     The DOJ filed the first criminal charges in connection with its investigation on December 12 and 13, 2016 against Jason T. Malek and Jeffrey A. Glazer of Heritage in the United States District Court for the Eastern District of Pennsylvania.  Malek was Heritage's President and Glazer was Heritage's CEO and Chairman during the period covered by the DOJ's investigation.  On December 14, 2016, the DOJ released an information charging Malek and Glazer with criminal violations of Section 1 of the Sherman Act (15 U.S.C. § 1) for price-fixing and other anti-competitive conduct in connection with generic Doxycycline and Glyburide.  The DOJ described how Malek and Glazer did not act alone and that "various corporations and individuals, *not made defendants in this Count*, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance of."  Malek and Glazer pled guilty to the DOJ charges on January 9, 2017.

176.     On December 14, 2016, in an article by Forbes entitled, *The Man the Feds are Using to First Crack Open Their Big Antitrust Case Against Generic Drug Makers*, Robert Connolly, former chief of the DOJ's Antitrust Division, stated the following:

> A criminal information against an individual for antitrust charges prior to any other government action in an antitrust case suggests the individual is cooperating with the government investigation.  ***"It sounds like it can be just the first case and others will follow, it would be unusual for the federal government to charge just one individual so I would assume there is more to come*."**

177. On the same day that the DOJ announced the charges against Malek and Glazer, twenty state Attorneys General revealed that they had sued six generic drug companies for their roles in the conspiracy to artificially inflate prices of Doxycycline and Glyburide. The Attorneys General Complaint states that the Attorneys General "have uncovered a wide-ranging series of conspiracies implicating numerous different drugs and competitors, which will be acted upon at the appropriate time." The Attorneys General describe these conspiracies as "schemes to fix and maintain prices, allocate markets and otherwise thwart competition" and explain that they are carried out by generic drug companies through their senior executives who "exploit their interactions at various and frequent industry trade shows, customer conferences and other similar events, to develop relationships and sow the seeds for their illegal agreements."

178. According to the Attorneys General Complaint, the drug manufacturers attempted to explain the suspicious price hikes through "a myriad of benign factors," however, the plaintiff States "found through their investigation . . . that the reason underlying many of these price increases is much more straightforward and sinister—collusion among generic drug competitors." Among others things, the company executives met at "regular 'industry dinners'" and "exchanged numerous and frequent telephone calls, emails and text messages."

179. The Connecticut Attorney General noted in his December 15, 2016 press release that the price collusion was not the isolated misconduct of a few rogue employees, explaining that "the misconduct was conceived and carried out by senior drug company executives and their subordinate marketing and sales executives." The Connecticut Attorney General further noted that the State's investigation is still ongoing and claims to have "uncovered evidence of a broad, well-coordinated and long-running series of schemes to fix the prices and allocate markets for a number of generic pharmaceuticals in the United States." As the Connecticut Attorney General

explained, "[w]hile the principal architect of the conspiracies addressed in this lawsuit was Heritage Pharmaceuticals, ***we have evidence of widespread participation in illegal conspiracies across the generic drug industry*** . . . . We intend to pursue this and other enforcement actions aggressively, and look forward to working with our colleagues across the country to restore competition and integrity to this important market."

180.    On March 3, 2017, Bloomberg, in an article entitled *Perrigo Joins Firms With Generic Drugs Under U.S. Glare*, reported that Perrigo was one of the companies under scrutiny at the DOJ.  It was also disclosed that the DOJ sought a stay of discovery in civil antitrust suits brought against Perrigo and its competitors in connection with three drugs—Desonide, Clobetasol, and Fluocinonide—so as to avoid compromising the government's investigation.  In its letter to the court requesting the discovery stay, the DOJ stated:  "There are significant overlaps between the companies and drugs that are being investigated criminally and the defendants and drugs identified in plaintiffs' amended complaints . . . . In light of these overlaps, civil discovery could reveal details of the ongoing criminal investigation and delay, or even frustrate, its progress."

181.    On May 2, 2017, Perrigo confirmed that the DOJ had executed search warrants at the Company's corporate offices in connection with its investigation into price collusion in the generic drug industry.  Among other things, the DOJ's investigation specifically called into question the truthfulness of Defendants' prior assurances regarding the sustainability of Perrigo's generic drug pricing strategy and the competitive nature of the generic drug markets in which

they purportedly compete.  As reported by Bloomberg, analysts from RBC Capital Markets stated that the raid of Perrigo "is going to bring the DOJ generic pricing risk back into focus."[10]

182.   The fact that the DOJ raided Perrigo's offices in May 2017 *after* sending subpoenas to its competitors strongly suggests that evidence learned through those prior subpoenas led the DOJ to believe that Perrigo was also engaged in improper pricing.  Moreover, the DOJ has filed motions to intervene and stay discovery in at least three civil antitrust actions alleging price-fixing in violation of the Sherman Act against Perrigo.  *See, e.g., In Propranolol Antitrust Litig.*, No. 1:16-mc-9901-JSR (S.D.N.Y.).  The DOJ explained that the "action presents a risk to the United States' interest in ensuring the integrity of its ongoing criminal investigation" because, among other reasons, "its on-going criminal antitrust investigation shares common questions of law and fact with the civil claims" and because the plaintiffs have sought the same documents produced to the federal prosecutors.  The DOJ's intervention in these civil actions implicating Perrigo's price-fixing activities is a powerful indication that the allegations of price-fixing are supported (at least in part) by documents and other information provided to the DOJ in connection with its investigation.

### G.   Defendants Falsely Represented the Fair Value of the Tysabri Royalty Stream, Perrigo's Largest Financial Asset

183.   Throughout the Relevant Period, the Tysabri royalty stream was Perrigo's largest financial asset and a critical component of the Company's overall growth strategy.  GAAP required Perrigo to account for the royalty stream as a financial asset, which required the Company to disclose the fair market value of the asset on a quarterly basis, taking expenses (or recognizing non-operating income) for all mark-to-market changes in its value.  Perrigo has now

---

[10] Caroline Chen, *Perrigo Offices Searched by U.S. Agents in Drug Price Probe*, Bloomberg, May 2, 2017.

admitted that, throughout the Relevant Period, Defendants improperly accounted for the Tysabri royalty asset and failed to make these required disclosures, concealing from investors the severe deterioration in the value of the Tysabri royalty stream.

### 1.     Perrigo Is Required to Adhere to GAAP

184.    GAAP include those principles recognized by the accounting profession conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.   SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) provides that financial statements filed with the SEC that are not presented in accordance with GAAP will be presumed to be misleading, despite footnotes or other disclosures.   The Financial Accounting Standards Board ("FASB"), the entity that holds the authority to promulgate GAAP, has codified GAAP into a numbered scheme called the Accounting Standards Codification ("ASC"), which has been adopted as the framework for public financial reporting.   FASB has also issued guidance in the form of FASB Concept Statements ("FASCONs"), which set the objectives, qualitative characteristics, and other concepts used in the development of GAAP, and reflect the underlying framework for the promulgation of accounting standards.

185.    One of the fundamental objectives of financial reporting is to provide accurate and reliable information concerning an entity's financial performance during the period being presented.   Financial statements (including footnote disclosures), like those filed on Forms 10-Q and 10-K with the SEC, are a central feature of financial reporting.   FASCON No. 8, *Conceptual Framework for Financial Reporting*, states that "[t]he objective of general purpose financial reporting is to provide financial information about the reporting entity that is useful to existing and potential investors, lenders, and other creditors in making decisions about providing resources to the entity." FASCON 8, ¶ OB2.

186.   FASCON No. 8 further provides that:  (i) "[d]ecisions by existing and potential investors about buying, selling, or holding equity and debt instruments depend on the returns that they expect from an investment in those instruments," (FASCON 8, ¶ OB3); (ii) "investors', lenders', and other creditors' expectations about returns depend on the their assessment of the amount, timing, and uncertainty of (the prospects for) future net cash inflows to the entity" (*id.*); (iii) in order to assess an entity's prospects for future net cash inflows, "existing and potential investors, lenders and other creditors need information about the resources of the entity, [and] claims against the entity" (FASCON 8, ¶ OB4); and (iv) investors and other creditors are interested to know and understand, among other things, "how efficiently and effectively the entity's management and governing board have discharged their responsibilities to use the entity's resources" (*Id.*).

187.   As this framework makes clear, investors, lenders and other creditors rely on financial statements for the financial information they need to make rational decisions regarding the entity.  Accordingly, they are considered to be "the primary users to whom general purpose financial reports are directed."  FASCON 8, ¶ OB5.

188.   A primary quality that renders financial information useful to investors, creditors, and other users in their decision-making is faithful representation.  For an entity to faithfully represent what it purports to represent, including its financial position and the results of its operations for selected periods of time, information must be "complete, neutral, and free from error."  FASCON 8, ¶ QC12 (emphasis omitted). To be complete, the financial information must include "all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations." FASCON 8, ¶ QC13. To be neutral, the

financial information must be "without bias in the selection or presentation of [such] information." FASCON 8 ¶ QC14.

189.    The standard describes a neutral depiction of financial information in more detail as follows:

> A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users. Neutral information does not mean information with no purpose or no influence on behavior. On the contrary, relevant financial information is, by definition, capable of making a difference in users' decisions.[11]

190.    For a financial asset like the Tysabri royalty stream, GAAP requires the asset be measured at their fair value at the end of each reporting period subsequent to its initial measurement.  *See* ASC 815-10-35-1.

### 2.    Perrigo Admitted that It Violated GAAP by Misclassifying the Tysabri Royalty Stream

191.    During the Relevant Period, Perrigo stated that the value of the Tysabri royalty stream was $5.8 billion.  This was false.  As the Company has now admitted, $5.8 billion was nowhere near the fair market value of the royalty stream.  While the Company was required to account for the royalty stream as a "financial asset," marking the fair value to market at least each quarter, the Company instead treated it as if it were an "intangible asset." Perrigo concedes that its accounting for the Tysabri royalty stream violated GAAP. As the Company admitted in May 2017:

> After an extensive evaluation of the facts and circumstances and the judgments required to determine the appropriate classification, it was determined that under existing U.S. GAAP the contingent payments from Elan's May 2013 sale of Tysabri® to Biogen (the "Tysabri® royalty stream") ***should have been recorded as a financial asset, rather than an intangible asset, on the date of our acquisition of Elan.***

---

[11] *Id.*

Our Tysabri® royalty stream is now accounted for in our consolidated financial statements for 2016 and prior restated periods as a financial asset using the fair value option. We made the election to account for the Tysabri financial asset using the fair value option as we believe this method is most appropriate for an asset that does not have a par value, a stated interest stream, or a termination date. Accounting for the Tysabri® royalty stream as a financial asset required us to adjust our financial statements for the Restated Periods to (1) remove the Tysabri® royalty stream from net sales in our Consolidated Statements of Operations, (2) remove the amortization expense (reflected in cost of goods sold) associated with recording the Tysabri® royalty stream as an intangible asset, and (3) include the quarterly changes in fair value of the Tysabri® royalty stream as a component of other non-operating income/expense. The cash payments we received from the royalty stream are included in our Consolidated Statements of Cash Flows for the Restated Periods and reflect the cash received from the Tysabri® royalty stream as cash from investing activities, rather than as cash from operating activities.[12]

192.    There was no basis for Perrigo to dodge the accounting required by ASC 815-10-35-1.   Perrigo knew all along that the Tysabri royalty stream was a financial asset.   The Company never operated any business involving Tysabri, and during the Company's May 12, 2016 earnings call, then-CEO Hendrickson expressly referred to the royalty stream as a "financial asset."   Perrigo's restatement is an admission that its financial statements during the Relevant Period were materially false when made.   GAAP defines a "restatement" as:

The process of revising previously issued financial statements to reflect the correction of . . . [a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that existed at the time the financial statements were prepared.

ASC 250-10-20; *see also* ASC 250-10-45-17 (distinguishing that a mere "change in accounting estimate shall not be accounted for by restating or retrospectively adjusting amounts reported in financial statements of prior periods").

---

[12] Form 10-K filed on May 22, 2017.

3.      **Through Perrigo's GAAP Violations, Defendants Concealed Billions of Dollars of Deterioration in Fair Value**

193.    Throughout the Relevant Period, Defendants used Perrigo's GAAP violations to create the impression that the valuation of the Tysabri royalty stream remained stable, even as internally known, adverse clinical and competitive developments caused its actual value to plummet.

194.    In June 2015, the phase II trial for Tysabri as a treatment for stroke failed to meet its primary endpoint.  This indication was one of the two potential new indications that Perrigo and Papa touted as "Tysabri upside" and placed at the very top of the Company's "base plus plus plus" pyramid slide presented to investors.  Instead of recording the diminution in fair value associated with this adverse development, Perrigo violated GAAP and told investors that the Tysabri royalty stream had the same value as before: $5.8 billion.

195.    The "Tysabri upside" thesis fell apart in October 2015 when the phase III trial for the other proposed new indication, secondary progressive multiple sclerosis, also failed.

196.    Tysabri's core indication for primary multiple sclerosis also came under attack in October 2015, when Phase III trial results for ocrelizumab, a competing drug, were so positive that experts called it a "game changer."[13]  In February 2016, the FDA designated ocrelizumab a "breakthrough therapy."

197.    Still, Defendants continued to assure investors that the Tysabri asset was not impaired.  In Perrigo's February 22, 2016 Form 10-KT, signed by each of the Individual Defendants, Perrigo again reported a $5.8 billion valuation for the royalty stream.  Making

---

[13] *See Phase III studies show Roche's ocrelizumab reduces relapse rate, delays disability progression in MS patients*, News Medical (Oct. 12, 2015), http://www.newsmedical.net/news/20151012/Phase-III-studies-show-Roches-ocrelizumabreduces-relapse-rate-delays-disability-progression-in-MS-patients.aspx.

matters worse, Perrigo stated that despite these negative developments, the royalty stream's "fair value exceeded its carrying value." This was false, as the Company now admits. In truth, Perrigo's own internal calculations show that the fair value of the Tysabri royalty stream dropped from $5.42 billion in June 2015 to only $5.02 billion on April 2, 2016. By the end of 2016, the fair value was **only $2.35 billion–over $3 billion less than the $5.8 billion referenced in the February 22, 2016 Form 10-KT**.

198. Investors did not learn the full extent of the monumental decline in the fair value of the Tysabri royalty stream until it was abruptly sold on February 27, 2017 for approximately $3 billion less than Perrigo had recorded its value—$2.2 billion (plus contingent payments that could total up to $650 million).

199. The market was shocked by this development. When, in May 2017, Defendants were forced to correct their GAAP violations by taking one of the largest restatements of any public company since 2001, accounting consultancy Audit Analytics noted:

> Back in March, we predicted that Perrigo would likely restate its historical financial statements. What we could not predict is that 85 days after the late filing, Perrigo would join the restatements club with a staggering $1 Billion restatement of net income. Since 2001, there have only been 19 restatements that exceeded the $1 Billion threshold.[14]

**H.   Perrigo Issued Aggressive, Unsupported Financial Guidance**

200. Despite the fact that: (i) the Omega acquisition was a known and observable debacle (to those inside the Company); (ii) Perrigo was not "insulated" from pricing pressures in the generic drug industry, and in fact was engaged in price collusion to keep their profits up; and (iii) the value of the Tysabri royalty stream was deteriorating by billions of dollars, Perrigo

---

[14] *Perrigo Restates to Correct More than $1 Billion in Errors*, Audit Analysis (June 1, 2017), http://www.auditanalytics.com/blog/perrigo-restates-to-correct-more-than-1-billion-in-errors/.

issued unsupported and unrealistic financial guidance based on the supposed contribution of Omega and strength of the Rx segment throughout the Relevant Period.

201.   CW-1 believed that Perrigo used aggressive sales projections as a means to fend off the hostile takeover attempt by Mylan.  According to CW-1, CIO Farrington played a large role in providing performance guidance for Omega during the Relevant Period, but the overall directives came from Papa.  Projections involving synergies, cost savings, and added sales channels were aggressive, and goals were unrealistically increased as part of the effort to prevent the Mylan takeover, CW-1 explained.

202.   Based on conversations with Farrington and members of Omega's staff in Belgium (including the head of IT, Deneubourg), CW-1 recalled that Perrigo ignored data migration issues in generating the Company's publicly disclosed financial guidance.  Ray likewise confirmed that Omega leadership believed that Perrigo's senior management was preoccupied with defeating the Mylan takeover bid and thus refused to acknowledge the negative impact of the Omega integration failures.  As one example, CW-1 explained that because Perrigo had no real-time access to Omega's financial data and performance information, Perrigo regularly relied upon verbal representations from Omega personnel as the basis for financial projections.  This problem, CW-1 advised, showed how much Perrigo did not understand Omega's performance, projections, and overall financial results.  CW-1 understood based on his interactions with colleagues, including Farrington, that there were some "guess" estimates concerning Omega's financial projections that were based on these verbal representations from Omega that later proved to be inaccurate when actual system data was finally accessed, as discussed above in ¶¶ 88-97.

I.   **Perrigo Campaigned Against Mylan's Hostile Takeover Attempt and Continued to Mislead Investors**

203.   Following Perrigo's rejection of Mylan's Third Offer on April 29, 2015, and with a tender offer from Mylan nearly certain to follow, the Company engaged in an ongoing public campaign to convince its shareholders to reject any potential tender offer by Mylan.   For example, Papa spoke at numerous health care conferences and continued to draw investors' attention to Perrigo's standalone value and purported growth prospects, supposedly driven by Omega revenue and cost synergies and access to the EU.   Papa and Brown also met with First Manhattan investment management professionals on several occasions in an effort to convince Plaintiff that Mylan did not offer a more valuable alternative to Perrigo as a standalone enterprise.   Without disclosing the massive integration problems posed by the Omega acquisition and the pricing pressures described above, Papa represented throughout 2015 that Mylan's offers "substantially undervalue[d]" Perrigo, and "[did not] take into account [] some of the important things that we've done with the Omega business."

204.   To this end, between May 2015 and September 2015, when Mylan launched the Tender Offer, Defendants emphasized the "tremendous revenue synergies" and growth opportunities created by Omega's established European network, spanning thirty-plus countries. For example, Defendants represented Omega's "commercial footprint in these countries" as "very, very profitable for Perrigo shareholders," and as "an important part of our future, as we can bring the Perrigo portfolio globally into the additional 33 countries with Omega."   According to Perrigo, "[n]ot only does Omega Pharma underscore our global strategy, it now positions us to continue European growth both organically and through acquisitions such as the one we're talking about today."

205.    Defendants also regularly represented to investors that Perrigo had successfully integrated Omega's systems and understood Omega's business prospects, despite the myriad issues identified in ¶¶ 87-122.  For example, on June 23, 2015, Brown said the following concerning Perrigo's integration efforts:

> [W]e are online - - I should say in line with our going online integration process. Back office is working smoothly.  We're bringing them onto all of our back-office systems, and importantly what was the underlying core of this deal was allowing Omega to remain independent in their sales and marketing process, not interfering with that, but providing them product to put into that pipeline.

206.    Brown further assured the market that the Mylan takeover attempt had not distracted Perrigo from integrating Omega, representing that:

> We [Perrigo] have management teams who are in charge of Omega integration who are actively involved on a day-to-day basis in both running Omega and another team that is focused on helping them get those product launches, helping on the integration.  That was underway.  That was rolling down the tracks before the Mylan letter came out, and that continues, so it is not as if the entire management team suddenly stops doing everything they are doing and is focused exclusively on the offer.

207.    Similarly, on August 5, 2015, during the Company's earnings conference call, Papa and Brown characterized Omega as "tremendously important to our future" and falsely represented that Perrigo "delivered on our Omega integration plan," "achieved great operational efficiencies and productivity improvement" and "continue[d] to execute on the integration of Omega . . . ."

208.    On the purported strength of Perrigo's standalone business—and to further entice shareholders to reject Mylan's inevitable Tender Offer—Defendants reaffirmed overly strong financial guidance on August 5, 2015, reiterating expectations for 2015 adjusted earnings of between $7.50 and $8.00 per diluted share.  While explaining the Company's quarterly results, Papa assured the market that the Company's "durable business model and *future growth prospects are self-evident* as we continue to deliver value for our shareholders."

209.    The next day, August 6, 2015, Perrigo released an investor presentation, the purpose of which was to convince Perrigo shareholders that the Company was more valuable as a standalone entity than as a merger partner with Mylan.  In that presentation, Perrigo deemed Mylan's Third Offer to be "value destructive" for shareholders and warned investors against accepting any "increased offer," claiming it would further destroy value through dilution and increased credit risk.  Notably, the Irish Takeover Panel, the government body responsible for enforcing the Irish Takeover Rules, would later determine that many such representations by Perrigo concerning Mylan's Third Offer were misleading.  *See* ¶¶ 423-25.

210.    Approximately two weeks later, on August 28, 2015, Mylan's shareholders voted to approve the acquisition of Perrigo, with more than two-thirds of all voted shares voting in favor and more than half of all outstanding shares voting in favor.  In response, Perrigo quickly reiterated the Board's prior conclusion that "Mylan's offer substantially undervalues Perrigo and would dilute [the Company's] growth profile and superior valuation."

211.    In direct response to the Company's representations and defense tactics, numerous analysts sided with Perrigo, reporting they believed the Company would be "better off without [Mylan]."  For example, BMO Capital Markets issued a report on September 10, 2015, stating, "[w]e spoke with PRGO management today and continue to believe, as do they, that Mylan's offer significantly undervalues PRGO.  PRGO underscored that it continues to have options."  In other words, Perrigo's campaign was working.

**J.    Perrigo Convinced First Manhattan and the Assignors to Reject Mylan's Tender Offer**

212.    On September 14, 2015, Mylan officially commenced its Tender Offer to Perrigo shareholders, offering those shareholders $75.00 in cash and 2.3 Mylan shares per Perrigo share if at least 50% of Perrigo's shares were tendered by the November 13, 2015 deadline.

213.     Mylan pitched its offer to Perrigo shareholders as deciding between one of two scenarios:  (i) accept a "highly attractive offer" including $75.00 in cash and participate in the "exciting potential for growth and value creation of a combined Mylan-Perrigo"; or (ii) receive no upfront cash and risk a significant decline in the value of Perrigo's stock price while "weathering the delays and potential execution and integration risk inherent in Perrigo's standalone strategy."

214.     Perrigo responded by convening an emergency conference call with analysts and investors on September 17, 2015, during which Defendants emphatically urged Perrigo shareholders to reject Mylan's Tender Offer.  According to Papa, Mylan's "***current offer on the table is not even in the right ZIP code, when compared to Perrigo's stand-alone value***."  Despite the fact that the Tender Offer had just been made earlier that same day, the Board, Papa announced, had already "unanimously determined that the offer substantially undervalues the Company and does not adequately compensate shareholders for Perrigo's ***exceptional growth prospects***."

215.     In a letter to Perrigo shareholders sent that same day, Papa expanded upon his conference call statements and directed investors to Omega, representing that "Mylan's offer not only fails to reflect Perrigo's outstanding track record of value creation, it also undervalues our ***compelling prospects for continued growth and sustainable, long-term shareholder value***," which includes "build[ing] upon our recently acquired pan-European [Omega] branded consumer healthcare platform . . . ."  In short, Papa declared that "the Omega transaction . . . has done outstanding," and that "[i]n one year, when you look at Perrigo, you will see a bigger, stronger company delivering value well above Mylan's offer today."

216.    On September 30, 2015—less than two weeks after Perrigo formally advised against the Tender Offer—Brown met with Director of Research Sawyer and certain First Manhattan investment management professionals.  During this meeting, Brown said *the "Omega acquisition [is] off to a good start"* and that she was "confident that the [generic Rx] business is on a firm footing [because] there are few competitors in Perrigo's niche generic topical segments, and there is a high cost of entry due to more stringent requirements for clinical trials."

217.    During the Company's quarterly earnings conference call held on October 22, 2015, Papa continued to misleadingly tout Perrigo's standalone value and growth potential, stating that the Company "ha[s] the momentum and strategy necessary to continue to drive that growth over both the short and long-term."

218.    In addition, Papa dismissed an analyst's comment that the "financial markets have become very concerned about the price inflation component of growth both on the generic and brand side going forward" Papa stated, as he had at the start of the Relevant Period, that Perrigo's "total strategy for pricing . . . is to keep pricing flat to up slightly" and that the Company's strategy is "really the best place for the [Company's] long, sustainable consistent approach to pricing . . . ."  Brown went one step further, assuring the market that *"nearly all of [Perrigo's] revenues are insulated from the current pricing drama you see playing out in the pharmaceutical industry today*."   Papa and Brown made these specific comments about Perrigo's pricing strategy in spite of the fact that just a few weeks later, on November 9, 2015, it was widely reported that the FDA had taken action on 82% of the backlog of ANDAs "as a rising chorus of voices, including Democratic presidential candidate Hillary Clinton, press[ed] the agency to clear the backlog to help counter rising pharmaceutical prices."

219.    That same day, Perrigo narrowed its guidance for 2015 adjusted earnings to a range between $7.65 and $7.85 per diluted share and announced 2016 adjusted earnings guidance of $9.30 per diluted share (or $9.45 per diluted share inclusive of a planned share repurchase plan).   A few weeks later, on November 13, 2015, the majority of Perrigo's shareholders declined to tender their shares, causing the Tender Offer to fail.

220.    As an immediate consequence of the failed Tender Offer, the Assignors and other Perrigo shareholders continued to hold on to stock valued at $140.54 per share on November 13, 2015, immediately after the Tender Offer failed, when they could have received a value of $174.36 per share (based upon the Mylan share price at the close on November 12, 2015) had the Tender Offer gone through.   As Perrigo's true prospects were revealed to the public during the first half of 2016, the stock continued to decline.

221.    As reported by the Wall Street Journal on November 14, 2015 in an article entitled, *Mylan's Defeat Cools Deal Boom*, Mylan's defeat "surprised many analysts and investors who predicted Mylan would eke out a victory" in its pursuit of Perrigo.   A day earlier, the Wall Street Journal had similarly noted that Perrigo, by overcoming Mylan's Tender Offer, had "join[ed] a small club of companies that have successfully beaten back a tender offer ***on persuasion alone***, without traditional corporate defenses."

222.    Having convinced Perrigo shareholders to reject Mylan's takeover effort, Defendants continued to issue false positive news to investors.   For example, on January 11, 2016, Perrigo announced that it was increasing its guidance for 2016 adjusted earnings from $9.45 per diluted share to a range of $9.50 to $10.10 per diluted share.   Papa again propped up the Company's unparalleled growth potential as the basis for the increased guidance, stating that Perrigo "enter[s] 2016 excited about ***the prospects for our durable business model and plan for***

*growth*," "expect[s] to launch greater than $1.2 billion in new products over the next three years, including products on [its] European branded platform," and "ha[s] the deepest Rx pipeline in our history." "For these reasons," Papa assured investors, Perrigo, "remain[s] confident in [its] ability to deliver on [its] 2016 growth targets."

## V.   THE TRUTH EMERGES

223.   The misleading nature of Defendants' statements was revealed through a series of disclosures beginning on February 18, 2016—just three months after the failed Tender Offer—when the Company announced its fourth quarter and calendar year 2015 financial results.

224.   That day, Perrigo reported 2015 adjusted earnings of $7.59 per share, versus earlier guidance of between $7.65 and $7.85 per share. Defendants attributed the earnings miss to the BCH segment "not meet[ing] [Perrigo's] internal expectations" following the Omega acquisition. "What has changed . . . are the BCH dynamics," Brown told investors during the earnings call, adding that "[i]t will take time to benefit from the people, process and product changes" Perrigo intended to make a statement that was in stark contrast to Defendants' representations throughout the Relevant Period touting the success of Omega and its integration into Perrigo's systems. According to Papa, the BCH segment was impacted by "lower net sales due to channel dynamics with the generic distribution . . . . [which] accounted for approximately 25% of the branded consumer healthcare net sales miss against [Perrigo's] expectations."

225.   In the Company's February 18, 2016 press release, the Company also disclosed that it was taking a $185 million impairment charge relating to Omega's assets:

> [T]he Company identified an impairment of certain indefinite-lived intangible assets based on management's expectations for future revenues, profits and cash flows associated with [] assets. . . . purchased in conjunction with the Omega Pharma Invest NV acquisition and [] included in the BCH segment.

Papa explained during the earnings call that the impairment represented "approximately 4% of the [$4.5 billion] acquisition price" of Omega.  Given the impairment, Perrigo reduced its 2016 earnings guidance from a range of $9.50 to $10.10 per diluted share to a range of $9.50 to $9.80 per diluted share.

226.    As Papa stated in the press release:

Fourth quarter 2015 BCH financial performance was below our expectations.  We are executing on our plan to drive improved BCH performance by taking select actions in the key areas of people, process, and products.  First, we are changing the management structure of the BCH segment, incorporating Perrigo's matrix leadership model, which will drive better transparency and accountability, sharpening our focus on performance metrics.  Second we are improving our processes in order to align systems, connectivity and functional accountability of the BCH business to Perrigo standards - while continuing to leverage the powerful marketing platform that BCH has in place.

227.    Papa elaborated during the earnings call that these reforms to the BCH business were geared toward "strengthening the line of connectivity and functional accountability of the BCH business with Perrigo standards."  One analyst from UBS was surprised by Papa's comments, posing the following question during the earnings call: "You went through some of the changes that you're going to do with the Omega business.  They all seem like blocking and tackling [i.e., basic] issues, *things that we'd expect you to do from day one*.  Why not take these actions earlier?"

228.    Other analysts were similarly surprised by the sudden shift in guidance and the impairment of the Omega assets.  In a report issued that same day entitled, *Major BCH Disappointment Overshadows Solid CHC Results; 4 Key Takeaways*, analysts from Jefferies noted that "it's disappointing that FY16 expectations were reduced 5 weeks after m[ana]g[emen]t's recent update."  Analysts from Deutsche Bank likewise explained in a report entitled, *Lowering PT to $172 post-4Q miss, keeping Buy*, that "[c]ontributing to investor disappointment is the fact that the company lowered the top end of its '16 EPS guidance range

provided only five weeks ago, as well as the somewhat sudden need to restructure and impair parts of the recently-acquired European Branded Consumer Healthcare (BCH) business (Omega)."

229.   In response to this news, which represented a partial disclosure of or the materialization of risks concealed by Defendants' fraud, the Company's share price fell $14.77 per share, or approximately 10%, from a close of $145.17 per share on February 17, 2016, to close at $130.40 per share on February 18, 2016.

230.   On April 21, 2016, in an article entitled, *Valeant in talks to hire Perrigo's Papa as CEO*, Reuters (and other news services) reported that Papa—who had spent the last year championing Perrigo's value and leading Perrigo's efforts against Mylan's takeover attempt— was in talks with Valeant to become its new CEO.  The Reuters article noted that last year Papa "vigorously defended Perrigo against a hostile takeover offer from Mylan . . . saying that the offer undervalued the company."

231.   In response to this news, which represented a partial disclosure of or materialization of risks concealed by Defendants' fraud, the Company's share price fell $7.33 per share, or nearly 6%, from a close of $128.68 per share on April 21, 2016, to close at $121.35 per share on April 22, 2016.

232.   Before the market opened on the next trading day, April 25, 2016, Perrigo confirmed that Papa had, in fact, resigned as the Company's CEO and would be assuming the role of CEO at Valeant.  David Steinberg, an analyst for Jefferies following Perrigo, noted, "[f]rankly, this seems out of character that he would leave without 'righting the ship.'"  The Wall Street Journal likewise reported in an article entitled, *As Its CEO Leaves for Valeant, Perrigo Continues to Struggle*, that Papa's departure was "like if you had decided to go on a road trip

across the country and they ditched you at a rest area halfway through," adding, "[a]lthough recent history isn't great, [investors] still believed he had a handle on the business."

233.    That same day, Perrigo issued weak preliminary first quarter 2016 financial results, drastically lowering its earnings guidance for 2016.  Specifically, Perrigo revealed that it was slashing its 2016 adjusted earnings guidance by more than 12% from a range of $9.50 to $9.80 per diluted share, to just $8.20 to $8.60 per diluted share.  According to the Company, "[t]he majority of this change in guidance . . . is the result of a reduction in pricing expectations in our Rx segment due to industry and competitive pressures" and "[t]he remainder of the reduction is primarily due to weaker-than-expected performance within the BCH segment for the next three quarters and lower expectations for consolidated new product launches."  Perrigo further noted that it had "identified indicators of impairment associated with" the BCH segment and the Omega acquisition, and was evaluating the need to take a second impairment charge related to Omega—in addition to the $185 million taken on February 18, 2016.

234.    Market commentators and analysts uniformly expressed surprise and disappointment.  Wells Fargo stated in a report entitled, *PRGO: Downgrading To Market Perform -- Too Much Uncertainty*, that "**Perrigo management set unrealistic and aspirational earnings guidance in its effort to defend against Mylan's hostile bid**."  Barclays, in a report entitled, *No shortage of frustration*, confirmed the market's shock over this news, reporting that while "[a] cut to numbers was certainly beginning to feel a bit inevitable, . . . the magnitude caught many investors by surprise."  Deutsche Bank downgraded Perrigo from a Buy to a Hold in a report entitled, *Stepping aside for now, lowering to Hold from Buy*, noting that it was "surprised by the magnitude of the miss and guide-down."  The Wall Street Journal noted "just

two months ago, Perrigo said it expected to earn $9.50 to $9.80 per share" in an article entitled, *Perrigo's Pain Isn't Just About Valeant*.

235.    More specifically, numerous analysts expressed surprise over the Company's disclosures concerning Omega and purported pricing pressure in the Rx segment, particularly in light of Perrigo's contrary public statements during the Relevant Period.  "Mad Money" host Jim Cramer stated that "Papa had come on 'Mad Money' and talked about how the Mylan bid dramatically undervalued Perrigo . . . . ***That was clearly untrue***."

236.    In an April 26, 2016 report entitled, *Major Guidance Cut & Seemingly Full Valuation Offer Limited Upside; D/G to Hold*, analysts from Jefferies also noted their surprise at management's comments regarding "generic Rx pricing headwinds and the now ***unequivocally disastrous Omega acquisition***," given that "[management] indicated as recently as Feb[ruary] 18 that its Rx business wasn't facing pricing issues and that the issues at Omega had been fully characterized."

237.    Market commentators openly questioned Defendant's prior statements on pricing. Analysts from UBS indicated that "investors may be somewhat *surprised to hear about the pricing pressure* from the Perrigo Rx business, given its niche portfolio with less than average competition."  The Wall Street Journal questioned outright whether the pricing pressures had, in fact, been negatively impacting Perrigo well before Perrigo's disclosure on April 26, 2016, noting in an article entitled, *Perrigo's Pain Isn't Just About Valeant*, that "[t]he deterioration seems in one sense to be a bit too quick, especially as it coincides with the appointment of a new CEO."

238.    Analysts were also concerned about the timing of the guidance as it related to Papa's departure and the Mylan takeover bid.  For example, in the same Barclays report entitled,

*No shortage of frustration*, Barclays stated that "[f]rustration is understandable, especially since the reset of expectations comes *~6 months after management convinced shareholders to rebuff M[ylan]'s tender offer*."

239.    In response to this news, which represented a partial disclosure of or the materialization of risks concealed by Defendants' fraud, the Company's share price fell $21.95 per share, or nearly 18%, from a close of $121.35 per share on April 22, 2016, to close at $99.40 per share on April 25, 2016.

240.    On April 26, 2016, the Standard & Poor's Ratings Services ("S&P") lowered all of its ratings on Perrigo, explaining that "[t]he downgrade reflects our expectation for weakness in Perrigo's high-margin generic pharmaceutical business, largely resulting from intensifying competition and lower pricing, and a further expected decline in the recently acquired European branded consumer business."   According to S&P, "the acquisition misstep in Europe [i.e., Omega] and negative earnings developments have, at least temporarily, *diminished investors' trust in the company's management*, especially after its stockholders' vote in favor of Perrigo's management in the face of Mylan's hostile takeover attempt last year."   S&P continued:  "In our opinion, any material synergistic benefits from this recent acquisition, which included instant access to millions of European consumers and the ability to launch new products in these markets, are unlikely over the next few years."

241.    On May 12, 2016, the Company announced actual results for the first quarter of 2016, reporting a first quarter *net loss* of $133.1 million and a diluted loss per share of $0.93 (which, on May 16, 2016, was revised up to $2.34 per diluted share).  Perrigo attributed the loss to an additional *$467 million impairment charge* relating to the Omega acquisition.

242.    During the earnings conference call announcing the loss and impairment charge, the Company's CEO at that time, Hendrickson, who had just replaced Papa, admitted that Perrigo's "***recent track record of performance against our own expectations is unacceptable***" and assured investors that the Company would target "***realistic***" forecasts going forward and would "***try to be as transparent as possible***"—a blatant admission that Papa's and the Company's previous forecasts were untenable and indefensible when issued.

243.    Hendrickson also admitted that, contrary to statements made by both Papa and Brown throughout the Relevant Period (and Mylan's takeover attempt), Perrigo was not "immune" to pricing pressures or, as Brown had falsely stated, insulated from the competition causing those pressures:

> As all of you know, pricing pressures and ultimately deflation have been a major topic across the industry. Our Rx team has done a great job over the past years of managing through this; however ***we are not immune to this dynamic***, and ultimately increased competition and greater than expected price erosion hurt our performance in Q1, and resulted in lowering of our expectations for the year.

244.    In response to this news, which represented a partial disclosure or materialization of Defendants' fraud, the Company's share price fell $3.71 per share, or 4%, from a close of $92.75 per share on May 11, 2016, to close at $89.04 per share on May 12, 2016.

245.    On August 10, 2016, Perrigo announced that, as a result of "transformational organizational changes" at Omega and continued pricing pressures in the Rx segment, the Company was once more cutting financial guidance, adding that projected 2016 impairment charges would nearly double, from $1.74 per share to $3.29 per share.  That same day, UBS reported it was "surprised that management did not plan for [issues arising from Omega's acquisition] in the last guidance change."

246.    In response to this news, Perrigo's common stock price fell approximately 10%, from a close of $95.09 on August 9, 2016, to close at $86.00 on August 10, 2016, following high trading volume of over 13.7 million shares.

247.    The revelations about Omega did not end in August 2016.  In December 2016, Perrigo announced it would restructure Omega in order to "improve the financial profile and enhance focus of the business on branded consumer OTC products."  The Company's shares dropped another 2.4% to close at $81.95 on December 8, 2016 following Perrigo's announcement that it had to entirely restructure the BCH unit.  As FiercePharma reported, Omega "ha[d] underperformed since [Perrigo] picked it up for $4.5 billion last March."  Finally throwing in the towel, Perrigo sold off various brands and businesses under the Omega umbrella, and laid off as many as eighty workers.  In January 2017, FiercePharma added that the restructuring would "result in a $150 million revenue toll each year."

248.    On February 27, 2017, Perrigo announced that it had agreed to sell the Tysabri asset previously touted to investors as having a "value of $5.8 billion," and which Defendants had never indicated was impaired, *for only $2.2 billion cash* (plus potential future payments of up to $0.65 billion). Perrigo also announced that, for the first time, the fair value of the royalty stream did not equal its carrying cost and it was therefore recording an impairment charge associated with the asset. Moreover, Perrigo stated that it was examining "historical revenue recognition practices" associated with the royalty stream and other potential accounting irregularities and, as a result, could not timely file its periodic reports with the SEC. Finally, Perrigo announced that Defendant Brown was unexpectedly leaving the Company. As CFO, Brown was the person most responsible for these accounting irregularities. Within months, the Company confirmed investors' fears, restating every single financial statement it had issued

since the first quarter of 2016—an admission that those statements were materially false as of the time they were issued.

249.    As a result, the Company's shares closed down nearly 12%, or $9.91 per share, from $84.68 at the close on February 27 to $74.77 on February 28, 2017, on unusually high trading volume of over 14 million shares. A Morgan Stanley analyst report described the developments as a "[p]ainful re-set" and explained that the pain was the result of inflated and unachievable organic growth targets: "Under previous CEO Joe Papa, Perrigo had targeted 5-10% . . . revenue growth, but the company did not achieve[] that level of growth in recent years." Likewise, an RBC Capital Markets analyst report described the disclosures as "worse than anticipated" and was concerned by the "**unexpected CFO departure**."

250.    On March 3, 2017, Bloomberg reported that Perrigo's name had been raised by antitrust regulators at the DOJ.[15]  On this news, Perrigo shares dropped 3.71% to close at $72.76, from $75.76 at the close of the prior day.

251.    After the close of the market on May 2, 2017, Perrigo revealed that its offices had been raided as part of an ongoing investigation by the DOJ into price-fixing in the pharmaceutical industry.  Investors were stunned.  As a Wells Fargo analyst report noted, Perrigo had not "included a disclosure in its prior SEC filings related to an investigation."  The raid was a far more severe measure than taken against most other generic drug manufacturers, who merely received subpoenas.  Consequentially, on May 3, 2017, Perrigo's shares closed down over 5%, or $3.88 per share, from $76.23 at the close on May 2, 2017, to $72.35 on May 3, 2017.

---

[15] *See Perrigo Joins Firms With Generic Drugs Under U.S. Glare*, Bloomberg (Mar. 3, 2017), https://www.bloomberg.com/news/articles/2017-03-03/perrigo-joins-list-of-firms-with-generic-drugs-under-u-s-glare.

252.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by the Assignors (and by extension, Plaintiff).   The disclosures of previously misrepresented and concealed material facts about Perrigo's operations, business, performance, and prospects caused the price of Perrigo's securities to decline markedly, wiping out millions of dollars in shareholder wealth.   It was entirely foreseeable to Defendants that misrepresenting and concealing these material facts would both:  (i) cause Perrigo common stock to trade in excess of its true value; and (ii) induce shareholders to reject Mylan's Tender Offer, thereby relinquishing an opportunity to receive substantially more value than holding onto their Perrigo common stock.   It was also foreseeable that the disclosure of this information, and the materialization of concealed risks associated with Defendants' misconduct, would cause the price of Perrigo common stock to decline as the inflation caused by Defendants' earlier misrepresentations and omissions was removed from the price of Perrigo common stock. Accordingly, the conduct of Defendants, as alleged herein, proximately caused foreseeable losses for the Assignors who purchased or otherwise acquired Perrigo common stock during the Relevant Period and/or held such common stock as of the termination of the Tender Offer and thereafter in reliance on Defendants' misrepresentations.

253.    On May 22, 2017, Perrigo filed its delinquent Form 10-K for calendar year 2016 and restated the financial statements previously filed on Form 10-Q for each of the first three quarters of 2016. Perrigo's delinquent 2016 Form 10-K conceded extensive material weaknesses in its financial reporting. With regard to the Tysabri royalty stream, the Company admitted:

> [M]anagement determined that its control over the review of the application of the accounting guidance in ASC 805 *Business Combinations* did not operate effectively in the appropriate identification of the assets acquired and liabilities assumed in connection with the Elan acquisition in December 2013. All originally filed financial statements presented up to the filing of this 2016 Form 10-K included the disclosure of the Elan acquisition with the Tysabri® royalty stream

presented as an intangible asset. In addition, due to the fact that the asset was historically classified as an intangible asset, we did not design or implement controls around the fair value accounting for the Tysabri® royalty stream as a financial asset, so these controls were not in place at any quarter end subsequent to the acquisition, including the date of the annual assessment of internal control. Accordingly, management concluded that these control deficiencies represent material weaknesses.

254.   Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of June 27, 2015, was no more than $5.42 billion, and as of December 31, 2015, was no more than $5.31 billion.

255.   Perrigo's restated Form 10-Q for the first quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of April 2, 2016, was no more than $5.02 billion.

256.   Perrigo's restated Form 10-Q for the second quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of July 2, 2016, was no more than $4.02 billion.

257.   Perrigo's restated Form 10-Q for the third quarter of 2016 conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of July 2, 2016, was no more than $3.55 billion.

258.   Perrigo's delinquent 2016 Form 10-K conceded that, in management's assessment, the fair value of the Tysabri royalty stream as of December 31, 2016, was no more than $2.35 billion.

259.   On June 7, 2017, Hendrickson—who succeeded Defendant Papa as CEO of Perrigo—announced that he would retire from Perrigo, making Hendrickson the second top executive to leave the Company in 2017 (after Defendant Brown).

## VI.  DEFENDANTS' MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

260.    As set forth below, Defendants issued numerous materially false or misleading statements and omissions of material fact throughout the Relevant Period.  These include both public statements and omissions made to investors at large as well as statements and omissions made during private meetings and telephone conversations with First Manhattan and members of Perrigo management, including Papa and Brown.  Indeed, First Manhattan began having direct calls and meetings with Perrigo as early as September of 2014 when First Manhattan investment management professionals had an initial call with Art Shannon from Perrigo's Investor Relations Department.

261.    On October 31, 2014, Sawyer and three First Manhattan portfolio managers, Tim Muccia, Jack Varon, and Andrew Freedberg, met with Papa for the first time at Perrigo's offices in New Jersey.  This meeting occurred just six days before Omega announced its intent to acquire Omega.

### A.  Statements Concerning the Omega Acquisition and the Valuation of Mylan's Offers

#### 1.  April 21, 2015 Press Release, Rejection Call, Presentation, and Earnings Release

262.    On April 21, 2015, Perrigo issued a press release on Form 8-K announcing that "Perrigo's Board Unanimously Rejects Unsolicited Proposal from Mylan" ("April 21 Press Release"), attaching an investor presentation entitled, *Perrigo: Creating Superior Value for Shareholders* ("April 21 Presentation"), and held a conference call (the "Rejection Call").  That same day, Perrigo also issued a press release on Form 8-K announcing its third quarter 2015 financial results ("April 21 Earnings Release").

263.     In the April 21 Press Release, Perrigo announced that its Board had "unanimously rejected" Mylan's Offer, having concluded that the Offer "***substantially undervalues the Company and its future growth prospects*** and is not in the best interests of Perrigo's shareholders."

264.     According to Perrigo, the Board's determination was informed by certain "key factors," including that the Offer:  (i) "does not take into account the full benefits of the Omega Pharma acquisition, which closed on March 30, 2015, including additional value to be derived from synergies and increased global presence"; (ii) "would deny Perrigo shareholders the full benefits of Perrigo's durable competitive position and compelling growth strategy"; and (iii) "substantially undervalues Perrigo's differentiated global business, including the Company's leading market position in key franchises, global distribution platform, and proven expertise in product development and supply chain management."

265.     During the April 21 Rejection Call, Papa also focused investors' attention on Omega, stating:  "[W]e have just completed the Omega acquisition, which among other major benefits, provides a significantly enhanced international platform for additional growth.  Simply put, Omega allows us to pursue paths that were never available to us in the past."

266.     When pressed by analysts for more information concerning Omega—which Papa had identified as a primary basis for rejecting any takeover attempt by Mylan—and the status of Perrigo's integration efforts, Papa responded:

> Sure.   Well, I will start with Omega.  We're very pleased with our initial integration projects with Omega, so there is a lot of good activities happening with the integration team.  I'd say it's focused on both driving that topline numbers . . . but it's also focused on improving the cost of goods sold.  We've got a supply chain team already working with them to drive the bottom line results as well.  As I talk about the growth of Omega from a historical point of view moving into the future, it has been accretive to our growth rate.  So we're excited about that.

267.    Later during that same call, Papa further stated:

At Omega, we feel very good about the opportunity with Omega and specifically what I would refer to and we've talked about in the past about revenue synergies. We do believe that there are revenue synergies with the product portfolio that we have at Perrigo as we bring the 3,000 Perrigo products and help to bring them to Omega and look for ways that we could do line extensions of existing Omega brands. ***That's something that we have teams underway already from an integration process. Those teams are very active in looking at which ones are the best ones to do, the earliest ones to do and move that forward***. We do believe that that will allow us with the Omega portfolio to be in that 5% to 10% compound annual growth rate. Obviously, the more success we have with Omega, the more it would help us to be at the higher end of that from the revenue synergies point of view. Number two, on the Mylan proposal, candidly, I don't have more facts than are out in the marketplace relative to what is in the proposal. There was no specifics in the proposal for Mylan relative to—they were at $205 per share but there was no specifics relative to cash versus stock percentages nor what their view was on synergies. Mylan is a good company, Perrigo is a good company. There are opportunities, but I don't want to make any specific comments about or speculate anything about the synergies that could be available between the two companies.

268.    In the April 21 Presentation, Defendants likewise assured investors that Omega "is accretive to Perrigo's organize[d] growth profile, and creates additional value derived from synergies and increased global scale." In addition, Papa accepted personal responsibility for the April 21 Presentation, making the representations required by Irish Takeover Rule 19.2 that the:

[D]irectors of Perrigo accept responsibility for the information contained in this presentation. To the best of the knowledge and belief of the directors (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information.[16]

269.    Papa further touted Perrigo's standalone growth prospects, highlighting the Omega acquisition:

Now, ***with the successful completion of the Omega acquisition*** on March 30, Perrigo is a top 5 global OTC company, ***better positioned than ever to deliver on our leading market positions***, unrivaled global manufacturing and distribution capabilities, unparalleled customer relationships, and broad portfolio of products

---

[16] Ex. 99.2 to April 21, 2015 Form 8-K, Slide 1.

to continue to deliver superior value for shareholders.  Our confidence in the future, as consumers around the world increasingly seek greater choice and value in their healthcare, is reflected in the guidance we are providing today.

270.    Each of Defendants' statements set forth in ¶¶ 263-69 above was materially false

or misleading when made, or omitted material facts necessary to render such statements not

misleading, for the following reasons:

a) Numerous former Perrigo and Omega employees confirm that since its acquisition, Omega drastically underperformed and failed to meet both publicly disclosed and internal goals, as evidenced by the more than $2 billion in impairment charges Defendants eventually were forced to take on Omega. *See* ¶¶ 87-122, 233, 241-42, 245, 247.

b) Far from delivering on the Company's Omega integration plan, according to numerous former Perrigo employees with direct knowledge concerning Omega's integration, including Ray, CW-1, CW-4, and CW-5, Perrigo failed to migrate Omega's complete financial data and performance information to Perrigo's incompatible central data management system during the Relevant Period, including data relating to: (i) sales, including orders, returns, and discounts; (ii) purchases, including orders, returns, and damaged goods reports; (iii) inventory, including sub-ledgers, damaged goods, and obsolete goods; and (iv) accounting, including sub-ledgers for accounts receivable and payable.  As a result, Perrigo had impaired visibility into trends in the Omega sales or supply chain and lacked an understanding of the causes of variances in projected sales or expenses because the Company had no access to the underlying detail.  *See* ¶¶ 87-122.

c) Despite touting operational efficiencies as a primary benefit of the Omega acquisition, according to Ray and CW-1, who were responsible for integration projects in Europe, substantive Omega financial data and performance information was available to Perrigo only by manual request to Omega's franchises.  This process would take at least three weeks for each such report and was highly susceptible to error.  Because Omega's financial data was non-automated, Perrigo relied on unconfirmed, verbal representations made by Omega concerning that data—many of which turned out to be incorrect—without having access to the underlying data in order to verify its accuracy.  *See* ¶¶ 88-97.

d) Despite claiming that Omega's market platform across European countries was a strategic benefit to Perrigo's overall operations and a key driver of the Company's overall growth prospects, from the start of the Relevant Period, Perrigo lacked a basic understanding of the European markets in which Omega operated, including the regulatory framework and country-specific laws applicable to Omega's operations concerning, among other things, privacy of information, pricing and product approvals, and pricing challenges caused by EU regulations and in-country supplier/seller competition, which forced Perrigo to cut into its margins

by lowering price points in the European markets in which Omega operated. *See* ¶¶ 98-101.

e)      The Company's financial forecasts were unrealistic, untenable, and indefensible, as Hendrickson has since admitted, telling investors on May 12, 2016 that the Company would target "realistic" forecasts "going forward."  ¶¶ 200-02. Multiple witnesses recounted detailed facts regarding the generation of Perrigo's aggressive guidance surrounding the Omega acquisition and the pushback Perrigo received from Omega.  ¶¶ 116-22.

f)      In violation of the representation required by Irish Takeover Rule 19.2, Defendants had not "taken all reasonable care" to ensure that the statements regarding Omega and its contribution to Perrigo's financial condition and prospects were "in accordance with the facts and . . . d[id] not omit anything likely to affect the import of such information," given what they knew about the struggles of the Omega integration (which are detailed in ¶¶ 423-25).

271.    Having chosen to speak publicly about Perrigo's Omega acquisition, integration and its purported benefits and synergies, Defendants violated their duties to: (i) disclose the true and complete material facts regarding the Omega acquisition as detailed above so as to render Defendants' statements not misleading; and (ii) update their statements when Defendants became aware of such information.  Defendants' statements and omissions are also material because there is a substantial likelihood that Perrigo shareholders would consider the misrepresented and omitted facts significant in making a decision as to whether to tender their Perrigo shares to Mylan or to purchase Perrigo stock.

## 2.      May 4, 2015 Meeting with Papa at First Manhattan

272.    On May 4, 2015, Papa visited First Manhattan's offices in New York and met with Sawyer and certain First Manhattan investment management professionals.  As Sawyer's report memorializing the meeting reflects, during this meeting, Papa stated that he did not believe that a deal with Mylan offered much value because, among other reasons, although Perrigo had sought in the past to acquire a European distribution platform and there had been

"the potential for Perrigo to make use of Mylan's global distribution," Perrigo had achieved that strategic benefit when Perrigo "acquired a European distribution platform with Omega."

273.    Papa then touted the benefits of the Omega acquisition, noting that it "broadens the footprint."   Papa added that he believes "the deal looks better than it did when it was announced 6-9 months ago" because "[c]ost synergies are likely to come in above the initial plan" and because Papa "sees potential for more revenue synergies as Perrigo should be able to take existing US drug compounds into Europe as line extensions for existing Omega brands."

274.    Each of Defendants' statements set forth in ¶¶ 272-73 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above.

### 3.    May 6, 2015 Deutsche Bank 40th Annual Health Care Conference

275.    On May 6, 2015, Papa attended and spoke on behalf of the Company at the Deutsche Bank 40th Annual Health Care Conference, held in Boston, Massachusetts.

276.    At the outset, Papa addressed Mylan's Third Offer, stating "[w]e believe we have a very strong standalone business" and "we believe the offer from Mylan substantially undervalues the Perrigo Company, and doesn't take into account really some of the important things that we've done with the Omega business."

277.    When asked specifically what about Omega drove Defendants' financial guidance, Papa responded:

> When we signed the deal on November 6 we were very excited about Omega. But if anything, since that point as we closed the Omega on March 30, we've become even more excited.   The excitement comes from a number of things. Number one, you take a company like Perrigo that was doing business in six countries. Now you open up, and you have 39 countries available.   You have 300 million more consumers that you have access to as a result of doing the Omega transaction.

That's a really exciting prospect for us as a Company. ***So we think there is tremendous revenue synergies for us as a business as we put these two businesses together***. Part of that revenue synergy is very simply we take the Perrigo products that we have today. Some of them are already approved in Europe. We take those and we look at ways we can do line extensions of Perrigo products via the-- take a Perrigo product, a product that's a nighttime pain product, match it up with the brand item that Omega has today, and you launch a nighttime pain product by Omega. Very simple, it takes advantage of the brand equity that's already in place for the Omega products. We think that's a great revenue synergy opportunity.

278. Papa further represented that:

[O]ne of the things Omega did really well was sales marketing. One of the things they, by their own admission, say they were not focused on was the supply chain and manufacturing. We think we can help them tremendously with that. We've already got over 20 projects, identified staff to lower the cost of goods of the Omega product. I remind you that 79% of what Omega sells today, they outsource. ***Some of those products we can bring into a Perrigo facility or an Omega facility with our expertise, and lower the cost of goods by 30-40%, which will absolutely add to the bottom line of Omega and Perrigo***.

279. Following these representations, Papa concluded "[n]ow that I've got the Omega business, and we're in 39 countries, we think the bolt-on strategy for the future can be very, very profitable for Perrigo shareholders as we now have a commercial footprint in these countries that we didn't have before." "[W]e're very excited about that" and "think that brings a significant number of synergies."

280. Each of Defendants' statements set forth in ¶¶ 276-79 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above.

### 4. May 12, 2015 Bank of America Merrill Lynch Health Care Conference

281. On May 12, 2015, Papa attended and spoke on behalf of the Company at the Bank of America Merrill Lynch Health Care Conference, held in Las Vegas, Nevada ("May 12 BoA Conference").

282.   With respect to the lingering Mylan takeover attempt, Papa again focused investors on the value that Omega purportedly added to Perrigo:

> What we've said as a board is that we believe that offer substantially undervalues the Perrigo Company.  And specifically, we said relative to the—***we're just getting started with the Omega transaction, and as a result of that we think there is a lot more opportunity for us as a company***.  As we've gone from competing in approximately six countries now to about 39 countries we think there's a lot of opportunity for the Perrigo Company. . . . ***So we do think that $202 or $187 number did significantly undervalue the Perrigo Company, especially given what we have now done with Omega***.

283.   Papa was then asked to identify the "most under-appreciated" aspect of the "Omega transaction."  He responded:

> Well, I will say for me personally even when we made the announcement on November 6, we thought there would be opportunity for synergy, but as now we've got more involved and closed the transaction on March 30.  So from November 6 to March 30 we've become smarter about what's in the Perrigo, I am sorry, within Omega and how the Perrigo products would fit within Omega, relative to taking the easy example.  Omega has got some great products for pain, but they don't have a night time pain that also has a product in it that allows you to sleep better at night.  It is the combination products that we have we think that would fit naturally into the Omega pipeline and launch new line extensions of the Omega pain products.  That [is] a great easy example.

284.   Papa was also asked, "[w]hen you said [the] Mylan offer severely undervalues and you offered new value, the $202 per share, is it the total deal value that is undervaluing or is it the cash-equity split that is the issue here?"  Papa responded "[i]t is the total that we believe to be undervalue of the Perrigo Company, the $202 number that we think based on our track record and performance, we think our Company is worth more than that."

285.   Each of Defendants' statements set forth in ¶¶ 282-84 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above.

### 5.    June 2, 2015 GSK Call and Presentation

286.    On June 2, 2015, Perrigo held a conference call with investors to discuss the Company's acquisition of a portfolio of brands from GSK ("GSK Call"), on which Papa, Brown, and Coucke spoke on behalf of Perrigo.  In conjunction with the GSK Call, the Company issued an investor presentation, entitled, *Perrigo: Building on Omega Pharma's Unique European OTC Platform* ("June 2 Presentation").

287.    During the GSK Call, Coucke, Perrigo's Executive Vice President and General Manager of BCH—which was, at the time, comprised almost entirely of Omega—made numerous representations concerning Omega and the value it purportedly added to Perrigo's business as a whole, Coucke highlighted the "attractive market opportunity in the European OTC space and how, as a combined Company with Omega and Perrigo, we are very well positioned to capture even greater share."  More specifically, Coucke told investors that:

> Due to Omega Pharma's unique model of engaging with pharmacies and retailers, and by distributing our products across our 36-country network, we are able to compete and to out-perform the largest global players in OTC Pharma . . . . Omega Pharma has become a top-five player in European OTC, and we are number one or two in a lot of key European markets.

288.    Drawing investors' attention to the presentation the Company had filed with the SEC that same day, Coucke explained that through the Omega acquisition, Perrigo had: (i) "hired best-in-class management and a consumer-centric sales and marketing team with extensive OTC experience"; and (ii) "streamlined the operations and we instituted an efficient management structure with real, efficient, direct, short reporting lines between Omega Pharma leadership team and country management."  Coucke further represented that the Omega acquisition "brings us closer to our individual customers than our peers. . . . Now, through the combination with Perrigo, we can accelerate what Omega Pharma has been doing for decades.  We are now better

equipped, prepared to add additional high-margin products to our unique platform across all of Europe."

289.    In the June 2 Presentation, Defendants repeated in substantial form many of the statements made in ¶¶ 287-88 above and again represented, among other things, that: (i) the Omega acquisition "[u]nderscores [Perrigo's] global strategy and positions Perrigo for continued European organic and inorganic growth"; (ii) "[w]ith Omega Pharma, Perrigo has obtained a world-class management team and leading European distribution network spanning 36 countries"; and (iii) the "[c]ombined commercial infrastructure, supply chain capabilities and financial strength enables highly synergistic bolt-on transactions."

290.    Each of Defendants' statements set forth in ¶¶ 287-89 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above.

### 6.    June 2, 2015 Jefferies Global Healthcare Conference

291.    On June 2, 2015, Papa attended and spoke on behalf of the Company at the Jefferies Global Healthcare Conference, held in New York, New York ("June 2 Jefferies Conference").   Once again, Papa represented that "Omega and Perrigo together are well-positioned" and characterized Omega as "immediately accretive":

> With Omega though, it was a perfect example of doing exactly what we did in the US, but now apply that to these 36 additional countries that I now have access to that I didn't before.  So I could not bolt on something in my German operations prior to Omega. I didn't have German operations. Now I do. Now I can bolt things on to Germany. I can bolt things on to Sweden.  That really is the logic of why we felt Omega was so strategically important to us, and it will allow us so many more opportunities to do these bolt-on transactions, which generally come with very good return characteristics, and why we think it's really important for the future success of the Perrigo Company.

292.     Each of Defendants' statements set forth in ¶ 291 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above.

### 7.     June 23, 2015 Oppenheimer Consumer Conference

293.     On June 23, 2015, Brown attended and spoke on behalf of the Company at the Oppenheimer Consumer Conference, held in Boston, Massachusetts.

294.     During the conference, Brown was specifically asked to discuss the "Omega integration." In response, Brown assured investors that:

> We closed the transaction on March 30, so we are about nine weeks in right now, and we are online—I should say in line with our going online integration process. ***Back office is working smoothly***. We're bringing them onto all of our back-office systems, and importantly what was the underlying core of this deal was allowing Omega to remain independent in their sales and marketing process, not interfering with that, but providing them product to put into that pipeline.

295.     Later, Brown doubled-down on her representations concerning the Omega integration efforts, stating:

> We [Perrigo] have management teams who are in charge of Omega integration who are actively involved on a day-to-day basis in both running Omega and another team that is focused on helping them get those product launches, helping on the integration. That was underway. That was rolling down the tracks before the Mylan letter came out, and that continues, so it is not as if the entire management team suddenly stops doing everything they are doing and is focused exclusively on the offer.

296.     An analyst then specifically asked Brown: "[H]as Mylan impacted the integration process for Omega in any way? Has there been any distraction?" In response, Brown stated in no uncertain terms: "No. That team continues to do what their mission is and what they have been scheduled to do." Brown added "they [Omega] are more invigorated than ever by the combination of what we can do together. So that team is doing their thing and I am off to Belgium next week. That was process like normal."

297.    Brown also reaffirmed Perrigo's targeted annual growth rate of 5-10%, specifically attributing the growth to what the Company would see "from the combined Perrigo and Omega footprint."

298.    Each of Defendants' statements set forth in ¶¶ 294-97 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above.

### 8.    July 22, 2015 Meeting with Papa at First Manhattan

299.    On July 22, 2015, Papa visited First Manhattan's offices in New York and met with Sawyer and certain First Manhattan investment management professionals.  As Sawyer's report memorializing the meeting reflects, during the meeting, Papa stated that he "believes the real value of Perrigo is 'substantially' higher" than the Mylan offer based on, among other things, "the potential for value creation from the recent Omega acquisition."  Papa added that the "[u]pside from Omega could be realized quickly" and that "[t]he Omega platform gives Perrigo the opportunity to extend its historic US acquisition model into Europe."

300.    Each of Defendants' statements set forth in ¶ 299 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 above and because:

a)    According to Ray, integration efforts were at a complete standstill at the time she took over as CISO in July 2015, so much so that CIO Farrington—who Papa had charged with integrating Omega—instructed her to discuss with Omega's head of IT, Deneubourg (her direct counterpart in Belgium) to find out why no advancement was happening.  *See* ¶ 90.

b)    According to Ray, Deneubourg was out of the office from July 2015 through August 2015 (returning part time in September 2015 with a broken leg), such that integration efforts "came to a standstill."  *See* ¶¶ 107-09.  In response, the integration team, including Ray, prepared a "CapEx forecast" and "Request for Hire."  Those requests disclosed the need for a new hire to replace Deneubourg, as it pertained to the stalled integration project.  The request was presented to the Board (including Chairman Papa), but was rejected, as were numerous similar

requests made to the Board and Papa by Farrington between August and November 2015.  *See* ¶¶ 110-11; *see, e.g.*, ¶¶ 103-16, 123.

c)   In or around July or August 2015, the same time Deneubourg was out of the office, Coucke instructed Deneubourg to put integration to the side until Perrigo resolved the numerous impediments that were preventing such integration, according to Ray.  *See* ¶ 111.

d)   In August 2015, Donovan came to the U.S. specifically to meet with and brief Perrigo management on then-existing integration challenges with respect to Omega, including technology and security issues.  *See* ¶¶ 91, 112.

e)   During quarterly update meetings in the second half of 2015 through early 2016, presentations during meetings made clear that Omega was not performing and was not at all what Perrigo had represented it to be, according to CW-8.  *See* ¶ 122.

### 9.   August 5, 2015 Earnings Call

301.   On August 5, 2015, Perrigo held the Company's fourth quarter 2015 earnings call ("August 5 Earnings Call"), in which Papa and Brown participated on behalf of Perrigo.

302.   During the August 5 Earnings Call, Papa again directed investors to Perrigo's supposedly successful integration of Omega, stating, "[e]ven with all the noise you've been following over the past few months [concerning Mylan's takeover bid] . . . [we] delivered on our Omega integration plan [and] achieved great operational efficiencies and productivity improvement . . . ."  Brown likewise represented that "[w]e [Perrigo] continue to execute on the integration of Omega."

303.   Each of Defendants' statements set forth in ¶ 302 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 and 300 above.

### 10.   August 6, 2015 Investor Presentation

304.   On August 6, 2015, Perrigo filed with the SEC a Form SC14D9, attaching a presentation entitled, *Creating Long-Term Value for Shareholders* ("August 6 Presentation"),

which focused heavily on the value added by the Omega transaction and on Perrigo's rejection of Mylan's Third Offer.

305.   In the August 6 Presentation, Defendants represented that:   (i) the Omega acquisition "[s]upports [Perrigo's] global strategy and positions Perrigo for continued European organic and inorganic growth"; (ii) with Omega Pharma, Perrigo has obtained "a world-class management team and leading European distribution network spanning at least 35 countries"; and (iii) the "[c]ombined commercial infrastructure, supply chain capabilities and financial strength enables highly synergistic bolt-on transactions."

306.   Following the Company's glowing review of Omega, Defendants addressed Mylan's Third Offer, representing that it was "value destructive" and telling investors that "the Board unanimously concluded that the offer substantially undervalues the Company and its future growth prospects and is not in the best interests of Perrigo's shareholders."

307.   Each of Defendants' statements set forth in ¶¶ 305-06 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71 and 300 above and because, in truth, the Omega integration was at a standstill throughout the summer of 2015.

**11.   August 13, 2015 Form 10-K**

308.   On August 13, 2015, the Company filed with the SEC the Company's Form 10-K for the period ending June 27, 2015 ("2015 Form 10-K"), which was signed by Papa and Brown. With respect to Omega, Defendants again represented that:

> Prior to its acquisition, Omega was one of the largest OTC companies in Europe. The Omega acquisition expanded our OTC leadership position across Europe, accelerated our international expansion and geographic diversification through enhanced scale and a broadened footprint, and diversified our revenue and cash flow streams while strengthening our financial profile.

309.    Each of Defendants' statements set forth in ¶ 308 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 12.    September 17, 2015 Press Release

310.    On September 17, 2015, Perrigo issued a press release on Form 8-K disclosing that the Company's Board recommended that Perrigo shareholders reject Mylan's Tender Offer, which included a presentation entitled, *Responding to Mylan's Inadequate Tender Offer: Perrigo's Board Recommends That You Reject the Offer and **Do Not Tender*** ("September 17 Press Release").

311.    In the September 17 Press Release, Defendants represented that Mylan's Tender Offer "substantially undervalues the Company and does not adequately compensate shareholders for Perrigo's exceptional standalone growth prospects."  Papa specifically represented that the Tender Offer "undervalues our compelling prospects for continued growth and sustainable, long-term shareholder value" because, among other things:

> We continue to build upon our recently acquired pan-European branded consumer healthcare [BCH] platform . . . demonstrating our unique positioning to capitalize on the growing $30 billion European OTC market opportunity.

312.    Each of Defendants' statements set forth in ¶ 311 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 13.    September 17, 2015 Conference Call

313.    On September 17, 2015, Perrigo held a conference call to discuss Mylan's Tender Offer and the Board's recommendation that shareholders reject that Offer ("September 17 Call"), in which Papa participated on behalf of Perrigo.

314.    During the September 17 Call, Papa represented that Mylan's "current offer on the table is not even in the right ZIP code, when compared to Perrigo's stand-alone value," and once again stated that the Board had "unanimously determined that the offer substantially undervalues the Company and does not adequately compensate shareholders for Perrigo's *exceptional growth prospects*."  To further allay investors' concern, Papa touted the success of the Omega acquisition, declaring that "the Omega transaction . . . has done outstanding."

315.    Each of Defendants' statements set forth in ¶ 314 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 14.    September 17, 2015 Letter to Shareholders

316.    On September 17, 2015, Perrigo filed with the SEC a letter on Form SC14D-9 from Papa concerning the Mylan Tender Offer.  Therein, Papa once more stated that "Mylan's offer not only fails to reflect Perrigo's outstanding track record of value creation, it also undervalues our *compelling prospects for continued growth and sustainable, long-term shareholder value*," which includes "build[ing] upon our recently acquired pan-European [Omega] branded consumer healthcare platform . . . ."  In addition, the letter stated that "[t]he directors of Perrigo," including Papa, "accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information."

317.    Each of Defendants' statements set forth in ¶ 316 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 15.  September 17, 2015 Morgan Stanley Healthcare Conference

318.  Also on September 17, 2015, Papa attended and spoke on behalf of the Company at the Morgan Stanley Healthcare Conference, held in New York, New York.

319.  At the outset, Papa was asked how Perrigo was "driving the organization to execute" on its growth agenda.  In response, Papa identified Omega as a driving force in that growth, stating:

> Our concept is we believe we have a base business that's going to be able to grow that 5% to 10% especially now that we've added the Omega business.  We just closed Omega on March 30.  So now we've got Omega, which allows us not [only] to compete in the six countries where we were before Omega.  But now we're up to 39 countries.  So a tremendous expansion of our geographic foot print, very important to us.

320.  With respect to Mylan's Tender Offer, which had been launched that same day, Papa concluded, "[w]e always said that Perrigo is not against deals.  We're just against this deal, because it's a bad deal."

321.  Each of Defendants' statements set forth in ¶¶ 319-20 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 16.  September 30, 2015 Meeting with Brown at First Manhattan

322.  On September 30, 2015—less than two weeks after Perrigo formally advised against the Tender Offer—Brown met with Sawyer and certain First Manhattan investment management professionals at First Manhattan's offices in New York.  As Sawyer's report memorializing the meeting reflects, during the meeting, Brown stated that the "***Omega acquisition is off to a good start.***"  Brown added that "[t]he business is ahead of plan through the first six months with healthy sales growth and upsides in operating synergies" and is "confident that the generic RX business would hold up under competitive pressure."

323.    Each of Defendants' statements set forth in ¶ 322 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

**17.    October 22, 2015 Earnings Call and Presentation**

324.    On October 22, 2015, Perrigo held the Company's third quarter 2015 earnings call ("October 22 Earnings Call"), in which Papa participated on behalf of Perrigo.  In conjunction with the October 22 Earnings Call, Perrigo issued an investor presentation, *Creating Value for Shareholders: Now and For the Long Term* ("October 22 Presentation").

325.    With respect to Omega, Papa represented during the October 22 Earnings Call that "we [Perrigo] built up the platform with the acquisition of Omega, which has enabled us to provide quality healthcare products to hundreds of millions more consumers globally.  We are continuing to build on this platform, realizing even greater benefits than we initially expected."

326.    In the October 22 Presentation, Defendants repeated the statements set forth in ¶¶ 325 above.

327.    Each of Defendants' statements set forth in ¶¶ 325-26 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

**18.    November 2, 2015 Form 10-Q**

328.    On November 2, 2015, the Company filed with the SEC the Company's Form 10-Q for the period ending September 26, 2015.  The Form 10-Q was signed by Papa and Brown. Therein, Defendants again represented that:

> Omega was a leading European OTC company, and is providing us several key benefits, including advancing our growth strategy outside the U.S. by providing access across a larger global platform with critical mass in key European countries, establishing commercial infrastructure in the high-barrier-to-entry European OTC marketplace, strengthening our product portfolio while enhancing

scale and distribution, enhancing our financial profile, and expanding our international management capabilities.

329.    Each of Defendants' statements set forth in ¶ 328 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 19.    January 5, 2016 Goldman Sachs Healthcare Conference

330.    On January 5, 2016, Papa attended and spoke on behalf of the Company at the Goldman Sachs Healthcare Conference, held in New York, New York.

331.    During the conference, Jami Rubin, a Goldman Sachs' analyst, asked Papa the following questions about Omega's integration and the revenue synergies Defendants had repeatedly touted throughout the Relevant Period:

> Let's talk about the integration of Omega.  That's, I think, pretty much behind you.  A big part of that Omega story was generating leverage—generating revenue synergies from Omega. How are you levering—A, are you getting that revenue synergy?  How are you getting it?  And how are you leveraging Omega across Perrigo?

Papa, without correcting Rubin's statement that the Omega integration was "pretty much behind [Perrigo]," responded:

> [W]e felt there would be revenue synergies of $100 million-plus and cost-of-goods-sold synergies in the order of magnitude of the $25 million range.  We still feel very good about those—certainly on the cost-of-goods-sold synergies.  We clearly are seeing projects in place that are going to generate far superior to $25 million just by simply either bringing some of the products that were outsourcing inside and/or things that we are doing just to leverage the Perrigo supply chain to get better raw material costs.  So we feel very good about that.

332.    Each of Defendants' statements set forth in ¶ 331 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### 20.   January 11, 2016 JPMorgan Healthcare Conference

333.   On January 11, 2016, Papa attended and spoke on behalf of the Company at the JPMorgan Healthcare Conference, held in New York, New York.  During the Conference, Papa made the following statements concerning Omega:

> Our branded consumer healthcare is a business that we acquired, the Omega Company.  We acquired Omega and closed the transaction on March 30, 2015 and it's one of the things that we think is very important to our future.  ***First and foremost, it moved us from a company competing in approximately 6 countries to a Company now than being in 39 countries.  So dramatically expanded our geographic footprint, which we think is important for our future***.  ***Number two: we are now top five over-the-counter company in Europe.  In fact, one of the fastest-growing over-the-counter companies in Europe.  We also think it well positions us for additional M&A in the branded consumer healthcare space in Europe as there is additional opportunities to roll up additional consumer assets in the rest of Europe.  So we are very excited about that.  Within Omega, we compete in very large segments: cough, cold, allergy, analgesics, etc.  And we try to find those where there's some unmet needs because of either formulation or something that we can do to make our product unique to the consumers***.  We also have some niche products where we are number one in the category.  Importantly, as we think about the future, with our branded consumer healthcare business, we think there is over $200 million of new product sales in our branded consumer healthcare business from 2016 to 2018.

334.   Each of Defendants' statements set forth in ¶ 333 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶¶ 270-71, 300, and 307 above.

### B.   Statements Concerning Generic Drug Pricing

335.   As discussed above, Perrigo was engaged in elicit price-fixing for multiple generic drugs beginning several years prior to the Relevant Period.  During the Relevant Period, Defendants routinely omitted the highly material fact that Perrigo was engaged in price collusion with its competitors to keep their profits up and misrepresented the competitive nature of the Company's participation in the generic pharmaceutical markets.  In addition, given the increased competition in the U.S. generic drug industry in which Perrigo operated and regulatory scrutiny

in that industry, Defendants were asked on a regular basis during the Relevant Period how that competition and scrutiny was impacting Perrigo's generic drug pricing and pricing strategy.   In each instance, Defendants falsely denied that Perrigo was feeling the impact of any "pricing pressures" and in fact, with few exceptions, falsely claimed that Perrigo was immune to such pressures.

### 1.   April 21, 2015 Rejection Call and Presentation

336.   During the April 21 Rejection Call, Papa was asked whether pricing in the generic drug industry would impact Perrigo's business and growth prospects.   In response, Papa explained that Perrigo intended, as it always had in the past, to "keep pricing flat to up slightly" and that he was "very comfortable that, certainly in our current year in our calendar 2015, as we look to the future, we can keep pricing flat to up slightly," in spite of the pricing pressures in the industry.

337.   In the April 21 Presentation, the Company projected 8%-12% net sales growth for the Generic Rx division.   The presentation slides explained that the "directors of Perrigo accept responsibility for the information contained in this presentation.   To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information."

338.   Each of Defendants' statements set forth in ¶¶ 336-37 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, because, as discussed in ¶¶ 24-28 and 124-45 above, in reality, pricing levels for Perrigo's U.S. generic drugs were unsustainable as a result of increased market competition, caused in large part by accelerated approvals of generic drug applications by the FDA and U.S. regulatory scrutiny into generic drug industry pricing.   Moreover, Defendants' statements

concealed the fact that Perrigo was engaged in price collusion with its generic drug competitors, as discussed in ¶¶ 146-82 above, and misrepresented the competitive nature of the Company's participation in the generic drug markets. Specifically, Defendants made materially false and/or misleading statements which had the effect of concealing, and/or failed to disclose, that: (i) Perrigo and several of its pharmaceutical industry peers engaged in anti-competitive conduct by colluding to fix generic drug prices; (ii) the foregoing conduct constituted anti-competitive conduct; and (iii) consequently, Perrigo's pricing decisions and strategy were based on anti-competitive conduct, as discussed above in ¶¶ 146-82. By electing to speak publicly about Perrigo's generic drug business—specifically, pricing and competition for generic drugs—and thereby putting these subjects into play, Defendants had a duty to fully, completely, and truthfully disclose all material facts regarding generic drug pricing, competition, and revenues so as to not mislead investors. As a result of the foregoing, Defendants' public statements were materially false or misleading at all relevant times. Defendants' statements and omissions are also material because there is a substantial likelihood that Perrigo shareholders would consider the misrepresented and omitted facts significant in making a decision as to whether to purchase Perrigo stock.

### 2.    April 22, 2015 First Manhattan Call with Papa

339.    On April 22, 2015, Sawyer and certain First Manhattan investment management professionals had a twenty minute conference call with Papa. As Sawyer's report memorializing the call reflects, during the call, Papa characterized the pipeline for the generic Rx business as the Company's "best ever," explaining that "no competitors have filed on several key products."

340.    Each of Defendants' statements set forth in ¶ 339 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### 3.      May 12, 2015 Bank of America Merrill Lynch Conference

341.    During the May 12 Bank of America Conference, Papa assured investors once

more that the Company intended to keep pricing "flat to up slightly":

> Obviously it's a competitive market out there.  There is always going to be—in a
> pricing world somebody is going to gain some share, somebody is going to lose
> some share.
>
> I think as a general rule, what I've tried to do with pricing at Perrigo in the eight
> years, nine years, I've been a part of the company is to keep pricing flat to up
> slightly.  And if I do that, I believe that puts me in the best long-term position to
> deliver shareholder value for the Company.
>
> <div align="center">***</div>
>
> [A]nd I think we're just going to certainly try to continue to make good decisions
> on that pricing, because I think as you've seen in our business, we've been able to
> drive some very significant growth, both on the top-line and the bottom-line for
> the company relative to our operating margins in the mid-40%s.

342.    Each of Defendants' statements set forth in ¶ 341 above was materially false or

misleading when made, or omitted material facts necessary to render such statements not

misleading, for the reasons set forth in ¶ 338 above.

### 4.      June 2, 2015 Jefferies Global Healthcare Conference

343.    During the June 2 Jefferies Conference, Papa was asked to comment on Perrigo's

pricing strategy, and again reaffirmed the viability of the Company's "flat to up slightly"

strategy, representing:

> That's what we do on our pricing for our business.  Across all the Perrigo
> segments, the consumer segment, the nutrition segment, the Rx segment and the
> API segment; we try to take a view on pricing across that total portfolio, with a
> goal of keeping our pricing flat to up slightly.
>
> Now in any individual category, like Rx, there may be more upside. But we're
> recognizing that there is going to be some products in Rx that I'm going to have
> to decrease for competitive reasons, as well as increase some.  So what we try to
> do is take a holistic view across that total portfolio, and keep pricing flat to up
> slightly.

<div align="center">117</div>

*** 

I will say, over the last several years to be fair, there's been more pricing upside
in the Rx category than perhaps some of the other categories.  But we still take
that kind of total portfolio view of keeping pricing flat to up slightly as a view.

344.    Each of Defendants' statements set forth in ¶ 343 above was materially false or

misleading when made, or omitted material facts necessary to render such statements not

misleading, for the reasons set forth in ¶ 338 above.

### 5.    August 5, 2015 Earnings Call

345.    During the August 5 Earnings Call, Papa was asked "where we are in this price

increase dynamic and how sustainable you feel like those increases are?"  Papa responded: "On

the generics and the pricing environment, our team has done a great job at looking at pricing . . . .

Across the portfolio we think there are still opportunities to do pricing."  Papa added "we think

we have got a strong Rx business.   And we look to still find some additional pricing

opportunities for the future."

346.    Each of Defendants' statements set forth in ¶ 345 above was materially false or

misleading when made, or omitted material facts necessary to render such statements not

misleading, for the reasons set forth in ¶ 338 above.

### 6.    August 13, 2015 Form 10-K

347.    The 2015 Form 10-K was signed by Brown and falsely stated that the Generic Rx

division "operate[d] in a highly competitive environment" and "face[d] vigorous competition

from other pharmaceutical companies that may threaten the commercial acceptance and pricing

of our products" and further stated that "[t]he market for Rx pharmaceuticals is subject to intense

competition from other generic drug manufacturers."   In addition, Perrigo listed Actavis (a/k/a

Allergan), Glenmark, Mylan, Sandoz, and Taro as among its "generic drug manufacturer

competitors."

348.     Each of Defendants' statements set forth in ¶ 347 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### 7.     September 30, 2015 Meeting with Brown at First Manhattan

349.     On September 30, 2015—less than two weeks after Perrigo formally advised against the Tender Offer—Brown met with Sawyer and certain First Manhattan investment management professionals at First Manhattan's offices in New York.  As Sawyer's report memorializing the meeting reflects, during the meeting, Brown stated that the "Generic RX business is a defensible asset" because "there are few competitors in Perrigo's niche generic topical segments, and there is a high cost of entry due to more stringent requirements for clinical trials."

350.     Each of Defendants' statements set forth in ¶ 349 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### 8.     October 22, 2015 Earnings Call and Presentation

351.     During the October 22 Earnings Call, Defendants Perrigo and Papa made the following materially false or misleading statements in response to an analyst question regarding generic drug pricing:

> Our total strategy for pricing, as I have said I think on numerous calls, is keep pricing flat to up slightly, which means that yes, some products we may attempt to the raise price there, but in other products we're bringing the price down.  So think about us as keeping pricing flat to up slightly as really the way we're going to look at our total portfolio.

> Whether we're talking about any specific product or any specific category or any segment of our business, the overall comment is flat to up slightly for our pricing. And I think that's really the best place for the long, sustainable consistent approach to pricing that we've had in the past and will in the future.

352.    During that same call, Brown told the market that "nearly all of [Perrigo's] revenues are **insulated from the current pricing drama** you see playing out in the pharmaceutical industry today."

353.    Also on October 22, 2015, Perrigo released inflated profit forecasts for calendar years 2015 and 2016.  The October 22 Presentation in which these profit forecasts were published indicated that:

> The directors of Perrigo accept responsibility for the information contained in this presentation.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this presentation is in accordance with the facts and does not omit anything likely to affect the import of such information.

Additionally, Perrigo and Papa indicated that the guidance constituted "profit forecast[s]" under Rule 28.1 of the Irish Takeover Rules.  This statement was intended to, and did, assure investors that the Company had compiled the profit forecasts **and** "the assumptions upon which [they are] based" using "**scrupulous care, accuracy and objectivity by the directors**" as Irish Takeover Rule 28.1 requires.  Perrigo's profit forecasts guided investors to expect adjusted diluted earnings per share (EPS) of $7.65-$7.85 in calendar year 2015, and $9.30-$9.83 in calendar year 2016.  In a letter attempting to justify this inflated model, Perrigo and Papa indicated that they assumed that 2016 net sales for the Generic Rx segment would grow organically in the middle of the 8%-12% guidance they had previously published, and that the competitive environment would not change.

354.    Each of Defendants' statements set forth in ¶¶ 351-53 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### 9.    January 5, 2016 Goldman Sachs Healthcare CEOs Conference

355.    During the January 5 Goldman Sachs Conference, Papa made the following

materially false or misleading statements:

> Number one, our goal – I've been at Perrigo nine years.  My goal in pricing has
> been the same for the nine years: try to keep my pricing flat to up slightly.  Now,
> to be clear, what that means is that I'm taking some products up, and some
> products can be competition and I'm taking them down.  On balance, what I've
> tried to – what I strive very hard to achieve is what I would call pricing flat to up
> slightly.
>
> Now, within a category like let's use the generic Rx products, there may be more
> volatility up or down in products. Certainly there's more than generics than there
> is in my consumer business. My consumer business has very minimal volatility.
> So that's what I've strived to accomplish.
>
> Is there a place now as we sit here today that there's going to be less pricing?  *I
> think the answer really is – I'm a believer in economic theory.  It all comes
> down to supply and demand.* In other words, if there are five players, 10 players
> supplying drug, I can pretty much tell you what the price points are going to be.
> It's going to be your cost of goods plus 10%.  It's going to find its way down to
> that level.
>
> In a case where there's only two or three players, it's – you are going to make
> better margins. And that's why we have purposely tried not to be in the
> commodity generics but to stay in the extended topicals.
>
> Do I think the point of your question is [sic] there going to be more price
> competition in even things like dermatology? Yes, I do because there are some
> people coming in.

356.    Each of Defendants' statements set forth in ¶ 355 above was materially false or

misleading when made, or omitted material facts necessary to render such statements not

misleading, for the reasons set forth in ¶ 338 above.

### 10.    February 18, 2016 Earnings Call

357.    On February 18, 2016, Perrigo announced fourth quarter calendar year results and

held a conference call, in which Defendants Papa and Brown made the following materially false

or misleading statements:

**Brown:** Were you to go through and accumulate the comments we made each quarter throughout calendar 2015 on new products in Rx, new product contributed approximately $121 million over the course of those four quarters. ***And pricing wise, we did see some pressure, give or take, in the total portfolio over the course of the year, approximately 1%.***

**Papa:** And the latter part of your question, it really talks about the pricing dynamics and what we're thinking about and looking at for the future. And I'd say the following. Are there some incremental product competition that we're going to face? The answer is yes.

However, what we've tried to do at the Perrigo Group is not just stay focused only on dermatology. As you know, we've moved into what I would refer to as extended topicals. So those are things beyond just certainly dermatology, but respiratory, nasal, ophthalmic.

And with those product categories – for example, at the end of the year, we'll launch our ProAir product in terms of a meter-dosed inhaler for respiratory –those are the things that are giving us great strength in our Rx category. ***And as we believe, that will give us a very high gross margin and operating margin, certainly as we think about the 2016 and beyond.*** So, we like what we see in terms of our ability to launch these new products and what they mean for gross margins and operating margins.

358. Each of Defendants' statements set forth in ¶ 357 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

**11.  February 25, 2016 Form 10-KT**

359. On February 25, 2016, Perrigo filed a report on Form 10-KT for the fiscal six month stub period ending December 31, 2015 ("2015 Form 10-KT"). The 2015 Form 10-KT was signed by the Defendants Papa, Brown, and Coucke, and falsely stated that, as a manufacturer of generic versions of brand-name drugs, Perrigo "operate[d] in a highly competitive environment" and "face[d] vigorous competition from other pharmaceutical companies that may threaten the commercial acceptance and pricing of our products" and further stated that "[t]he market for Rx products is subject to intense competition from other generic

drug manufacturers."  In addition, Perrigo listed Actavis (a/k/a Allergan), Glenmark, Mylan,

Sandoz, and Taro as among its "generic drug manufacturer competitors."

360.    Each of Defendants' statements set forth in ¶ 359 above was materially false or

misleading when made, or omitted material facts necessary to render such statements not

misleading, for the reasons set forth in ¶ 338 above.

### 12.    May 12, 2016 Earnings Call

361.    On May 12, 2016, Perrigo announced first quarter calendar year 2016 results and

held a conference call ("May 12 Call"), in which Defendants Perrigo and Brown made the

following materially false or misleading statements:

> During the quarter, we experienced 24 competitive launches against our portfolio,
> producing sharp price erosion in a number of topical products we sell. These
> factors, combined with continued pricing pressure due to the consolidation of the
> large buying cooperative groups, and the absence of significant new products in
> the quarter, further impacted our ability to execute on our planned pricing
> strategies.
>
> Despite all of this, however, the team was able to maintain its extended topicals
> leadership position in the quarter. These pricing pressures impacted both the
> adjusted gross and operating margins, accounting for the decline you see here
> year-over-year.

362.    The statements set forth in ¶ 361 above were materially false or misleading or

omitted material facts about the Company's business, operations and growth.  Specifically,

Defendants made materially false and/or misleading statements which had the effect of

concealing, and/or failed to disclose, that Perrigo and several of its pharmaceutical industry peers

engaged in anti-competitive conduct by colluding to fix generic drug prices, as discussed above

in ¶ 338.

### 13.    May 16, 2016 Press Release

363.    On May 16, 2016, Perrigo issued a press release announcing first quarter calendar

year 2016 results, in which it made the materially false or misleading statements, that "the Rx

segment delivered strong margins in an increasingly challenging pricing and competitive environment," and that "[f]irst quarter adjusted operating income of $117 million decreased by 3% compared to the prior year, primarily driven by industry pricing and competitive pressures."

364.    Each of Defendants' statements set forth in ¶ 363 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### 14.    May 16, 2016, August 10, 2016 and November 10, 2016 Forms 10-Q

365.    Also on May 16, 2016, the Company filed a Quarterly Report on Form 10-Q for the first quarter of calendar year 2016 ("May 16 Form 10-Q").  The Quarterly Report was signed by Defendant Brown and falsely stated that the Company had experienced "a recent reduction in pricing expectations in our U.S. businesses from historical patterns, in particular in our Rx segment due to industry and competitive pressures in the sector," which it attributed in part to "competition in specific product categories."

366.    Perrigo's Forms 10-Q for the second and third calendar quarters of 2016, dated August 10, 2016 ("August 10 Form 10-Q") and November 10, 2016 ("November 10 Form 10-Q"), respectively, were also signed by Defendant Brown, and contained substantially similar statements as in ¶ 365, above.

367.    Each of Defendants' statements set forth in ¶¶ 365-66 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### 15.    May 24, 2016 UBS Global Healthcare Conference

368.    On May 24, 2016, Defendant Brown participated in the UBS Global Healthcare Conference and made the following materially false or misleading statements:

So, now, if you're trying to say, of that basket, how much is pressure versus specific pricing initiatives, in some cases, one could say that they're intrinsically linked. What do I mean? We saw a dynamic in Q1 of products being launched against us when we didn't have our product launches right at that time. **So, we saw some competitive pressure.** We'll have our products launching later in the year, but we got the pressure at this point and weren't ready with our own launches at that moment.

Now, you start to say: Okay. **Now, we're seeing a different pricing dynamic for the remainder of the year.** We have some price increases slated over the rest of the calendar year.

How do we feel? Are those really going to happen? Are we going to have some pressure on being able to execute against that tactical plan in our price increases? Will there be challenges? So, is that **directly pricing pressure from the consortia**, or is it really a situation of indirect? And is it our own reticence perhaps to be able to execute on those specific actions?

So, they're linked. So, you think, of the changing guidance, more than half is Rx. And of those changes, **it's linked to the environment**. It's linked to how well we'll be able to execute on those remaining plans because of the environment, as well as some things, the dynamic that happened in Q1 that flows through, obviously, for the rest of the year.

369.   Each of Defendants' statements set forth in ¶ 368 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, for the reasons set forth in ¶ 338 above.

### C.   Statements Containing Perrigo's Financial Guidance

370.   Faced with Mylan's hostile takeover attempt, Defendants issued financial guidance that lacked a reasonable basis and cloaked Perrigo's true financial condition and prospects, as such guidance did not take into account the true value of the Omega acquisition and Perrigo's problems with the Omega integration (set forth in ¶¶ 87-122 above), as well as Perrigo's true exposure to pricing pressures in the generic drug industry (set forth in ¶¶ 123-45 above), thereby misrepresenting Perrigo's involvement in price collusion for generic drugs (set forth in ¶¶ 146-82 above, and the true value of the Tysabri Royalty stream (set forth in ¶¶ 183-99 above). Such financial guidance was also misleading because, at the time it was issued,

Defendants did not disclose specific, material information which, had it been disclosed, would have reasonably called into doubt Perrigo's financial guidance. Having elected to issue financial guidance, Defendants violated their duties to: (i) disclose such specific information so as to render Perrigo's financial guidance not misleading; and (ii) update Perrigo's financial guidance when Defendants became aware of such information. Defendants' financial guidance statements are also material because there is a substantial likelihood that Perrigo shareholders would consider the misrepresented and omitted facts significant in making a decision as to whether to tender their Perrigo shares to Mylan.

371. Finally, Perrigo's financial guidance statements were materially false or misleading when made because: (i) in violation of their representations of compliance with Irish Takeover Rule 19.1, Defendants had not "taken all reasonable care" to ensure that their forecasts were "in accordance with the facts and do[] not omit anything likely to affect the import of such information"; and (ii) Perrigo's profit forecasts for calendar years 2015 and 2016 were not prepared with "scrupulous care, accuracy and objectivity" as required by Irish Takeover Rule 28.1.

372. The materially false or misleading financial guidance statements issued by Defendants are set forth below within ¶¶ 373-87.

### 1. April 21, 2015 Earnings Release

373. In the April 21 Earnings Release, concurrent with Perrigo's rejection of the Mylan Offer, the Company announced its adjusted earnings guidance for 2015 of $7.50 to $8.00 per diluted share. The April 21 Earnings Release was signed by Brown.

374. Moreover, Papa, as the Chairman of the Board, made the following representation, as required by Irish Takeover Rule 19.2:

> The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.

375.    Papa and Perrigo also indicated that the statements constituted "profit forecast[s]" under Irish Takeover Rule 28.1 which declares that "every such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy, and objectivity by the directors of the . . . offeree . . . ."

376.    These statements set forth in ¶¶ 373-75 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶¶ 370-71 above.

## 2.    August 5, 2015 Earnings Release

377.    On August 5, 2015, Perrigo filed with the SEC a Form 8-K announcing second calendar quarter results ("August 5 Earnings Release").  The August 5 Earnings Release was signed by Brown.  Therein, Perrigo and Papa reaffirmed its adjusted earnings guidance for 2015, representing to investors that "[t]he Company continues to expect calendar year 2015 adjusted earnings per diluted share of $7.50 to $8.00."

378.    Moreover, Papa, as the Chairman of the Board, made the following representation, as required by Irish Takeover Rule 19.2:

> The directors of Perrigo accept responsibility for the information contained in this announcement.  To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.

379.    Papa and Perrigo also indicated that the statements constituted "profit forecast[s]" under Irish Takeover Rule 28.1 which declares that "every such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy, and objectivity by the directors of the . . . offeree . . . ."

380.    The statements set forth in ¶¶ 377-79 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶¶ 370-71 above.

### 3.    October 22, 2015 Press Release and Presentation

381.    On October 22, 2015, Perrigo issued a press release on Form 8-K announcing its third quarter 2015 financial results, which was signed by Brown ("October 22 Press Release"). Therein, Perrigo narrowed its guidance for 2015 adjusted earnings to a range between $7.65 and $7.85 per diluted share, and also announced 2016 adjusted earnings guidance of $9.30 per diluted share (or $9.45 per diluted share inclusive of a planned share repurchase plan).

382.    Among other things, Papa reiterated that the Company's "durable business model and *future growth prospects are self-evident* as we continue to deliver value for our shareholders." These representations were repeated in substantial form in the Company's October 22 Presentation.

383.    Moreover, Papa, as the Chairman of the Board, made the following representation within the October 22 Presentation containing Perrigo's financial guidance, as required by Irish Takeover Rule 19.2:

> The directors of Perrigo accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.

384.    Papa and Perrigo also indicated that the statements constituted "profit forecast[s]" under Irish Takeover Rule 28.1 which declares that "every such profit forecast (including the assumptions upon which it is based) shall be compiled with scrupulous care, accuracy, and objectivity by the directors of the . . . offeree . . . ."

385.    In a separate letter to investors required by Irish Takeover Rule 28.1, Perrigo and Papa identified the assumptions they employed to calculate the 2015 and 2016 profit forecasts.

This included the assumption that the *"integration and realization of synergies in relation to the acquisition of Omega Pharma . . . will proceed as planned and will not be subject to unforeseen material delays*."  Perrigo and Papa expressly noted that this "factor[]" is "within the Directors Influence and Control."

386.   The statements in ¶¶ 381-85 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶¶ 370-71 above.  Additionally, the statements in ¶ 381 above were materially false or misleading because the assumptions underlying Perrigo's profit forecasts were not prepared with "scrupulous care, accuracy and objectivity" as required by Irish Takeover Rule 28.1, including the assumption that the Omega integration and synergies "will proceed as planned."

### 4.   January 11, 2016 Earnings Release

387.   On January 11, 2016, Perrigo issued a press release on Form 8-K announcing its updated 2016 full year adjusted earnings guidance.  Specifically, the Company increased its 2016 adjusted earnings guidance from $9.45 per diluted share to a range of $9.50 to $10.10 per diluted share, an increase of 24% to 29% over 2015 adjusted earnings per diluted share guidance range of $7.65 to $7.85.  These statements were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶¶ 370-71 above.

### D.   Statements Concerning the Tysabri Royalty Stream

### 1.   April 29, 2015 Form 10-Q

388.   On April 29, 2015, Perrigo filed its Quarterly Report on Form 10-Q for the quarter ending March 28, 2015, which was signed by Defendants Papa and Brown ("April 29 Form 10-Q").  The April 29 Form 10-Q stated that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  The April 29

Form 10-Q stated that the Tysabri royalty stream was an "intangible asset," and that "[t]he asset's ***value is $5.8 billion***, which is being amortized over a useful life of 20 years."

389.   Each of Defendants' statements set forth in ¶ 388 above was materially false or misleading when made, or omitted material facts necessary to render such statements not misleading, because: (i) the Tysabri royalty stream's value was not $5.8 billion; (ii) Perrigo's financial results reported were not accurate and violated GAAP by improperly accounting for the royalty stream as an intangible asset instead of a financial asset; and (iii) Perrigo failed to disclose the fair market value of the royalty stream, and failed to record mark-to-market changes in that fair market value.  *See* ¶¶ 183-99.  Because Defendants failed to properly account for the Tysabri royalty stream in violation of GAAP, investors were not informed and could not understand that the royalty stream was deteriorating in value, as became apparent in February 2017 when Perrigo was only able to sell the asset for $2.2 billion (or up to $2.85 billion if certain milestones were met).

### 2.    August 13, 2015 Form 10-K

390.   The 2015 Form 10-K referenced GAAP compliance but did not disclose the fair value of the Tysabri royalty stream at the end of the fiscal year; instead, it likewise stated that that the asset had "a value of $5.8 billion and a useful life of 20 years."

391.   The statements in ¶ 390 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above.

### 3.    October 22, 2015 Press Release

392.   On October 22, 2015, Perrigo and the Company's directors, including Papa, issued a press release announcing earnings for the third calendar quarter of 2015 ("October 22 Press Release").  The October 22 Press Release stated:

The directors of Perrigo accept responsibility for the information contained in this announcement. To the best of the knowledge and belief of the directors of Perrigo (who have taken all reasonable care to ensure such is the case), the information contained in this announcement is in accordance with the facts and does not omit anything likely to affect the import of such information.

393.    The statements in ¶ 392 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above, and for the additional reason that Director Papa had not "taken all reasonable care" to ensure that the description of the Tysabri royalty stream was "in accordance with the facts and does not omit anything likely to affect the import of such information."

### 4.      November 2, 2015 Form 10-Q

394.    The November 2 Form 10-Q claimed that its financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')."  The November 2 Form 10-Q did not disclose the fair market value of the Tysabri royalty stream, or update prior statements claiming the asset's value to be $5.8 billion.

395.    The statements in ¶ 394 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above.

### 5.      January 5, 2016 Goldman Sachs Healthcare CEO's Conference

396.    During the January 5 Goldman Sachs Conference, Defendants Perrigo and Papa gave a presentation to investors and were specifically asked about the Tysabri royalty stream:

[<Q>:] Tysabri is -- has -- it gets less play because it's a path of royalty stream, but it's also a very important part of your earnings picture.  I guess a two-part question: what is the strategic rationale of keeping this now?  Obviously, it is important to your earnings, but you could also sell it.

And just curious to get your thoughts on your own internal outlook for Tysabri in light of new competition next year from Roche.  And just looking at consensus estimates, it looks like the Street is modeling growth of about 8% per year. And just wondering how comfortable you are with that.

[**<A - Joseph C. Papa>**:] First and foremost, I'm going to say we think we've got a great partner with Tysabri and Biogen.  And they've just done a great job with the product from day one.  And we are really pleased with what they have done.  And we think there's continued opportunity for more patients to move to what I would refer to as the highly effective category versus the Avadox, Betaseron, Copaxone (inaudible).

So we think the category of highly effective – especially when the introduction of new competition like Roche and other people are promoting is going to just expand that slice of the pie.  So we feel very good about it.

397.     The statements in ¶ 396 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above.

### 6.     February 25, 2016 Form 10-KT

398.     The 2015 Form 10-KT referenced conformity with GAAP but did not disclose the fair market value of the Tysabri royalty stream at the end of the fiscal year; it instead again stated that the asset had "a value of $5.8 billion and a useful life of 20 years."

399.     The statements in ¶ 398 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above.

### 7.     May 12, 2016 Earnings Call

400.     During the May 12 Call, Defendant Perrigo and its new CEO, Hendrickson, conceded that the Tysabri royalty stream was a "financial asset."  Nonetheless, in the earnings press release Perrigo issued on that same day announcing earnings for the first quarter of 2016, Perrigo failed to account for the Tysabri royalty stream as GAAP requires for financial assets, or to disclose its fair market value.

401.     The statements in ¶ 400 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above.  Furthermore, as the Company admits in its restated 10-K and 10-Qs, the fair value of the Tysabri royalty stream actually fell to no more than $5.02 billion as of April 2, 2016, *a decline of $290 million in just three months*.

### 8. May 16, 2016 Form 10-Q

402. The May 16 Form 10-Q claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." Like the earnings announcement four days earlier, the May 16 Form 10-Q failed to account for the Tysabri royalty stream as a financial asset, or disclose its fair market value. Moreover, the May 16 Form 10-Q stated that the royalty stream's "fair value exceeded the carrying value."

403. The statements in ¶ 402 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶¶ 389 and 401 above.

### 9. August 10, 2016 Form 10-Q

404. The August 10 Form 10-Q claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." The August 10 Form 10-Q did not disclose the fair market value of the Tysabri royalty stream at the end of the second quarter of 2016, instead stating that "fair value exceeded the carrying value" at the time.

405. The statements in ¶ 404 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above. Furthermore, as the Company now admits in its restated 10-K and 10-Qs, the fair value of the Tysabri royalty stream *had deteriorated to no more than $4.02 billion as of July 2, 2016, or $1.78 billion less than the $5.8 billion value claimed during the Relevant Period*. As a result, the royalty stream's fair value did not "exceed[] the carrying value."

### 10. November 10, 2016 Form 10-Q

406. The November 10 Form 10-Q claimed that Perrigo's financial statements were "prepared in accordance with U.S. generally accepted accounting principles ('GAAP')." The November 10 Form 10-Q did not disclose the fair market value of the Tysabri royalty stream at

the end of the third quarter of 2016, instead stating that "fair value exceeded the carrying value" at the time.

407.    The statements in ¶ 406 were materially false or misleading and issued without a reasonable basis for the reasons set forth in ¶ 389 above.  Furthermore, as the Company now admits in its restated 10-K and 10-Qs, the fair value of the Tysabri royalty stream **had deteriorated to no more than $3.55 billion as of October 1, 2016, or $2.25 billion less than the $5.8 billion value claimed during the Relevant Period**.  As a result, the royalty stream's fair value did not "exceed[] the carrying value."

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

408.    Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or ultimate authority over Perrigo's and the Individual Defendants' materially false or misleading statements and omissions.  The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V above were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the specific facts alleged above, including in ¶¶ 80-222 regarding Defendants' personal knowledge and/or reckless disregard of the falsity of the materially false misrepresentations and omissions, Defendants' scienter is further evidenced by the following facts:

409.    *First*, Perrigo's sale of OTC products through Omega—which, as the Company represented, provided it access to over thirty additional countries following the acquisition—was the Company's core international operation through the BCH segment during the Relevant Period.  As discussed above (*see* ¶¶ 68-75), Omega comprised almost the entirety of the BCH segment, and OTC sales through Omega's network accounted for nearly all of Perrigo's revenues

and operations within BCH during the Relevant Period.  Moreover, throughout the Relevant Period, Defendants repeatedly identified Omega as the primary driver of Perrigo's growth prospects and standalone value.

410.    The Individual Defendants each had a substantial role in overseeing the Omega integration.  For example, Papa told investors on June 2, 2015: "I had to integrate the Omega organization."  Brown assured investors on June 23, 2015 that Mylan's takeover bid had not "distract[ed]" the integration process for Omega and stated "[t]hat the [integration] team continues to do what their mission is and what they had been scheduled to do" and that she was "off to Belgium" to meet with that team.  Coucke, as General Manager of the BCH segment after the acquisition, was responsible for the management of Omega as a whole.  Astoundingly, Deneubourg specifically informed Ray that Coucke had instructed him in mid-2015 to put integration to the side, despite Perrigo's public representations to the contrary.

411.    Moreover, the Individual Defendants each had access to detailed information concerning Omega, including the numerous material issues that plagued Perrigo's efforts to integrate Omega.  This information was transmitted and learned through regular meetings and other communications, including those with Farrington who, as Perrigo's CIO, was the "specific person that [Papa] had designated in [the] Company who heads up all my integrations" and was responsible for attempting to "successfully integrate Omega," according to CW-1.  Consistent with his designation and subsequent responsibilities, according to CW-1, Farrington made it clear that he met and conversed regularly with Papa, Brown, and Coucke, as well as other Board members and senior members of Papa's team, and was in daily contact with Papa.  In CW-1's words, "if not on speed dial with each other, [they were] pretty darn close."  Ray likewise

understood that Brown met with Farrington at least weekly and was aware of the integration issues and failures.

412.    As detailed above, CIO Farrington was fully aware of the crippling issues with the Omega integration project, holding weekly or bi-weekly meetings with senior members of Perrigo's IT leadership team, mandating weekly reporting from the integration teams, and convening regular conference calls with senior level personnel at both Perrigo and Omega to discuss compliance and regulatory issues relating to data integration. *See, e.g.*, ¶¶ 90, 96, 103-07, 109-10, 112, and 117.  These meetings and calls were attended by and specifically recalled by multiple witnesses, including Ray and CW-1.   Among other specific information that Farrington provided to Papa and other senior members of Perrigo leadership, Farrington confirmed to Ray that he had reported the Omega data migration issues to Papa and sought assistance at the highest levels—from Papa and Perrigo's Board—to remedy those issues. *See* ¶¶ 105, 109-12.  Ray recounted that Farrington told Papa during the summer of 2015 that the migration had not occurred, the project was stalled, and Deneubourg was injured.  Ray further recalled that Farrington had spoken directly with Papa about dedicating funds to hire an assistant for Deneubourg to restart integration.  According to Ray, Farrington told the integration team that he attempted (without success) to make the case for the position several times to Papa during the August 2015 through November 2015 timeframe.  As discussed above, Farrington's request was expressly rejected by Papa and the Board in August 2015 and again in October 2015. *See* ¶¶ 109-12.

413.    In addition to the information that the Individual Defendants received from CIO Farrington on a regular basis, during July and August 2015, Omega's senior-most executives made repeated efforts to report integration issues and pricing concerns to Papa and Brown, who,

in reckless fashion, disregarded and put blinders on to these adverse reports. Furthermore, during quarterly update meetings in the second half of 2015 through early 2016, which were attended by CW-1, slide presentations were made which showed that Omega was struggling and failing to meet its performance goals. *See* ¶ 122. These slides were viewed by Brown and were presented by her to the executive team.

414.   At a minimum, the Individual Defendants were reckless in falsely touting the Company's growth prospects and issuing unrealistic guidance based on Omega without having full transparency into Omega's financial data. *See* ¶¶ 87-122.

415.   ***Second***, Perrigo's production of generic drugs through the Company's Rx segment was also a core operation of the Company during the Relevant Period. During a January 13, 2014 healthcare conference prior to the Relevant Period, Papa represented to investors that "***[our] generic Rx segment, has been a real star for us***." In fiscal year 2015, Rx contributed 22% to Perrigo's consolidated net sales. Analysts covering Perrigo during the Relevant Period identified "intensifying competition and lower pricing" as among the chief risks to Perrigo achieving the analysts' stated price and earnings targets and as the basis for downgrades to Perrigo's common stock ratings. For example, on April 26, 2016, the S&P lowered all of its ratings of Perrigo, explaining that the downgrade reflected our expectation for, among other things, "weakness in Perrigo's high-margin generic pharmaceutical business, largely resulting from intensifying competition and lower pricing," suggesting that the market considered Perrigo's "high-margin generic pharmaceutical business" to be a primary determinant of the Company's bottom line.

416.   Papa and Brown, who, as CEO and CFO, were the Company's senior-most executives, knew that pricing pressures in the generic drug industry were impacting (or were

reasonably likely to impact in the near future) Perrigo's Rx segment. Both Papa and Brown claimed to have personal knowledge of Perrigo's pricing strategy in the Rx segment and the Company's ability to withstand pricing pressures in the generic drug industry. *See* ¶¶ 137-45 above. Moreover, Papa and Brown had access to information concerning, among other things, the increased competition in the U.S. generic drug market and the FDA's ramped-up approval of generic drug applications. Indeed, these Defendants knew the immense regulatory scrutiny was aimed at driving down the price of generic drugs, which had reached unsustainable levels. Throughout the Relevant Period, Perrigo maintained a comprehensive list of competitor companies that had filed ANDAs with the FDA for products that would, if approved, compete with Perrigo's products. *See* ¶¶ 137-45 above. Perrigo was also keenly focused on and monitored the FDA approval process, and thus was aware of when and how drugs would hit the market. *Id.* Papa and Brown therefore had access to information concerning applications in the FDA pipeline for generic drugs that would, once approved, rival Perrigo's stable of generics. At a minimum, the Individual Defendants were reckless in falsely stating that the Company was "insulated" from negative pricing pressures and was keeping pricing "flat to up slightly" despite those pressures.

417.    ***Third***, Perrigo's price collusion with its generic drug rivals exhibited all the hallmarks of fraudulent intent, including:

a)    There were no material increases in demand or production costs or reported supply shortages for Perrigo's generic drugs that would justify or otherwise explain the dramatic and concerted price increases for these drugs and Perrigo's competitors' generic drugs. (¶¶ 29, 156). The more compelling explanation for these price increases is price collusion between Perrigo and its competitors, as evidenced by: (i) the sudden and astronomical nature of the increases; (ii) the fact that the increases occurred in concert with the Company's competitors; and (iii) the fact that the increases typically shortly after the industry conferences or events attended by Perrigo representatives (¶¶ 146-72). Moreover, the price increases operated as a "one-way ratchet": the drug prices never decreased following the

initial price increases to their pre-increase equilibrium price points as one would expect if the sudden price increases reflected temporary supply shortages, cost increases, or other benign market explanations. (¶¶ 29, 146-72).

b)      Price increases of the magnitude alleged herein would have been contrary to Perrigo's economic interest absent an agreement to fix prices. Without the certainty that all of the Co-Conspirators would raise and maintain the prices for their generic drugs, each Co-Conspirator risked getting undercut by the others, leading to a loss of market share and revenue. This risk was alleviated by the Co-Conspirators' agreement to raise and maintain their prices.

c)      Perrigo and the Individual Defendants had a demonstrable motive to fix prices with Perrigo's competitors which derives from the nature of the U.S. generic drug market itself. As discussed above (¶ 126), because federal law requires each generic pharmaceutical to be readily substitutable for another generic of the same brand drug, competition will cause prices to fall until they near generic drugmakers' marginal production costs. This is confirmed by the price movements alleged herein, which show that prior to the alleged price collusion among Perrigo and the Co-Conspirators, the prices of Desonide, Clobetasol, Econazole, Permethrin, Tretinoin, and Halobetasol Propionate had stabilized. (¶¶ 146-72). This stabilization of prices in turn caused Perrigo's profits to level off, thus giving Perrigo and its Co-Conspirators a common motive to conspire to raise prices.

d)      Perrigo and the Company's representatives had substantial opportunities at industry conferences and events to collude on prices. Given the frequency and regularity of these conferences, there is a strong inference that the various participants in the alleged price-fixing schemes were well-acquainted with each other, bolstering the likelihood that these participants entrusted each other to engage in, and jointly conceal, the illicit price-fixing.

e)      As described above (¶¶ 129-31 and 150), the historic rise in generic drug prices before and during the Relevant Period was well publicized. These price increases led Congress to commence an industry-wide investigation beginning in 2014. This Congressional investigation, the subsequent DOJ subpoenas to Perrigo's Co-Conspirators (including Allergan, Mylan and Taro), and the widespread publicity surrounding the price hikes that spawned these investigations, gave rise to a duty to investigate the existence of price collusion and a duty to monitor changes in the Company's generic drug pricing. These duties to investigate and monitor fell upon the Individual Defendants as the Company's senior-most executives who were responsible for signing and attesting to the accuracy of the Company's filings with the SEC and addressing market analysts and the investing public during earnings calls. At a minimum, Perrigo's and the Individual Defendants' false or misleading statements were recklessly made, in dereliction of their duty to investigate perceived anti-competitive behavior and their duty to monitor changes in the pricing of the Company's core products.

f)    The Individual Defendants, who were the Company's senior-most executives, were aware of the historically colossal price increases and the reasons for these increases. The Individual Defendants had access to information concerning these price increases, including the Company's pricing models described above (¶ 173). At a minimum, they were reckless in falsely telling investors that the market for Perrigo's generic drugs was truly competitive without confirming the absence of price collusion.

418.    The fact that the DOJ raided Perrigo's offices in connection with its generic pharmaceutical price-fixing investigation and intervened in three civil antitrust actions against Perrigo after subpoenaing and receiving documents other generic drug manufacturers strongly suggests that federal prosecutors have determined that there is evidence of a criminal conspiracy to fix prices in an anti-competitive manner.

419.    *Fourth*, the Individual Defendants had a palpable motive to engage in the fraudulent conduct alleged herein, namely, to fend off Mylan's Tender Offer and, by extension, to preserve their lucrative jobs at Perrigo. As reported by Bloomberg in a March 7, 2016 article entitled, *Perrigo Paid Executives Bonuses for Fending Off Mylan Offers*, following Perrigo's disclosures in a March 4, 2016 preliminary proxy statement, Papa received additional restricted stock in December 2015 worth $1.5 million at the time and a $500,000 cash bonus. The one-time $2 million payment was made to Papa for his "key contributions related to Mylan's hostile takeover attempt" between April 2015 and November 2015, when Perrigo shareholders rejected the Tender Offer. Brown likewise received stock awards valued at $375,000 and a cash bonus for an equal amount.

420.    *Fifth*, public statements made by the Individual Defendants during the Relevant Period, as well as those made by Papa and Brown during face-to-face meetings with First Manhattan investment management professionals, strongly and plausibly suggest that each had detailed knowledge of or access to the material facts and information misrepresented or concealed by Defendants. The vast majority of Defendants' misrepresentations explicitly or

implicitly pertain to the value (or purported lack thereof) of Mylan's Tender Offer, Omega's performance and prospects, Perrigo's generic drug pricing, or Perrigo's financial guidance; and each of the Individual Defendants made statements and fielded questions regarding these subjects during earnings calls, investor conferences, and private meetings with First Manhattan. In that regard, the Individual Defendants controlled the contents of their statements on behalf of the Company.

421.   *Sixth*, Defendants' intent to issue false or misleading financial guidance is evidenced by, among other things, senior management's knowledge or reckless disregard of internal financial projections that were prepared by the relevant business managers.   For example, as recounted by CW-3 (*see* ¶¶ 116-22 above), Perrigo management rejected a budget projecting EBIT of 9 million euros that CW-3 prepared for Omega Belgium in 2015, overriding CW-3's budget with one that unrealistically called for 24 million euros (i.e., two to three times more EBIT than he had projected).   Defendants' intent is further evidenced by their knowledge of or disregard for the pricing challenges that Perrigo faced in the EU market.   More specifically, according to Ray, Omega executives and sales personnel in Belgium, France, and Germany explained the effect of the pricing challenges caused by EU regulations to Perrigo's U.S. executive management, including Papa, senior management in Ireland, and Board members in the U.S.   *See* ¶¶ 98-101, 106, 111, 114.   According to Ray, however, the Omega sales team felt that executive management and the Board ignored or minimized their warnings because they were more concerned at the time with fending off the Mylan takeover.   Frustration boiled over to the point where some Omega salespeople stopped attending meetings with Perrigo's executive management.   For these reasons and those alleged above (¶¶ 370-71 and 386), Defendants issued false financial projections that lacked a reasonable basis and that the Individual Defendants did

not honestly believe, given the adverse facts regarding the Omega acquisition, the pricing pressures facing Perrigo that were known (but denied) by Defendants, Perrigo's involvement in price collusion, and the deterioration of the Tysabri royalty stream.

422.    During Perrigo's May 12, 2016 earnings conference call reporting a first quarter *net loss* of $133.1 million attributed to an additional $467 million impairment charge relating to the Omega acquisition, the Company's new CEO, Hendrickson, who had just replaced Papa, assured investors that that the Company would target "*realistic*" forecasts going forward—a patent admission that Papa's and the Company's previous forecasts were indefensible and issued without a reasonable basis.

423.    ***Seventh***, Papa, as the Chairman of the Board, was required to and, in fact, did certify pursuant to Rule 19.2 of the Irish Takeover Rules that each took "all reasonable care to ensure that . . . the information contained in [public] document[s] or advertisement[s] [signed by the Director] is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information."  As a result, Papa, in nearly every presentation and press release issued during the Relevant Period through the end of the Mylan Tender Offer, unequivocally assured investors that "the directors of Perrigo accept responsibility for the information contained in [public documents or advertisements]" and that:

> To the best of the[ir] knowledge and belief . . . (having taken all responsible care to ensure that such is the case), the information contained in th[e] [documents or advertisements] is in accordance with the facts and, where appropriate, that it does not omit anything likely to affect the import of such information.

Thus, Perrigo's directors, including Papa, by their own claim that they investigated the factual basis for their assertions, must be charged with knowledge of the true facts misrepresented to and/or concealed from investors.

424.    In addition, with respect to Perrigo's profit forecasts throughout the Relevant Period, Irish Takeover Rule 28.1 requires that "[e]very such profit forecast (including the assumptions upon which it is based) shall be complied with scrupulous care, accuracy and objectivity."  To be sure, Papa, who was at the epicenter of the Mylan Tender Offer, confirmed for investors his personal knowledge of the Irish Takeover Rule mandates, stating on October 22, 2015 that:

> The Irish rules and Irish governance process is very clear . . . . We've had regular communications with the takeover panel.  And they've been very helpful to us. So there's a good process.  We understand it.  **We've been working very closely with the takeover panel to make sure that we follow the rules**.

By failing to employ the "scrupulous care, accuracy and objectivity" required by Irish Takeover Rule 28.1 when issuing profit forecasts for the Company, the Defendants were, at a minimum, reckless in issuing these forecasts.

425.    Notwithstanding Defendants' representations of compliance with the Irish Takeover Rules, the Irish Takeover Panel, the government body responsible for enforcing Irish Takeover Rules, **twice** determined that Perrigo violated Rule 19.3, "Avoidance of Misleading Statements," during the Company's campaign against the Tender Offer.  Specifically, the Panel found that Perrigo made a series of statements describing the Tender Offer that "may **mislead shareholders and the market** or may create uncertainty contrary to Rule 19.3(a) of the . . . Takeover Rules."[17]  The Irish Takeover Panel's rulings were issued in August 2015 and October 2015.

---

[17]  *See* Press Release, Mylan Comments on Misleading Statements Made by Perrigo (Aug. 25, 2015), https://www.sec.gov/Archives/edgar/data/1585364/000119312515301798/d76981d425.htm; Press Release, https://www.sec.gov/Archives/edgar/data/1585364/000158536415000145/a1009201514-d9aattachment.htm.

426.   **Eighth**, as Perrigo's CEO and CFO, Papa and Brown were each provided with, or had access to, copies of the SEC filings alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  As CEO and CFO, both Papa and Brown signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") and Exchange Act Rule 13a-14(a) in connection with Perrigo's Forms 10-Q and Form 10-K filed with the SEC during the Relevant Period.   As signatories of both: (i) the SOX certification representing that "the information contained in th[e] [SEC filings] fairly presents, in all material respects, the financial condition and results of operations of Perrigo"; and (ii) the Rule 13a-14(a) certification representing that the Company's SEC filings did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading," Papa and Brown each had a duty to monitor any conduct or information that threatened to undermine the veracity of these filings, including all material facts concerning the Omega acquisition and the integration of Omega into Perrigo's business, as well as information concerning the Company's product pricing.  As Perrigo's CEO and CFO, Papa's and Brown's knowledge or recklessness is imputed to the Company.

427.   **Ninth**, the terminations and resignations of high-ranking executives, including all three of the Individual Defendants, during or shortly after the revelation of the alleged fraud are further indicia of scienter.

428.   Throughout the Relevant Period, Papa promised an earnings and growth surge for Perrigo that never materialized.  Once it was revealed that his last major acquisition, Omega, the purported centerpiece for such a surge, was, in fact, detrimental to Perrigo's bottom line, he abruptly and unexpectedly resigned.  Jim Cramer, the host of "Mad Money" who outright called

certain of Papa's during statements Relevant Period "*clearly untrue*," likewise questioned Papa's "rapid[]" departure, stating he thought the business was in "more of decline than we realized" when Perrigo "turned down a $200 bid from Mylan" under Papa.

429.    Immediately upon assuming the position of CEO, Perrigo's then-CEO Hendrickson also fired Coucke, Omega's business head, who, like Papa, made a number of false or misleading representations concerning Omega's purported growth and prospects during the Relevant Period.

430.    In July 2016, only three months after Papa's resignation, Boothe, the head of Perrigo's Rx segment which, contrary to Defendants' representations, was harmed by pricing pressures, abruptly left the Company, even though Hendrickson, during the May 12 Earnings Call, had characterized Booth as "the right person to guide the business in this market [i.e., the generic drug market]" amid those admitted pressures.

431.    Within a year's time, Brown likewise abandoned Perrigo's sinking ship, leaving the Company the same day that Perrigo announced it was investigating "historical revenue recognition practices" regarding the Tysabri royalty stream and that the Company could only sell it for $2.2 billion (absent other milestones being reached), *$3 billion less than the value Perrigo had repeatedly reported to investors, which Brown oversaw and approved*.

432.    *Tenth*, the sheer size of the impairments taken by Perrigo in connection with or related to Omega and the Tysabri restatement supports a strong inference of scienter.  In total, Defendants' misrepresentations concerning Omega led to total impairments charge of approximately *$2.3 billion* in 2016, or 50% of the approximately $4.5 billion purchase price for Omega.  This includes a $1.67 billion impairment recorded in third quarter of 2016, plus the $652 million in impairments announced on February 18 and May 12, 2016.  The Tysabri

restatement corrected for over *$1 billion* in net income. The $3.6 billion difference between the market price for the Tysabri royalty, as reflected in its sales price of just $2.2 billion (before *contingent* payments of up to $650 million), and the $5.8 billion value Defendants claimed during the Relevant Period, also strongly supports an inference that Perrigo, Papa, and Brown knew that the Tysabri asset was worth far less than reported to investors.

## VIII. RELIANCE

### A.    Plaintiff Is Entitled to a Presumption of Reliance

433.    At all relevant times, the market for Perrigo common stock was open and efficient for the following reasons, among others: (i) Perrigo common stock met the requirements for listing, and was listed and actively traded on the NYSE under the ticker symbol "PRGO"; (ii) as a registered and regulated issuer of securities, Perrigo filed periodic public reports with the SEC, in addition to the Company's frequent voluntary dissemination of information; (iii) Perrigo regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services; (iv) Perrigo was followed by numerous securities analysts employed by major brokerage firms, including Barclays, UBS, Royal Bank of Canada, and Wells Fargo, who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms and that were publicly available and entered the public marketplace; (v) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Perrigo's common stock; and (vi) without knowledge of the misrepresented or omitted facts, the Assignors purchased or otherwise acquired Perrigo common stock between the time that Perrigo made the material misrepresentations and omissions and the time that the truth was revealed, during which

period the price of Perrigo's common stock was artificially inflated by Defendants' misrepresentations and omissions.

434.    As a result of the foregoing, the market for Perrigo common stock promptly digested current information regarding Perrigo from all publicly available sources and the prices of Perrigo's stock reflected such information.  Based upon the materially false or misleading statements and omissions of material fact alleged herein, Perrigo common stock traded at prices in excess of the true value of Perrigo common stock during the Relevant Period.  The Assignors purchased, acquired, or held Perrigo common stock relying upon the integrity of the market price of Perrigo common stock and other market information relating to Perrigo.

435.    Under these circumstances, the Assignors, as purchasers or acquirers of Perrigo common stock at artificially inflated prices during the Relevant Period or as holders of Perrigo common stock as of the expiration of Mylan's Tender Offer on November 13, 2015, suffered similar injuries and a presumption of reliance under the fraud-on-the-market doctrine applies.

436.    Further, at all relevant times, the Assignors relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  The Assignors would not have purchased, acquired, or held Perrigo common stock at artificially inflated prices if Defendants had disclosed all material information as required.  Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, the Assignors, and by extension Plaintiff, are entitled to a presumption of reliance.

**B.    Plaintiff's Allegations of Direct Reliance**

437.    During the Relevant Period, Plaintiff undertook rigorous, security-specific research in reaching investment decisions concerning Perrigo common stock on behalf of the Assignors for whom Plaintiff was delegated investment discretion through investment advisory

agreements and on whose behalf Plaintiff purchased, otherwise acquired or held Perrigo common stock during the Relevant Period.

438.    As part of its investment analysis, Plaintiff directly relied on information publicly disclosed by Defendants in public filings with the SEC and public statements to investors during the Relevant Period, including the materially false or misleading statements and omissions alleged in Section V above.

439.    Plaintiff also had a series of face-to-face meetings and telephone calls with Defendants beginning in September 2014 and throughout the Relevant Period, during which Plaintiff asked pointed questions of Papa and Brown about the status of the Omega acquisition and the Company's Generic Rx business, among other things, in their efforts to learn about Perrigo and to inform their investment decisions regarding Perrigo common stock.  Plaintiff directly relied on the statements made by Defendants during these meetings and calls as part of its investment decisions on behalf of the Assignors for whom Plaintiff was delegated investment discretion and on whose behalf Plaintiff purchased, otherwise acquired or held Perrigo common stock during the Relevant Period.

440.    In deciding to: (i) hold Perrigo common stock as of the expiration of Mylan's Tender Offer on November 13, 2015 and not to tender the respective shares; and (ii) purchase or acquire Perrigo common stock on the dates set forth on Appendix A hereto, Plaintiff relied on both Defendants' public and private false or misleading statements, set forth in Section V above, as being materially complete and as not omitting material information, including information regarding Perrigo's financial condition, the Omega acquisition, the Company's generic Rx business, and with respect to the Mylan Tender Offer.

441.    Plaintiff did not know—and in the exercise of reasonable diligence, could not have known—that Perrigo's public filings with the SEC and public statements to investors were materially false or misleading representations or materially incomplete when deciding to:  (i) hold Perrigo common stock as of the expiration of Mylan's Tender Offer on November 13, 2015 and not to tender their respective shares; and/or (ii) purchase or acquire Perrigo common stock during the Relevant Period, on behalf of the Assignors referenced in ¶ 437.

442.    Defendants' materially false or misleading representations or omissions of material fact in the Company's public filings with the SEC and public statements to investors and in Defendants' one-on-one communications with First Manhattan had a material influence on, and were a substantial factor in bringing about, Plaintiff's investment decisions with respect to its respective decisions to:  (i) hold Perrigo common stock as of the expiration of Mylan's Tender Offer on November 13, 2015 and not to tender their respective shares; and/or (ii) purchase or acquire Perrigo common stock during the Relevant Period, on behalf of the Assignors referenced in ¶ 437.

443.    In reasonable reliance upon Defendants' materially false or misleading representations or omissions of material fact, Plaintiff purchased or acquired Perrigo common stock at artificially inflated prices on behalf of the Assignors referenced in ¶ 437.

## IX.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

444.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

445.    None of the statements complained of herein were forward-looking statements. Rather, each was a historical statement or statement of purportedly current facts and conditions at the time each statement was made.

446.    To the extent that any of the materially false or misleading statements alleged herein, or any portions thereof, can be construed as forward-looking, such statement were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements or omissions.

447.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading forward-looking statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of Perrigo who knew that the forward-looking statement was false or misleading.

## X.    CAUSES OF ACTION

### COUNT I
### Violation of Section 14(e) of the Exchange Act
### Against All Defendants

448.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against all Defendants pursuant to Section 14(e) of the Exchange Act, 15 U.S.C. § 78n(e).

449.   Section 14(e) provides:

It shall be unlawful for any person to make any untrue statement of material fact or omit any material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer.

450.   Defendants violated Section 14(e) because each made one or more materially false or misleading statements or omissions of material fact in connection with Mylan's Tender Offer, which commenced on September 14, 2015 and expired on November 13, 2015, in violation of their duties to disclose all material facts so as to make their statements true and not misleading.

451.   During the Relevant Period, and while in possession of material adverse, non-public information, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make the materially false or misleading statements and omissions of material fact alleged herein to: (i) knowingly or recklessly deceive the Assignors with respect to Perrigo's operations, business, performance and prospects; (ii) cause the market price of Perrigo common stock to trade above its true value; and (iii) induce the Assignors and a majority of Perrigo shareholders to reject Mylan's Tender Offer, and thereby interfere with the Assignors' opportunity, and deprive  the Assignors of the opportunity, to tender its Perrigo stock in exchange for the combination of cash and Mylan stock offered by Mylan through the Tender Offer.  As a direct and proximate result of Defendants' wrongful conduct, the Assignors suffered damages in connection with its holdings of Perrigo common stock as of the expiration of Mylan's Tender Offer on November 13, 2015 because the Tender Offer, which was in large part defeated as the result of Defendants' material misrepresentations and omissions, would have provided the Assignors with substantially more value than holding Perrigo common stock.  In addition, as the previously misrepresented and/or

concealed material facts eventually emerged, the price of Perrigo common stock substantially declined, further damaging the Assignors.  These declines and the preceding disclosures are set forth above in ¶¶ 35-42 and 223-59.

452.    Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit in violation of Section 14(e).  Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were readily available to them, if not known.

453.    By virtue of the foregoing, Defendants have violated Section 14(e) of the Exchange Act.

## COUNT II
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

454.    Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.  This claim is brought against Defendants pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78(j)(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

455.    During the Relevant Period, Defendants used the means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of the national securities exchanges to make materially false or misleading statements and omissions of material fact alleged herein to: (i) deceive the investing public, including the Assignors; (ii) cause the market price of Perrigo

common stock to trade above its true value; and (iii) cause the Assignors to purchase or otherwise acquire Perrigo common stock at artificially inflated prices that did not reflect the stock's true value during the Relevant Period.  In furtherance of their unlawful scheme, plan, or course of conduct, Defendants took the actions alleged herein.

456.    While in possession of material adverse, non-public information, Defendants, individually and in concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce, the U.S. mails, and the facilities of a national securities exchange: (i) employed devices, schemes, and artifices to defraud; (ii) made false or misleading statements of material fact and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the purchasers of the Company's common stock, including the Assignors, in an effort to maintain artificially high market prices for Perrigo common stock, in violation of Section 10(b) and Rule 10b-5.  Defendants are alleged as primary participants in the wrongful conduct alleged herein.

457.    Defendants acted with knowledge or a reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to disclose such facts, even though such facts were readily available to them, if not known.   Defendants' material misrepresentations and omissions were made knowingly and/or recklessly, for the purpose and effect of concealing the truth with respect to Perrigo's operations, business, performance, and prospects from the investing public and supporting the artificially inflated price of its common stock.

458.    The dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, artificially inflated or maintained artificial inflation

already in the market price of Perrigo common stock during the Relevant Period. Relying directly or indirectly upon the materially false or misleading statements made by Defendants and on the efficiency and integrity of the market in which the Company's common stock trades, and upon the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed by Defendants, the Assignors purchased or otherwise acquired Perrigo common stock during the Relevant Period at artificially inflated prices. As the previously misrepresented and/or concealed material facts eventually emerged, the price of Perrigo common stock substantially declined, causing losses. These declines and the preceding disclosures are set forth above in ¶¶ 35-42 and 223-59.

459.   At the time of the material misrepresentations and omissions alleged herein, the Assignors were ignorant of their falsity and believed them to be true. Had the Assignors known the relevant truth with respect to Perrigo's financial results, operations, business, and prospects, which was misrepresented and/or concealed by Defendants, the Assignors would not have purchased or otherwise acquired Perrigo common stock at the artificially inflated prices that they paid.

460.   By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. As a direct and proximate result of Defendants' wrongful conduct, the Assignors suffered damages in connection with their transactions in the Company's common stock during the Relevant Period.

### COUNT III
**Violation of Section 18 of the Exchange Act**
**Against All Defendants**

461.   Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein. As set forth above, Perrigo made or caused to be made statements in its

Forms 10-K with the SEC which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts.

462.    Perrigo was required to file reports on Form 10-K pursuant to Sections 13(a) and 15(d) the Exchange Act and the rules and regulations promulgated thereunder.

463.    In connection with making the decision to purchase Perrigo common stock on behalf of the Assignors for whom First Manhattan was delegated investment discretion through investment advisory agreements, and as discussed in ¶¶ 437-43 above, Plaintiff specifically read and relied upon the statements made by Defendants in Perrigo's SEC filings including, but not limited to, the Company's statements in those filings set forth above.

464.    Plaintiff reasonably relied upon Perrigo's statements as being materially complete, and as not omitting material information, including information concerning the Omega acquisition, generic drug pricing and the Tysabri royalty stream.  Plaintiff relied upon Perrigo's Form 10-K filings not knowing that they were false or misleading.  In reasonable reliance upon the materially false or misleading statements included in Perrigo's SEC filings, Plaintiff purchased Perrigo common stock at artificially inflated prices on behalf of the Assignors for whom First Manhattan was delegated investment discretion.

465.    When the truth emerged regarding the materially false or misleading statements contained in Perrigo's Form 10-K filings, including statements concerning the Omega acquisition, generic drug pricing, and the Tysabri royalty stream, the price of Perrigo's common stock declined, causing substantial harm to the Assignors, as referenced above in ¶¶ 35-42 and 223-59.

466.     As a direct and proximate result of Perrigo's wrongful conduct, the Assignors suffered damages in connection with their transactions in the Company's common stock during the Relevant Period.

### COUNT IV
**Violation of Section 20(a) of the Exchange Act**
**Against Defendants Papa, Brown, and Coucke**

467.     Plaintiff incorporates by reference and realleges all preceding paragraphs as if fully set forth herein.   This claim is brought against Papa, Brown, and Coucke pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

468.     During the Relevant Period, Papa and Brown were the CEO and the CFO of Perrigo, respectively, and were privy to, and monitored, confidential and proprietary information concerning Perrigo, its business, operations, performance, and future prospects, including its compliance with applicable federal, state, and local laws and regulations.   Coucke was the Executive Vice President and General Manager for BCH segment and the co-founder of Omega. Coucke was therefore responsible for the day-to-day management and controlled and directed the business and activities of Omega.

469.     In these roles, the Individual Defendants had regular access to non-public information about its business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board of Directors and committees thereof, as well as reports and other information provided to them in connection therewith.

470.     Each of the Individual Defendants was a controlling person of Perrigo within the meaning of Section 20(a), as alleged herein.   By virtue of their high-level positions, participation in, and/or awareness of the Company's day-to-day operations and finances, and/or knowledge of

the statements filed by the Company with the SEC and disseminated to the investing public, Papa, Brown, and Coucke each had the power and authority to influence and control, and did influence and control, directly or indirectly, the day-to-day decision-making of the Company, including the content and dissemination of the statements Plaintiff alleges were materially false or misleading and/or omitted material facts.

471.    Papa, Brown, and Coucke were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability and ultimate authority to prevent the issuance of the statements or cause the statements to be corrected.    In particular, Papa, Brown, and Coucke maintained direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had, or are presumed to have had, the power to control or influence the particular public statements or omissions giving rise to the securities violations as alleged herein, and exercised the same.

472.    As set forth above, Defendants violated Section 10(b) and Rule 10b-5, Section 14 and Section 18 of the Exchange Act by their acts and omissions as alleged herein.  By virtue of the Individual Defendants' status as controlling persons and their respective participation in the underlying violations of Section 10(b) and Rule 10b-5, Section 14 and Section 18 of the Exchange Act, Papa, Brown, and Coucke are liable pursuant to Section 20(a).  As a direct and proximate result of Papa's, Brown's, and Coucke's culpable conduct, the Assignors suffered damages in connection with its purchases of the Company's stock during the Relevant Period.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, including:

A.     Awarding compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon, as allowed by law;

B.     Awarding extraordinary, equitable, and/or injunctive relief as permitted by law (including, but not limited to, rescission);

C.     Awarding Plaintiff its costs and expenses incurred in this Action, including reasonable counsel fees and expert fees; and

D.     Awarding such other and further relief as may be just and proper.

## XII.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated:  April 20, 2018                        Respectfully submitted,

                                              *s/ Christopher A. Seeger*
                                              **SEEGER WEISS, LLP**
                                              Christopher A. Seeger
                                              55 Challenger Road
                                              6th Floor
                                              Ridgefield Park, NJ 07660
                                              Telephone:  (973) 639-9100
                                              Facsimile:  (973) 639-9393

                                              **KESSLER TOPAZ**
                                              **MELTZER & CHECK LLP**
                                              Darren J. Check
                                              David Kessler
                                              Matthew L. Mustokoff
                                              Michelle M. Newcomer
                                              Margaret E. Mazzeo
                                              Joshua A. Materese
                                              280 King of Prussia Road
                                              Radnor, PA 19087
                                              Telephone: (610) 667-7706
                                              Facsimile: (610) 667-7056

                                              ***Counsel for Plaintiff First Manhattan Co.***

## CERTIFICATION OF SERVICE

I hereby certify that, on April 20, 2018, service of the Amended Complaint for Violation of the Federal Securities Laws was accomplished pursuant to the court's electronic filing procedures by filing these documents through the ECF system.

Dated: April 20, 2018

*s/ Christopher A. Seeger*

**SEEGER WEISS LLP**
Christopher A. Seeger
55 Challenger Road
6th Floor
Ridgefield Park, NJ 07660
Telephone:  (973) 639-9100
Facsimile:  (973) 639-9393